Supreme Court, U.S.
FILED

081443 MAY 19 2009

OFFICE OF THE CLERK

NO. 08-

In The

# Supreme Court of the United States

*In re* TROY ANTHONY DAVIS, *Petitioner*

## PETITION FOR A WRIT OF HABEAS CORPUS

## CAPITAL CASE

Philip Horton*
Jason Ewart
Danielle Garten
Dominic Vote
ARNOLD & PORTER LLP
555 12th Street, NW
Washington D.C. 20004
(202) 942-5000

Thomas H. Dunn
GEORGIA RESOURCE CENTER
303 Elizabeth Street, NE
Atlanta, Georgia 30307
(404) 222-9202

May 19, 2009

* Counsel of Record

**CAPITAL CASE**

**QUESTIONS PRESENTED**

Mr. Davis' habeas petition presents exceptional circumstances that have sharply divided the courts below. Since Mr. Davis' murder conviction, seven of nine State witnesses have recanted their trial testimony, and several new witnesses have identified or implicated Sylvester "Redd" Coles as the shooter. Despite substantial new evidence of his innocence, no court has ever held a hearing to assess the scores of new witnesses that show Mr. Davis is innocent.

The questions presented are:

1. Whether transfer to the district court for a hearing pursuant to this Court's original habeas jurisdiction is warranted in the exceptional capital case where the petitioner has raised a substantial case of innocence, the lower federal courts refused to address his innocence in his first federal habeas petition and no State or federal court has held an evidentiary hearing to examine his new evidence?

2. When federal courts fail to consider a petitioner's innocence in his first federal habeas petition, does the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") preclude stand-alone innocence claims raised for the first time in a successive habeas petition based on the same evidence the federal courts failed to review in the first petition?

## PARTIES TO THE PROCEEDINGS BELOW

This petition stems from a habeas corpus proceeding in which petitioner, Troy Anthony Davis, was the movant before the United States Court of Appeals for the Eleventh Circuit. Mr. Davis is a prisoner sentenced to death and in the custody of William Terry, Warden of the Georgia Diagnostic and Classification Prison.



## TABLE OF CONTENTS

QUESTIONS PRESENTED .......... i

PARTIES TO THE PROCEEDINGS BELOW .......... ii

TABLE OF AUTHORITIES .......... v

TABLE OF APPENDICES .......... viii

OPINION BELOW .......... 1

STATEMENT OF JURISDICTION .......... 1

RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS .......... 1

STATEMENT OF FACTS .......... 2

REASONS FOR GRANTING THE WRIT .......... 10

I. STATEMENT OF REASONS FOR NOT FILING IN THE DISTRICT COURT .......... 11

II. THE EXCEPTIONAL CIRCUMSTANCES OF THIS CASE WARRANT THE EXERCISE OF THIS COURT'S JURISDICTION .......... 11

A. The Recantations In This Case Are Rare and Exceptional .......... 12

B. Extraordinarily, the Lower Federal Courts Denied Mr. Davis Any "Meaningful Avenue to Avoid a Manifest Injustice" in His First Habeas Petition .......... 16

III. THE COURT OF APPEALS ERRED IN BARRING MR. DAVIS' SECOND PETITION ............................ 16

A. Mr. Davis Diligently Discovered and Presented His New Evidence to the District Court in His First Federal Habeas Proceedings ............................................ 17

B. The Court of Appeals Erred In Holding that Stand-Alone Innocence Claims Can Never Be the Subject of a Second or Successive Petition ..................................... 20

IV. MR. DAVIS' SECOND PETITION MEETS THE REQUIREMENTS OF 28 U.S.C. § 2254 .................... 22

A. Mr. Davis is Entitled to An Evidentiary Hearing .... 22

B. The Georgia Supreme Court's Minimal Factual Findings Deserve No Deference under § 2254 ............ 23

V. EXECUTION OF MR. DAVIS WITHOUT AN EVIDENTIARY HEARING WOULD RAISE SERIOUS CONSTITUTIONAL ISSUES .................... 28

A. The Eighth Amendment Bars the Execution of the Innocent ............................................................ 28

B. An Evidentiary Hearing is Required to Assess Mr. Davis' *Herrera* Claim ............................................ 31

CONCLUSION ............................................................ 32



## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Smith*, 2009 WL 426261 (6th Cir. 2009) ........ 13

*Amrine v. Bowersox*, 128 F.3d 1222 (8th Cir. 1997) ............ 14

*Bousley v. U.S.*, 523 U.S. 614 (1998) ................................. 18

*Bryan v. Mullin*, 335 F.3d 1207 (10th Cir. 2003) ................ 24

*Calderon v. Thompson*, 523 U.S. 538 (1998) ....................... 20

*Clisby v. Jones*, 960 F.2d 925 (11th Cir.1992) ..................... 18

*Davis v. Terry*, 465 F.3d 1249 (11th Cir. 2006) .................. 18

*Dixon v. Snyder*, 266 F.3d 693 (7th Cir. 2001)..................... 14

*Dobbert v. Wainwright*, 468 U.S. 1231 (1984)...................... 12

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) ........ 13

*Ex parte Fahey*, 332 U.2. 258 (1947) .................................. 10

*Felker v. Turpin*, 518 U.S. 651 (1996)........................... 10, 17

*Ford v. Wainwright*, 477 U.S. 399 (1986) ........................... 31

*Haouari v. U.S.*, 510 F.3d 350 (2d. Cir 2007) ..................... 13

*Herrera v. Collins*, 506 U.S. 390 (1993) ....................... passim

*House v. Bell*, 547 U.S. 518 (2007) ..................................... 28

*Imbler v. Craven*, 298 F.Supp. 795 (D.C. Cal. 1969)........... 14

*In Re McDonald*, 514 F.3d 539 (6th Cir. 2008) .............. 13, 14

*In re Michael*, 326 U.S. 224 (1945) .......... 12

*In re Vial*, 115 F.3d 1192 (4th Cir. 1997) .......... 20

*In re Williams*, 330 F.3d 277 (4th Cir. 2003) .......... 20

*Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008) .......... 29

*Miller-El v. Dretke*, 545 U.S. 231 (2005) .......... 24

*Nunes v. Mueller*, 350 F.3d 1045 (9th Cir. 2003) .......... 24

*Panetti v. Quarterman*, 127 S. Ct. 2842 (2007).. 19, 22, 31, 32

*Rhines v. Weber*, 544 U.S. 269 (2005) .......... 19

*Rolan v. Vaughn*, 445 F.3d 671 (3d Cir. 2006) .......... 25

*Schlup v. Delo*, 513 U.S. 298 (1995) .......... 16, 18, 19, 22

*Simpson v. Norris*, 490 F.3d 1029 (8th Cir. 2007) .......... 25

*Slack v. McDaniel*, 529 U.S. 473 (2000) .......... 22

*Smith v. Baldwin*, 510 F.3d 1127 (9th Cir. 2007) .......... 13

*Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005) .......... 13

*State ex rel Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003) .......... 14

*Stewart v. Martinez-Villareal*, 523 U.S. 637 (1998) .......... 22

*Teti v. Bender*, 507 F.3d 50 (1st Cir. 2007) .......... 25

*Townsend v. Sain*, 372 U.S. 293 (1963) .......... 23

*U.S. v. Calles*, 271 Fed. Appx. 931 (11th Cir. 2008) .......... 13



*Valdez v. Cockrell*, 274 F.3d 941 (2001) .......... 25

*Williams v. Taylor*, 529 U.S. 420 (2000) .......... 23

*Wolfe v. Johnson*, -- F.3d --, 2009 WL 1272651 (4th Cir. 2009) .......... 13

**Congressional History**

141 Cong.Rec. S7803-01 (1995) .......... 21

142 Cong.Rec. H3305 (1996) .......... 21

H.R. CONF. REP. 104-518 (1996), *reprinted in* U.S.C.C.A.N. 944. .......... 21

**Statutes**

28 U.S.C. § 2241 .......... 1, 1[illegible]

28 U.S.C. § 2242 .......... 11

28 U.S.C. § 2244(b) .......... passim

28 U.S.C. § 2254 .......... passim

GA. CODE ANN. § 16-10-70(b) .......... 1[illegible]

## TABLE OF APPENDICES

APPENDIX A -- MAJORITY AND DISSENTING OPINIONS OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT DENYING PERMISSION TO FILE A SUCCESSIVE HABEAS PETITION DATED MARCH 16, 2009 ................................1a

APPENDIX B -- MAJORITY AND DISSENTING OPINIONS OF THE SUPREME COURT OF GEORGIA DATED MARCH 17, 2008 ..............................38a

APPENDIX C -- ORDER DENYING EXTRAORDINARY MOTION FOR NEW TRIAL AND MOTION FOR STAY OF EXECUTION BY THE SUPERIOR COURT OF CHATHAM COUNTY DATED JULY 13, 2007 ........................................................57a

APPENDIX D - 28 U.S.C. § 2241 ......................................64a

APPENDIX E - 28 U.S.C. § 2244 ......................................66a

APPENDIX F - 28 U.S.C. § 2254 ......................................69a

EXHIBITS 1-35



## PETITION FOR A WRIT OF HABEAS CORPUS

Petitioner Troy Davis respectfully requests that this Court transfer for hearing and determination his application for habeas corpus to the district court in accordance with its authority under 28 U.S.C. § 2241(b).

## OPINION BELOW

The opinion of the Unites States Court of Appeals for the Eleventh Circuit is published at *In re Davis*, --- F.3d ----, 2009 WL 1025712 (11th Cir. 2009) and attached at Appendix A.

## STATEMENT OF JURISDICTION

The order of the court of appeals denying authorization to file a successive petition was entered on April 16, 2009. This Court's jurisdiction is invoked pursuant to 28 U.S.C. §§ 2241, 2254(a), 1651(a) and Article III of the U.S. Constitution.

## RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

**The Fourteenth Amendment of the United States Constitution** states, in relevant part: "Nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ."

**The Eighth Amendment of the United States Constitution** states, in relevant part: "nor cruel and unusual punishments inflicted."

**28 U.S.C. § 2241 (2009):** Appendix D.

**28 U.S.C. § 2244 (2009):** Appendix E

**28 U.S.C. § 2254 (2009):** Appendix F

## STATEMENT OF FACTS

Since Mr. Davis' trial, evidence has surfaced that shows not only that Troy Davis is innocent, but that Sylvester "Redd" Coles murdered Officer MacPhail. Seven of the State's key witnesses against Mr. Davis have recanted their testimony. Moreover, new witnesses implicate Redd Coles as the man who murdered Officer MacPhail. No court has held an evidentiary hearing to assess Mr. Davis' new evidence.

In the early morning hours of August 19, 1989, Officer Mark MacPhail was murdered in a parking lot in Savannah, Georgia. Redd Coles – consistent with his reputation in the neighborhood – verbally harassed and chased Larry Young to a nearby Burger King parking lot where Officer MacPhail was working as on off-duty security guard. *See* T. at 798-99, 902-03. Troy Davis and Darrell Collins heard the commotion and silently followed the scuffle. In the parking lot, Redd Coles dug into his pants for a gun and threatened the retreating Young by stating: "you don't know me, don't walk away from me, I'll shoot you." T. at 799, 825, 845, 878-880. Mr. Davis approached Coles and Young to break up the fight when Young was struck on the head with a pistol. T. at 799, 825, 845, 878-880. In severe pain, Young yelled for help. Officer MacPhail responded and was shot dead with a .38 caliber revolver.

An hour before Officer MacPhail was killed, Michael Cooper was shot when the car in which he was riding came under fire in Savannah's Cloverdale neighborhood. Redd Coles and Troy Davis both were attending a party near the car shooting in Cloverdale. T. at 1364; *see also* Exhibit 23



(affidavit of April Hester at ¶ 2). Unlike Mr. Davis, Coles was a close neighbor to three of the car passengers who were fired upon. Coles and one of the car passengers engaged in a heated argument after the shootings. Redd Coles' sister, Valerie Gordon, told the police and testified that Coles and Joseph Blige, who was hanging out the window of the car immediately before Cooper was shot, quarreled and Blige exclaimed to Redd Coles "I thought y'all were trying to kill me," implying that Blige thought Coles had shot at him in the car. *See* Exhibit 19 at 5; T. at 1171-72.

One shell casing found by a homeless man near where Coles lived and Officer MacPhail was killed matched casings found near where the car shooting occurred. T. at 1268, 1294. The shell casings were fired from a .38 caliber revolver. *Id.* After searching Mr. Davis home, police never found any weapons or ammunition. *See* T. at 1292.

After initially denying it, Redd Coles was ultimately forced to admit that he was carrying a .38 caliber revolver on the night of the shootings. T. at 927. Coles was never able to produce the revolver for ballistics testing. T. at 931. New evidence shows that, contrary to his trial testimony, Coles hid his gun in an abandoned house shortly after the murder. *See* Exhibit 22. (affidavit of Tonya Johnson). The murder weapon was never found.

After a highly-visible police canvass of Coles' neighborhood, Redd Coles approached the police with his attorney to save himself and point the finger at Troy Davis. T. at 1313. Coles never mentioned that he was carrying a .38 caliber revolver, nor did he describe the clothing he was wearing that evening. *See* Exhibit 12 (8/18/1989 police statement of Redd Coles); T. at 1331.

Within an hour of Coles' visit to the police station, Detective Ramsey obtained an arrest warrant for Mr. Davis. T. at 1321. Before the detective learned that Coles had a .38 revolver, questioned Coles about his clothing or showed a

photo array to any of the eyewitnesses to the MacPhail murder, Detective Ramsey's superiors held a press conference, released Mr. Davis name and picture to the press and began a highly-publicized, city-wide campaign against Mr. Davis. *See* Trial Exhibit 1.

Only hours after the shooting, Detective Ramsey assembled a photo array that included Mr. Davis' picture, but no picture of Coles. T. at 1315. Detective Ramsey, however, did not show the photo array to any eyewitness to the MacPhail until at least five days after the shooting. T. at 1319-20.

In the interim, Mr. Davis's picture – the same picture used in the witness photo array – appeared on television and on wanted posters near where the eyewitnesses lived and worked. *Compare* Exhibit 20 *with* 21; *see also* Trial Exhibit 1. Several other pictures of Mr. Davis appeared on the front page of the Savannah Evening News and in nightly news coverage. On August 21, 1989 - two days after the shooting - Mr. Davis' picture appeared in the paper under the headline: "POLICE PUSH HUNT FOR KILLER." Video of Mr. Davis surrendering to police was widely covered by all outlets of the Savannah media before any eyewitness was shown a photo array. *See* Trial Exhibit 1.

After five days of media coverage in which the police made a high profile, public commitment to the theory that Troy Davis was the shooter, investigators learned Coles was carrying a .38 caliber gun on the night of the shootings. T. at 931; 1331. When confronted, Coles admitted carrying the weapon but could not produce it for ballistics testing. *Id.* Nevertheless, the detectives never searched Coles' house or car for the murder weapon (T. at 937) and never included Coles' picture in witness photo spreads (T. at 1327-28).

On the day of Coles' revelation that he was carrying a .38 revolver, Detective Ramsey assembled three State eyewitnesses in a crime scene "reenactment" and allowed



Redd Coles to play the role of an innocent bystander. T. at 1324-25. Further, Coles was allowed to hear the witness recollections of the clothes the shooter was wearing. T. at 1327. Only after the reenactment, did Coles tell the police that he was wearing a yellow shirt – the color reenactment witnesses remembered the innocent bystander was wearing – but claimed he had given the shirt to Mr. Davis after the shooting. *See* Exhibit 12 (8/28/1989 transcript of interview with Coles). Coles' sister helped verify his story when she was interviewed 3 days later. T. at 1318. After the reenactment, Coles repeatedly claimed he was wearing the yellow shirt on the night of the shooting.

The State presented nine witnesses who testified against Mr. Davis. Seven of those witnesses have now recanted their testimony.

<u>Dorothy Ferrell</u> has clearly disavowed her identification of Mr. Davis by stating in her 2000 affidavit that she saw nothing and testified falsely. Exhibit 1. Ferrell, who was standing at least 160 feet away from the dark parking lot when the shooting occurred, explained that she felt compelled to identify Mr. Davis because she was on parole. *Id.* Ferrell further explains that Detective Ramsey showed her only one photograph and intimated that she "should say that Troy Davis was the one who shot the officer like the other witness had." *See id.*

Portions of trial record support Ferrell's recantation. In her affidavit, Ferrell recounts that she told a friend that she had testified falsely and the friend called Mr. Davis' trial counsel to report her perjury. *Id.* Indeed, the trial record shows that soon after Ms. Ferrell testified, Mr. Barker's wife received a call stating Ms. Ferrell lied at trial because the district attorney had promised to help her while she was in jail. T. at 1476. Soon after, the district attorney disclosed a letter (Exhibit 2) he received from Ms. Ferrell before trial. The letter from Ferrell asks for the district attorney's help getting out of jail. No one else knew about the request made

in the letter but Ferrell, the district attorney and the caller. Thus, there is credible evidence in the record that Ferrell recanted to a friend immediately after she testified.

Darrell Collins has recanted his trial testimony in clear and certain terms. At trial, Collins told the jury that Mr. Davis assaulted Larry Young in the Burger King parking lot. T. at 1123. In his 2002 affidavit, however, Darrell Collins renounced his trial testimony and stated instead that: "I never saw Troy hit or slap the man that Redd was arguing with . . . . I remember that I told the jury that Troy hit the man that Redd was arguing with. That is not true. I never saw Troy do anything to the man . . . ." Exhibit 3. Consistent with several other affidavits and testimony at trial, Collins' affidavit describes a harsh interrogation in which police threatened the 16 year-old with jail time if he did not parrot the story Coles had reported to Detective Ramsey.

Larry Young hesitantly implicated Mr. Davis as his attacker at trial. In his 2002 affidavit, however, Young admitted that at the time of the incident he could not remember "what different people were wearing . . . [and] just couldn't tell who did what." Indeed, he stated, "I never have been able to make sense of what happened that night. It's as much a blur now as it was then." Exhibit 5. Young explained that he had been drinking and had sustained a massive head injury from the brutal assault on the night of the shooting. *Id.* Young's recantation is not surprising in light of the fact that he initially confused Mr. Davis and Redd Coles when asked to identify who he was arguing with. See T. at 805, 831, 835.

Antoine Williams has clearly recanted his identification of Mr. Davis by stating that he had "no idea what the shooter looked like" and "couldn't really tell what was going on because he had the two darkest shades of tint that you could possibly have on the windows of [his] car" when the shooting occurred. Exhibit 4. Williams' recantation is not surprising considering he (1) saw Mr. Davis' picture (the same picture used in the photo array) on a



wanted poster before he was show the photo array (T. at 971); and (2) at trial, Williams identified Mr. Davis but admitted that he was only 60% sure when he was shown a photo array 5 days after the shooting. T. at 970.

Harriet Murray's affidavit clearly describes Redd Coles, not Troy Davis, as the shooter by Coles' self-confessed, belligerent actions toward Larry Young. Murray's affidavit is convincing in that it is consistent with both her initial police statement (taken 2 hours after the shooting) and her preliminary hearing testimony (given 3 weeks after the shooting). *Compare* Exhibit 8 *with* 10; PH at 70-71; *see also* P.H. at 8-9, 31-32, 33-34; T. at 799, 823, 902, 904, 906, 1422 (Coles description of his actions toward Young). Moreover, Murray identified Mr. Davis by process of elimination when she was shown a Coles-free photo array immediately after Detective Ramsey had Murray, Coles, Collins and Young "reenact" the shooting with Coles playing the innocent bystander. T. at 1324-25. According to Ms. Murray's August 24, 1989 police statement, she picked Mr. Davis' picture after the reenactment because Mr. Davis was "the only one left."

Kevin McQueen has clearly admitted that his testimony was a complete fabrication. McQueen testified at Mr. Davis' trial that Troy had confessed to him in the Chatham County jail. McQueen had been a "snitch" in other prosecutions (T. at 1228), and his version of Troy's "confession" differed wildly from established facts (*e.g.*, Mr. Davis was eating breakfast at the Burger King in the morning when a drug deal went bad). *See* T. 1227. McQueen subsequently admitted, "[t]he truth is that Troy never confessed to me or talked to me about the shooting of the police officer. I made up the confession from information I had heard on TV. and from other inmate's talk about the crimes. Troy did not tell me any of this." Exhibit 6.

Jeffrey Sapp has clearly recanted his testimony in full. Sapp testified at trial that the day after the shooting Mr. Davis confessed to him that he assaulted Larry Young and shot

Officer MacPhail. T. at 1249-52, 1259. Sapp explains that his false testimony was the result of police pressure. Similar to Darrell Collins' interrogation, Sapp's affidavit states that "the police came to me and talked to me and put a lot of pressure on me to say 'Troy said this' or 'Troy said that.' They wanted me to tell them that Troy confessed to me about killing that officer. The thing is, Troy never told me anything about it. I got tired of them harassing me, and they made it clear that the only way they would leave me alone is if I told them what they wanted to hear." Exhibit 7.

The only remnants of the State's case against Troy Davis are the self-serving testimony of Redd Coles and Steven Sanders' dubious courtroom identification of Mr. Davis. Four hours after the shooting, Sanders told the police "I wouldn't recognize [the assailant or the other two men] again except for their clothes." Exhibit 11 at 2. Two years after the incident and one day after seeing Troy Davis' picture in the newspaper, Sanders identified Troy as the assailant for the first time in the courtroom. T. at 984-985.

The overwhelming evidence now shows that Redd Coles shot Officer MacPhail. Gary Hargrove, who knew Redd Coles well, places Coles by name in the position of the shooter when the shots were fired. *Compare* Exhibit 16. *with* PH at 83; T. at 849-50. Hargrove's affidavit supports trial testimony from Joseph Washington, who identified Coles as the shooter. *See* T. at 1343.

Since trial, Redd Coles has admitted to four separate friends and family that he — not Troy Davis — murdered Officer MacPhail.

Benjamin Gordon, who is a member of Coles' family, has sworn that Coles confessed to him. In his 2008 affidavit, Benjamin Gordon recounts that he had a conversation with Coles in 1995 or 1996 about the murder of Officer MacPhail. Exhibit 13. In response to the conversation about the MacPhail shooting, Coles confessed that he "shouldn't have



done that shot. That shot was [expletive deleted] up." *Id.* Gordon recounts that Coles then began to cry. *Id.*

Anthony Hargrove, a long-time friend of Redd Coles, heard Coles admit to killing an officer and letting a man named "Troy" take the fall for it. Exhibit 16. Redd Coles, according to Hargrove, had a "nasty temper" and often carried a gun. Hargrove has seen Coles use the gun to pistol-whip and shoot those with whom he got into altercations. *Id.*

Shirley Riley, another friend of Coles, heard Redd Coles admit he "did shoot the officer . . . but he said it was an accident." Exhibit 17. Redd told Riley that he had shot MacPhail after he had been drinking. *Id.*

Darold Taylor stated that he heard Coles admit to shooting Officer MacPhail. Exhibit 18. Taylor , who was a friend of Coles, asked Coles if the rumors that he had shot MacPhail were true. Coles admitted that he had killed the officer, but told Taylor to stay out of his business. *Id.*

**A. The Court of Appeals Decision**

On March 16, 2009 a divided panel of the court of appeals denied Mr. Davis permission to file a second habeas petition asserting a stand-alone innocence claim in the district court. The lower court held that Mr. Davis "failed to meet the procedural requirements of 28 U.S.C. § 2244(b)(2)." Appendix A at 8a. Specifically, it held that stand-alone innocence claims pursuant to this Court's opinion in *Herrera v. Collins* could never be the subject of a second or successive petition. Second, it held that under § 2244(b)(2)(B)(i), Mr. Davis should have supplemented his *Schlup* innocence claim with a *Herrera* innocence claim.

The dissent found that "[t]o execute Davis, in the face of a significant amount of proffered evidence that may establish his actual innocence, is unconscionable and unconstitutional." *Id.* at 26a. Mr. Davis' case does "not fit neatly into the

narrow procedural confines delimited by AEDPA. But it is precisely this type of occasion that warrants judicial intervention." The dissent disagreed with the majority's view that AEDPA's procedural bars should be read to preclude Mr. Davis' case. *Id.* at 31a.

## REASONS FOR GRANTING THE WRIT

This Court's power to grant an extraordinary writ is very broad but reserved for exceptional cases in which "appeal is a clearly inadequate remedy." *Ex parte Fahey*, 332 U.2. 258, 260 (1947). Title 28 U.S.C. 2244(b)(3)(E) prevents this Court from reviewing the court of appeals' order denying Mr. Davis leave to file a second habeas petition by appeal or writ of certiorari. The provision, however, has not repealed this Court's authority to entertain original habeas petitions, *Felker v. Turpin*, 518 U.S. 651, 660 (1996), nor has it disallowed this Court from "transferring the application for hearing and determination" to the district court pursuant to 28 U.S.C. § 2241(b).

Rule 20 of this Court requires a petitioner seeking a writ of habeas corpus demonstrate that (1) "adequate relief cannot be obtained in any other form or in any other court;" (2) "exceptional circumstances warrant the exercise of this power;" and (3) "the writ will be in aid of the Court's appellate jurisdiction." Further, this Court's authority to grant relief is limited by 28 U.S.C. § 2254, and any considerations of a second petition must be "inform[ed]" by 28 U.S.C. § 2244(b). *See Felker*, 518 U.S. at 662-63.

Mr. Davis' last hope for an evidentiary hearing to prove his innocence lies with this Court. His case presents exceptional circumstances that warrant exercise of this Court's discretionary powers.



## I. STATEMENT OF REASONS FOR NOT FILING IN THE DISTRICT COURT

As required by Rule 20.4 and 28 U.S.C. §§ 2241 and 2242, Mr. Davis states that he has not applied to the district court because the circuit court prohibited such an application. *See* Appendix A. Mr. Davis exhausted his State remedies for his stand-alone innocence claim when a sharply-divided Georgia Supreme Court denied his Extraordinary Motion for New Trial and an evidentiary hearing on March 17, 2008 (Appendix B) and the Georgia Board of Pardons and Paroles denied his application for clemency on September 12, 2008. Since Mr. Davis exhausted his State remedies and was denied permission by the court of appeals to file a second habeas petition, he cannot obtain relief in any other form or any other court.

## II. THE EXCEPTIONAL CIRCUMSTANCES OF THIS CASE WARRANT THE EXERCISE OF THIS COURT'S JURISDICTION

The courts that have reviewed Mr. Davis' innocence case have been sharply divided. Nevertheless, the bare majority of the court of appeals and Georgia Supreme Court denied Mr. Davis relief without a hearing based on the oft-cited rule that recantations are "inherently suspect." Mr. Davis' new evidence, however, is an exception to that rule.

Few - if any - recantation cases involve consistent, multiple recantations from State witnesses who were innocent bystanders to the crime. Moreover, recantations from innocent bystanders are even more rare in States such as Georgia where the penalty for perjury in a capital case is a mandatory life sentence.

### A. The Recantations In This Case Are Rare and Exceptional

This Court has held that "[a]ll perjured relevant testimony is at war with justice, since it may produce a judgment not resting on truth." *In re Michael*, 326 U.S. 224, 227 (1945). A study of federal habeas case law reveals no case in which seven State witnesses have recanted their testimony, much less a case with seven recantations supplemented by four confessions from the alternative suspect. Moreover, the recantations presented to this Court are of the rare variety: recantations from State witnesses who were innocent bystanders.

The outcomes of federal habeas recantation cases usually - if not invariably - hinge on the recanting witness' relationship to the defendant and the materiality of the recantation. Federal courts have found that recantations are "viewed with great suspicion" because they are often "given for suspect motives" and do not serve to "undermine the accuracy of the conviction." *See Dobbert v. Wainwright*, 468 U.S. 1231 (1984) (Brennan, J., *dissenting* to denial of a motion for stay of execution based on a single recantation from petitioner's son). However, an exhaustive review of federal habeas cases in the past ten years shows that almost all recantation cases summarily rejected without an



evidentiary hearing involved recantations from defendant's accomplice or a family member.[1] This is not such a case.

Recantations by innocent bystanders with no relation to the defendant are rare. Indeed, when innocent bystander witnesses recant their testimony, federal courts have often granted an evidentiary hearing or, in many instances, habeas relief. *See, e.g., Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) (habeas relief granted on second habeas petition based on recantation of State witness-victim); *Alexander v. Smith*, 2009 WL 426261 at *8 (6th Cir. 2009) (hearing held to examine recantation of fellow inmate); *In Re McDonald*, 514 F.3d. 539, 547 (6th Cir. 2008) (single recantation of State witness who knew defendant sufficient for §2244 permission to file successive habeas petition); *Souter v. Jones*, 395 F.3d 577, 592 (6th Cir. 2005) (finding actual innocence based on recantations of 2 of 3 State forensic experts); *Dixon v. Snyder*,

---

[1] Under certain circumstances courts have nevertheless suggested that a hearing may be appropriate where the recantation was made by an accomplice. *See Wolfe v. Johnson*, -- F.3d --, 2009 WL 1272651 at *25 (4th Cir. 2009). However, recantations by accomplices or family members are generally viewed with skepticism. *See, e.g., U.S. v. Calles*, 271 Fed. Appx. 931 (11th Cir. 2008) (denying motion for new trial based on recantation of defendant's brother who, because he was defendant's brother "had a motive to lie"); *Haouari v. U.S.*, 510 F.3d 350 (2d. Cir 2007) (denying successive habeas petition based on recantation of co-defendant, finding recantations are more suspicious "when, as here, the recanting witness is one who was involved in the same criminal scheme and, having received the benefit of his cooperation agreement, now sits in jail with nothing to lose by recanting"); *Smith v. Baldwin*, 510 F.3d 1127, 1142 (9th Cir. 2007) (en banc) (overturning panel to deny habeas relief because defendant was not actually innocent based on recantation of accomplice who "thought he could recant, and possibly help his partner in crime, without any personal consequences"); *U.S. v. Jasin*, 280 F.3d 355 (3d Cir. 2002) ("Courts generally consider exculpatory testimony offered by codefendants after they have been sentenced to be inherently suspect.").

266 F.3d 693, 704-705 (7th Cir. 2001) (granting habeas relief on trial recantation of bystander witness); *Amrine v. Bowersox*, 128 F.3d 1222 (8th Cir. 1997) (en banc) (remand for evidentiary hearing as a result of three recantations from State eyewitnesses who were bystanders); *see also State ex rel Amrine v. Roper*, 102 S.W.3d 541 (Mo. 2003) (granting habeas relief); *Imbler v. Craven*, 298 F. Supp. 795 (D.C. Cal. 1969) (habeas relief granted on recantation of passer-by eyewitness).

In *McDonald*, for example, the Sixth Circuit recently held that a second habeas petition was appropriate where a single innocent bystander witness recanted, explaining that "given the lack of direct evidence linking [the defendant] to the underlying crimes, [the affiant's] recanting of her trial testimony looms large." 514 F.3d. at 547.

Moreover, State perjury laws have made recantations by innocent bystanders even more rare in Georgia. Georgia law provides harsh penalties for perjury, especially in capital cases. *See* GA. CODE ANN. § 16-10-70(b) ("A person convicted of the offense of perjury that was a cause of another's being punished by death shall be punished by life imprisonment."). An exhaustive search of Georgia Extraordinary Motion for New Trial cases shows that recantations invariably come from accomplices who had little to lose after their own convictions or family members (or close relations) of the defendant who had the inclination risk a perjury charge for a loved one.

The recanting witnesses in this case are not accomplices or family members. Recanting witnesses Larry Young, Dorothy Ferrell, Antoine Williams, Kevin McQueen and Harriet Murray have no connection to Mr. Davis and nothing to gain from their recantations. These witnesses were merely present at the scene because they lived or worked



adjacent to the parking lot in which Officer MacPhail was killed.

In *Herrera v. Collins* this court denied habeas relief because petitioner's new evidence failed to show he was innocent. 506 U.S. 390, 396 (1993). The contrast between the evidence in *Herrera* and Mr. Davis' petition could not be more stark. Herrera pled guilty to one of the two murders for which he was convicted, left his bloody social security card at the scene of the murder, was identified by two police officers as the shooter and -- when he was arrested -- was found with the victim's blood on his clothes and a handwritten confession in his pocket. *Id.* at 394. In an attempt to prove his innocence, Herrera offered only affidavits from family members and their associates attempting to show that Herrera's brother, who had died seven years earlier, had confessed to the crime. *Id.* at 396-97. The Court emphasized that the affidavits were inconsistent and failed to undercut the strong physical evidence tying Herrera to the murders. *Id.* at 418.

In contrast, Mr. Davis' new evidence eviscerates the State's case against him. Seven of the State's witnesses have recanted their testimony in a fashion consistent with both the record and the recantations of other witnesses. These recanted witnesses included five innocent bystanders who have no connection with Mr. Davis and can only suffer under the laws of Georgia for renouncing their testimony. The alternative suspect -- Redd Coles -- undisputedly was at the scene and had the motive, weapon and opportunity to commit the crime. Moreover, the only physical evidence (a single shell casing) connects back to a gun that police never found (or a gun that Coles conveniently lost) and a party that both Coles and Mr. Davis attended. Moreover, Coles confessed -- not to relatives of Mr. Davis -- but to his own friends and family. Unlike Herrera's brother, Coles is still alive and available for subpoena to testify at an evidentiary hearing.

The facts that Mr. Davis has asserted, when proven in a hearing, will show that no credible inculpatory evidence remains.

**B. Extraordinarily, the Lower Federal Courts Denied Mr. Davis Any "Meaningful Avenue to Avoid a Manifest Injustice" in His First Habeas Petition**

Only rarely - if ever - does a substantial case of innocence slip through the cracks of the federal habeas system and require the petitioner to bring a stand-alone innocence claim in a second habeas petition. Ordinarily, petitioners with substantial cases of innocence obtain review of their evidence at their first federal habeas proceeding by alleging innocence as a "gateway" to hearing their otherwise-defaulted constitutional trial errors under this Court's opinion in *Schlup v. Delo*, 513 U.S. 298 (1995)

Mr. Davis' case represents an extreme aberration of how innocence cases are normally reviewed in federal court. The district court and the court of appeals utterly ignored Mr. Davis' *Schlup* innocence claim during his first federal habeas petition. This failure compelled him to file a second habeas petition asserting a stand-alone innocence claim. This Court has held that a *Schlup* claim is designed to provide the "petitioner a meaningful avenue by which to avoid a manifest injustice" *Schlup*, 513 U.S. at 327. The procedural history of this case and the most recent decision of the court of appeals show that Mr. Davis has been denied any such meaningful avenue to justice.

## III. THE COURT OF APPEALS ERRED IN BARRING MR. DAVIS' SECOND PETITION

The court of appeals denied Mr. Davis permission to file a second petition, holding that he "failed to meet the procedural requirements of [28 U.S.C.] § 2244(b)(2)." Although these procedural requirements "inform" this Court's



consideration of original habeas petitions, this Court has not decided whether it is bound by them. *See Felker*, 518 U.S. at 663 (pretermitting the question of whether the Court is bound by § 2244(b)(2) finding that the provision "informs" its decision).

The purposes of § 2244(b)(2) that "informs" this Court's consideration of Mr. Davis original habeas petition are twofold: Section 2244(b)(2)(B)(ii) requires that the petitioner diligently discover and present his new evidence in his first habeas petition. Mr. Davis has diligently done so. Section 2244(b)(2)(B)(i) requires that the claim raised in a second petition "impugn" the reliability of the underlying conviction. Mr. Davis' stand-alone innocence claim does exactly that.

**A. Mr. Davis Diligently Discovered and Presented His New Evidence to the District Court in His First Federal Habeas Proceedings**

Section 2244(b)(2)(B)(i) requires that a claim brought in a second petition must be dismissed unless "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." The clear purpose of this provision is to ensure that petitioner's diligently discover all evidence and present it to the district court in the first federal habeas petition.

Here, all of the evidence underlying Mr. Davis' *Herrera* claim (save the 2008 Affidavit of Benjamin Gordon) was discovered before or during Mr. Davis' first federal habeas proceeding and submitted to the court in support of his *Schlup* actual innocence claim.

The court below did not find that Mr. Davis failed to discover and present his new evidence in his first federal habeas petition. Instead, the court of appeals read into §

2244(b)(2)(B)(i) a requirement that Mr. Davis should have supplemented his *Schlup* innocence claims with a stand-alone *Herrera* innocence claim in the first federal petition. *See* Appendix A at 13a.

The only reason Mr. Davis now raises a *Herrera* claim in a second petition is because the district court and the court of appeals failed to consider his *Schlup* innocence claim in his first petition. At the time of Mr. Davis' first petition, this Court and the Eleventh Circuit had mandated that courts decide *Schlup* claims before they reach a petitioner's procedurally-defaulted constitutional claims. *See Bousley v. U.S.*, 523 U.S. 614, 623 (1998) (remanding Schlup issue when district court failed to address it); *see also Clisby v. Jones*, 960 F.2d 925, 936 (11th Cir.1992) (en banc) (instructing district courts to resolve all claims presented in § 2254 petitions). Neither the district court nor the court of appeals in its 2006 opinion addressed Mr. Davis' innocence. *See* Appendix A at 3a ("The district court did not rule on his actual innocence claim".); *Davis v. Terry*, 465 F.3d 1249, 1251-53 (11th Cir. 2006) (explaining that a *Schlup* claim is a "procedural claim" and a *Herrera* claim is a "substantive claim" and since Mr. Davis "did not make a substantive [*Herrera*] claim of actual innocence," the "true gravamen of this appeal [is] the question of whether the district court erred in concluding that Davis' constitutional claims of an unfair trial.").

Mr. Davis' second petition would have been unnecessary or moot had the lower courts followed the mandate of this Court and decided the innocence issue in his first federal petition. Once a petitioner is found to be innocent under *Schlup*, relief based on the petitioner's underlying constitutional claims invariably follows. Indeed, once a court finds that "it is more likely than not that no juror would convict petitioner in light of the new evidence," it defies all logic and morality that he would be executed



nonetheless. Conversely, if a petitioner fails to meet the "more likely than not" *Schlup* innocence standard, he necessarily cannot meet *Herrera's* higher standard. *See Schlup*, 513 U.S. at 316. Thus, had the lower courts decided Mr. Davis' innocence in his first petition, his conviction would have been overturned or his *Herrera* claim would be moot.

Moreover, Mr. Davis' counsel diligently sought to include a *Herrera* claim in his first petition but was denied by the district court. Mr. Davis amassed new evidence sufficient to plead a *Herrera* claim after he filed his first habeas petition but before the district court had ruled on any substantive motion. During the time of Mr. Davis' first federal habeas proceedings, it was common for district courts to employ a "stay-and-abeyance" procedure to allow petitioners to return to State court and pursue previously unexhausted claims. *See Rhines v. Weber*, 544 U.S. 269, 274 (2005). Mr. Davis requested a stay and abeyance so that he could exhaust his stand-alone innocence claim in State court. Exhibit 34 at 5-7. The State opposed Mr. Davis' motion and the federal habeas court denied Mr. Davis' request. Exhibit 35. Had Mr. Davis included his unexhausted *Herrera* claim in his first federal habeas petition alongside his exhausted claims, the habeas court would have been compelled to dismiss his entire petition after the AEDPA's 1-year statute of limitations had run. *See Rhines*, 544 U.S. at 275 (under this Court's total exhaustion requirement, inclusion of unexhausted claims alongside exhausted claims will result in dismissal of the entire petition, usually after AEDPA's statute of limitations has run); *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2854 (2007) (noting the "problem" created by AEDPA's statute of limitations and the total exhaustion requirement).

**B. The Court of Appeals Erred In Holding that Stand-Alone Innocence Claims Can Never Be the Subject of a Second or Successive Petition**

The court below arrived at the counterintuitive conclusion that AEDPA closes the door to petitioners who are innocent but cannot show any constitutional deficiency at trial. Section 2244(b)(2)(B)(ii) requires "clear and convincing evidence that, but for the constitutional error, no reasonable fact finder would have found the defendant guilty of the underlying offense." The court of appeals held that the statute's language requires both clear and convincing evidence of actual innocence as well as another constitution violation. Appendix at 18a.

In holding that innocence is not enough, the court of appeals has turned § 2244(b)(2)(B)(ii) on its head with no regard for its purpose, legislative history or this Court's prior construction of the statute. This Court has held that "AEDPA's central concern [is] that the merits of concluded criminal proceedings not be revisited *in the absence of a strong showing of actual innocence*." *Calderon v. Thompson*, 523 U.S. 538, 558 (1998) (emphasis added). Other circuits have similarly held that 2244(b)(2)(B)(ii)'s restricts second petitions to claims that "impugn" the underlying conviction, not the sentence.[2]

[2] *See, e.g., In re Williams*, 330 F.3d 277, 283 n.3 (4th Cir. 2003) (The purse of AEDPA was to restrict second petitions to "claims impugning the reliability of the petitioner's conviction for the underlying offense."); *In re Vial*, 115 F.3d 1192, 1198 (4th Cir. 1997) (The identical provision in § 2255 applies only "to challenges to the underlying conviction; it is not available to assert sentencing error.").



The House Conference Report on AEDPA explained that AEDPA "limited [second petitions] to those petitions that contain newly discovered evidence that would seriously undermine the jury's verdict."[3]

The Senate legislative history clearly shows that 244(b)(2)(B)(ii) was meant to contain a "safety valve" for innocence. Senator Hatch, the co-sponsor of the Specter-Hatch bill that contained the language of §2244(b)(2)(B)(ii), addressed the concerns about the provision to his colleagues by stating:

> [T]he Specter-Hatch bill permits successive habeas corpus petitions in death penalty cases where the petitioner may be innocent. If the petitioner is innocent, he or she can have successive habeas corpus petitions and our bill contains a safety valve which permits Federal courts to hear legitimate claims. We have provided for protection of Federal habeas corpus, but we do it one time and that is it-<u>unless</u>, of course, they can truly come up with evidence of innocence that could not have been presented at trial. There we allow successive petitions. Any time somebody can show innocence, we allow that.

141 Cong.Rec. S7803-01, S7825 (1995) (emphasis added). The Specter-Hatch bill containing the language in §2244(b)(2)(B)(ii) was passed by the Senate and became part of AEDPA in 1996. *Id.* at S7857; 142 Cong.Rec. H3305 (1996).

[3] *See* H.R. Conf. REP. 104-518, at 111 (1996), *reprinted in* U.S.C.C.A.N. 944, 944.

Here, the court of appeals shut off the innocence "safety valve" for Mr. Davis. To hold that a successive petition requires a technical constitutional error in addition to innocence turns the purpose of §2244(b)(2)(B)(ii) on its head. Such strict statutory construction is unwarranted in this case. *See Schlup*, 513 U.S. at 319 n. 35 (habeas law involves "an interplay between statutory language and judicially managed equitable considerations.")

Even in cases where the petitioner's guilt was not questioned, this Court has resisted interpretations of § 2244 that "would produce troublesome results, create procedural anomalies and close our doors to a class of habeas petitioners seeking review without any clear indication that such was the intent of Congress." *Panetti*, 127 S. Ct. at 2854 (holding that Eighth Amendment incompetency to be executed was not "second or successive" under § 2244 because the claim would have been premature in petitioner's first federal habeas petition); *see also Stewart v. Martinez-Villareal*, 523 U.S. 637, 644 (1998) (holding that a petition filed second in time was not "second or successive" as such a literal reading of § 2244 would lead to a "perverse" result); *Slack v. McDaniel*, 529 U.S. 473, 483 (2000) (finding that a petition filed second in time is not a "second or successive petition" so as to protect the "vital role" that the "writ of habeas corpus plays in protecting constitutional rights").

## IV. MR. DAVIS' SECOND PETITION MEETS THE REQUIREMENTS OF 28 U.S.C. § 2254

### A. Mr. Davis is Entitled to An Evidentiary Hearing

If this Court transfers Mr. Davis' habeas petition to the district court, Mr. Davis would be entitled to an evidentiary hearing under 28 U.S.C. § 2254(e)(2). Subject to



the requirements of § 2254, a federal evidentiary hearing is required "unless the state-court trier of fact has after a full hearing reliably found the relevant facts," *Townsend v. Sain*, 372 U.S. 293, 313 (1963) (*overruled on other grounds*).

Section 2254(e)(2) does not preclude an evidentiary hearing in this case because Mr. Davis consistently, but unsuccessfully, sought an evidentiary hearing to prove his innocence in State court. By the terms of its opening clause, § 2254(e)(2) bars an evidentiary hearing only to prisoners who have "failed to develop the factual basis of a claim in State court proceedings." In *Williams v. Taylor*, this Court held that a petitioner who did not receive a hearing in State court may receive an evidentiary hearing in federal court "unless there is lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." 529 U.S. 420, 435 (2000). The Court held that "[d]iligence will require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." To no avail, Mr. Davis asserted his innocence and requested an evidentiary hearing at every level of the State proceedings in connection with his Extraordinary Motion for New Trial. *See* Appendix B at 52a (Georgia Supreme Court opinion) ("Davis argues that the trial court should not have denied his extraordinary motion for new trial without first holding a hearing."); Appendix C at 58a (Trial court order) ("Defendant moves this Court to convene a hearing on Defendant's Extraordinary Motion for New Trial.").

### B. The Georgia Supreme Court's Minimal Factual Findings Deserve No Deference under § 2254

The Georgia Supreme Court's review of Mr. Davis' Extraordinary Motion for New Trial is entitled to no deference under § 2254 since the state courts failed to conduct an evidentiary hearing and the Georgia Supreme Court made

an unreasonable determination of the facts in light of the evidence Mr. Davis had presented.

Under AEDPA's amendments to § 2254, a federal court may grant habeas relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). Factual determinations made by State courts are presumed correct unless rebutted by "clear and convincing evidence." § 2254(e)(1). When the state court conducted an evidentiary hearing, this Court has held that these standards are "demanding but not insatiable" as "deference does not by definition preclude relief." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

AEDPA's provisions deferring to State court factual determinations are inapplicable where, as here, the petitioner did not have the opportunity for a full and fair hearing in State court. There is a split among the circuits as to whether § 2254(d)(2) and § 2254(e)(1) apply when the State court failed to conduct an evidentiary hearing. The Tenth and Ninth Circuits have held that the presumption of correctness contained in § 2254(d)(2) and (e)(1) does not apply if the habeas petitioner did not receive a full, fair and adequate hearing on factual determination sought to be raised in the habeas petition. *Bryan v. Mullin*, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (en banc); *Nunes v. Mueller*, 350 F.3d 1045, 1055 (9th Cir. 2003). In *Bryan v. Mullin*, for example, the Tenth Circuit, sitting en banc, afforded no deference to the State court factual findings, reasoning that "because the state court did not hold an evidentiary hearing, we are in the same position to evaluate the factual record as it was." 350 F.3d at 1216.

Conversely, the Fifth Circuit has held that a "full and fair hearing is not a precondition" to accord the State court's factual determinations deference under § 2254(d)(2) or (e)(1).



*Valdez v. Cockrell*, 274 F.3d 941, 951 (2001). The First and Third Circuits have taken the middle ground, finding that the lack of an evidentiary hearing in State Court should be a consideration in applying deference under § 2254(d)(2) and (e)(1). *Teti v. Bender*, 507 F.3d 50, 59 (1st Cir. 2007) ("While it might seem questionable to presume the correctness of material facts not derived from a full and fair hearing in state court, the veracity of those facts can be tested through an evidentiary hearing before the district court where appropriate"); *Rolan v. Vaughn*, 445 F.3d 671, 679-80 (3d Cir. 2006) ("after AEDPA, state fact-finding procedures may be relevant when deciding whether the determination was 'reasonable' or whether a petitioner has adequately rebutted a fact, the procedures are not relevant in assessing whether deference applies to those facts."); *see also Simpson v. Norris*, 490 F.3d 1029, 1035 (8th Cir. 2007) ("Where the facts are in dispute, the federal court in habeas corpus must hold an evidentiary hearing if the habeas applicant did not receive a full and fair evidentiary hearing in a state court.").

Regardless of the applicable level of deference afforded the Georgia Supreme Court, the court's conclusions about Mr. Davis' new evidence are rebutted by the affidavits to a clear and convincing degree, showing that the court's conclusion of "immateriality" was unreasonable.

The sharply divided Georgia Supreme Court concluded that an evidentiary hearing was unnecessary because, under Georgia law, recantations are immaterial regardless of credibility or substance unless the defendant can show that the recanted witness' testimony is the "purest fabrication" by "extrinsic proof that the witness' prior testimony was physically impossible." Appendix B at 42a.

In response to Chief Justice Leah Ward Sears' characterization of the majority's categorical rule barring recantations as "immoral and illogical," the majority

attempted to show some semblance of substantive review by crediting Steve Sanders' first-time identification of Mr. Davis at trial two years after the shooting (despite his police statement on the night of the shooting that he "wouldn't recognize" the shooter again) and noting that it believed Mr. Davis' recantation affidavits were merely statements that the eyewitness "*now* do not feel able to identify the shooter." Appendix B at 51a. The majority's last-ditch attempt at showing some appearance of substantive review was unreasonable and is rebutted by the text of each affidavit to which the court was referring. The submitted affidavits clearly show that each recanting eyewitness was unable to identify the shooter *at trial* and *on the night of the crime.*

Dorothy Ferrell's affidavit clearly states that she was not able to identify the shooter at trial or on the night of the crime:

> "I didn't see who was doing the shooting, I just heard the gunshots. … I don't know which of the guys did the shooting because I didn't see that part. … I didn't want to get up there and [testify] that I saw who did the shooting because I didn't see that part. But I felt like I had to say that." Exhibit 1.

D.D. Collins' affidavit shows that he "never" saw Mr. Davis do anything:

> "I testified against Troy at his trial. I remember that I told the jury that Troy hit the man Redd was arguing with. That is not true. I never saw Troy do anything to the man." Exhibit 3.



Larry Young's affidavit shows that he "never" — at trial or the night of the shooting — was able to identify the shooter or what he was wearing:

> "[The Police] kept asking me what had happened at the bus station and I kept telling them that I didn't know. Everything happened so fast down there. I couldn't honestly remember what anyone looked like or what different people were wearing. Plus, I had been drinking that night so I just couldn't tell who did what. … I was never able to make sense of what happened that night. It's as much of blur now as it was then." Exhibit 5.

Antoine Williams' affidavit also clearly states that he was "totally unsure of his identification" on the night of the shooting and at trial:

> "Even today I know that I could not honestly identify with any certainty who shot the officer that night. *I couldn't then either.* At Troy Davis' trial, I identified him as the person who shot the officer. *Even when I said that,* I was totally unsure whether he was the person that shot the officer. I felt pressure to point at him because he was the only one sitting in the courtroom." Exhibit 4 (emphasis added).

The majority's unreasonable factual determinations in light of the clear language of the affidavits is an error attributable to the lack of an evidentiary hearing examining the new evidence and deserves no deference.

## V. EXECUTION OF MR. DAVIS WITHOUT AN EVIDENTIARY HEARING WOULD RAISE SERIOUS CONSTITUTIONAL ISSUES

Mr. Davis' execution without a full and fair hearing in which he could make a truly persuasive demonstration that he is actually innocent will violate his federal constitutional rights to due process and freedom from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments *See Herrera*, 506 U.S. at 417 (assuming a "truly persuasive demonstration of actual innocence made after trial would render execution of a defendant unconstitutional"); *House v. Bell*, 547 U.S. 518, 554 (2007). (same).

### A. The Eighth Amendment Bars the Execution of the Innocent

In *Herrera v. Collins*, five Justices unequivocally found that the execution of an innocent person violates the Constitution. *See* 506 U.S. at 419 ("the execution of a legally and factually innocent person would be a constitutionally intolerable event") (O'Connor, J., joined by Kennedy, J., *concurring*); *id.* at 431 ("the Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence.") (Blackmun, J., joined by J.J. Stevens and Souter, *dissenting*). Nevertheless, this Court has only "assume[d]", without deciding that the execution of an innocent man is unconstitutional. *Id.* at 417 (opinion of Rehnquist, C.J.).

In the sixteen years since the Court assumed that the execution of the innocent is unconstitutional, the basis for this Court's Eighth Amendment analysis has eroded. The Court in *Herrera* based its Eighth Amendment analysis on the idea that "constitutional provisions [] have the effect of ensuring against the risk of convicting an innocent person." *Id.* at



398-99. Public consensus now shows that, in some cases, constitutional protections are insufficient to protect the innocent from an erroneous capital conviction.

The "objective evidence of contemporary values" that informs the Eighth Amendment is evidenced in many ways. This Court has often looked to state statutes to determine contemporary values for purposes of Eighth Amendment analysis. *See Kennedy v. Louisiana*, 128 S. Ct. 2641, 2652 (2008). A consensus of State laws on the issue "is entitled to great weight." *Id.* at 2658.

Since *Herrera* was decided, the country has become skeptical of the infallibility of our criminal system as shown by State statutory enactments and public opinion. The impact of the DNA revolution had not begun to erode public confidence in the outcome of criminal trials when *Herrera* was decided. Since 1989, there have been 238 post-conviction DNA exonerations. When *Herrera* was decided in 1993, DNA had proven only 15 convictions to be erroneous.[4] Eyewitness misidentification testimony was a factor in 77 percent of post-conviction DNA exoneration cases, making it the leading cause of these wrongful convictions.[5]

In response to the public's concern about the growing number of erroneous convictions based on faulty eyewitness identifications, Wisconsin, New Jersey, Maryland, and North Carolina enacted state statutes requiring law enforcement agencies to reform the administration of eyewitness identifications.[6] In 2007, Vermont, West Virginia and

---

[4] *See* www.innocenceproject.org/know.

[5] *See* www.innocenceproject.org/Content/351.php

[6] See http://www.innocenceproject.org/news/LawView5.php.

Georgia created task forces to review eyewitness identification procedures. *Id.* Starting in 1994 (one year after this Court's decision in *Herrera*), the vast majority of States have enacted post-conviction DNA testing access statutes to the potentially innocent. Now, forty-six states, the District of Columbia and the United States have DNA statutes that compel DNA testing if the results would have a sufficient exculpatory effect.[7] Additionally, Pennsylvania, North Carolina, Connecticut and California have all created criminal justice reform commissions to address the causes of wrongful convictions.[8]

Several states have passed laws severely limiting the use of the death penalty. For example, on May 7, 2009 the Governor of Maryland signed into law a capital punishment reform bill that limits the imposition of the death penalty to first-degree murder cases with biological or DNA evidence, videotaped voluntary confessions, or video linking defendants to a crime. *See* 2009 Md. Laws 186. In March 2009, the State of New Mexico banned the death penalty in all cases, citing concerns over imperfections in the criminal justice system and the potential for innocent people to be put to death. *See* 2009 N.M. Laws 11. In a similar vein, legislators and governors in the states of Montana, Kansas, Connecticut and Colorado have all recently initiated reviews of their states' death penalty statutes.[9]

---

[7] *Id.* (providing links to each State's DNA access statute).

[8] *See* http://www.innocenceproject.org/news/LawView6.php.

[9] *See* www.deathpenaltyinfo.org; www.kansascity.com/news/breaking_news/story/1190748.html; www.ncadp.org/news.cfm?articleID=227.



In the wake of 238 DNA exonerations and the resulting myriad of legislative actions, the post-*Herrera* consensus is that the existing procedural protections currently provided by the Constitution are insufficient to avoid the execution of the innocent. *Herrera's* assumptions that "our society has a high degree of confidence in criminal trials" and that existing constitutional protections "have the effect of ensuring against the risk of convicting an innocent person" are plainly contrary to the large number of recent exonerations and contemporary norms. *Herrera*, 506 U.S. at 398, 420.

In the rare case of seven recantations, four of whom were innocent bystanders, four confessions from Redd Coles and at least one new eyewitness implicating Coles as the shooter, the Eighth and Fourteenth Amendments require that Mr. Davis have an evidentiary hearing to prove that he is innocent.

### B. An Evidentiary Hearing is Required to Assess Mr. Davis' *Herrera* Claim

This Court has recognized that "[i]n capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability" *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) (plurality opinion). In *Ford*, Justice Powell's controlling opinion found that Florida's refusal to consider relevant evidence of insanity before an execution of a defendant who had made a substantial showing of incompetence violated due process. *Id.*

Similarly in *Panetti*, this Court recently held that failing to allow the defendant to submit relevant evidence of insanity violated due process. 127 S. Ct. at 2857-58. The exclusion of relevant evidence was sure to "invite arbitrariness and error" in the state court's determination of

whether the Eighth Amendment barred execution and, thus, violated due process. *Id.*

In *Ford* and *Panetti*, this Court limited the strain that non-meritorious insanity claims may have on the judicial system by requiring "a substantial threshold of insanity" before requiring a hearing. *Panetti*, 127 S. Ct at 2856 (*citing Ford*, 477 U.S. at 426, 424). Similarly, the facts of this case limit the requirement of a hearing to instances where the defendant faces imminent execution despite substantial new admissible innocence evidence that has never been the subject of a State or federal court evidentiary hearing.

## CONCLUSION

The petition for a writ of habeas corpus should be transferred to the district court for a hearing and determination.

Respectfully submitted.

Philip Horton
Jason Ewart
Danielle Garten
Dominic Vote
ARNOLD & PORTER LLP
555 12th Street, NW
Washington D.C. 20004
(202) 942-5000

Thomas H. Dunn
GEORGIA RESOURCE CENTER
303 Elizabeth Street, NE
Atlanta, Georgia 30307
(404) 222-9202

May 19, 2009

# APPENDIX

## APPENDIX A -- MAJORITY AND DISSENTING OPINIONS OF THE U.S. COURT OF APPEALS FOR THE ELEVENTH CIRCUIT DENYING PERMISSION TO FILE A SUCCESSIVE HABEAS PETITION

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

**No. 08-16009**

Filed
U.S. Court of Appeals
Eleventh Circuit
April 16, 2009
Thomas K. Kahn
Clerk

**IN RE:**

**TROY ANTHONY DAVIS,**

**Petitioner.**

**Application for Leave to File a Second or Successive Habeas Corpus Petition, 28 U.S.C. § 2244(b)**

(April 16, 2009)

Before DUBINA, BARKETT and MARCUS, Circuit Judges.

PER CURIAM:

On October 22, 2008, Troy Anthony Davis ("Davis"), a Georgia death row inmate, has filed an application with this Court seeking authorization to file a second or successive 28 U.S.C. § 2254 federal habeas petition, raising for the first time a freestanding actual innocence claim. Davis had previously filed a federal habeas petition in the United States District Court for the Southern District of Georgia in 2001, alleging, among other things, violations of *Giglio v. United*

*States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Davis now claims that his execution would violate the Eighth and Fourteenth Amendments because he is actually innocent of the offense of murder. We took the unusual step of staying Davis's execution, which had been scheduled for October 27, 2008, and ordered the parties to submit further briefs. Thereafter, we scheduled the case for oral argument. Having the benefit of the parties' briefs and after hearing extensive oral argument, we deny Davis's application.

## I. RELEVANT PROCEDURAL HISTORY

A Georgia jury convicted Davis for the murder of Savannah police officer Mark Allen MacPhail in the early morning hours of August 19, 1989, and for two other offenses. The trial court sentenced him to death for the murder conviction. The Supreme Court of Georgia affirmed Davis's convictions and death sentence. *Davis v. State,* 263 Ga. 5, 426 S.E.2d 844,*cert. denied,* 510 U.S. 950, 114 S.Ct. 396, 126 L.Ed.2d 344 (1993). Thereafter, in 1997, the state trial court denied his state habeas corpus petition for relief, and in 2000, the Supreme Court of Georgia affirmed the denial of Davis's petition. *Davis v. Turpin,* 273 Ga. 244, 539 S.E.2d 129 (2000), *cert. denied,* 534 U.S. 842, 122 S.Ct. 100, 151 L.Ed.2d 59 (2001). Davis then filed his first federal habeas corpus petition on December 14, 2001, raising a number of constitutional violations, including: (1) that the prosecution knowingly presented false testimony at his trial, in violation of *Giglio*; (2) that the prosecution failed to disclose material exculpatory evidence, in violation of *Brady*; and (3) that his trial counsel was constitutionally ineffective, in violation of *Strickland.*Because Davis failed to raise these constitutional claims before the state court, he sought to overcome his procedural default of these claims by showing under *Schlup v.*



*Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995), that he should be able to raise these claims anyway because he was actually innocent of the underlying murder.[FN1]The district court did not rule on his actual innocence claim, instead reaching the merits of his constitutional claims and denying his petition.

Notably, Davis did not raise a substantive freestanding claim of actual innocence in his first federal habeas petition. During the proceedings, however, Davis moved the district court to stay the federal habeas proceedings in order for him to present a freestanding actual innocence claim to the state courts. In April 2004, the district court denied Davis's stay request.

After the district court denied Davis's habeas corpus petition, we affirmed. *Davis v. Terry,* 465 F.3d 1249, 1256 (11th Cir.2006), *cert. denied,* --- U.S. ----, 127 S.Ct. 3010, 168 L.Ed.2d 728 (2007). We held that the petitioner failed to sustain a *Brady* or *Giglio* violation, nor did he establish a violation of the Sixth Amendment right to the effective assistance of counsel. And we made clear in our opinion that Davis had "not ma[d]e a substantive claim of actual innocence."*Id.* at 1251.

In 2007, the state trial court set a new execution date. Soon thereafter, Davis filed an extraordinary motion for new trial, presenting newly discovered evidence in support of his motion. *See* Ga.Code Ann. § 5-5-41 (2007); *Dick v. State,* 248 Ga. 898, 899, 287 S.E.2d 11, 13 (1982) (indicating that affidavits in support of an extraordinary motion for new trial include *"facts* sufficient to authorize that the motion be granted if the facts developed at the hearing warrant such relief"); *Timberlake v. State,* 246 Ga. 488, 491, 271 S.E.2d 792, 795-96 (1980) (indicating that newly discovered evidence must be so material that it probably would result in a different verdict). This evidence consisted of: (1) seven affidavits containing recantations of eyewitnesses who

testified at trial; (2) three affidavits averring post-trial confessions to the murder by another man, Sylvester "Red" Coles; (3) several affidavits of persons who had not previously testified who were either present at the scene of the murder or in the general area immediately following the crime; (4) two expert affidavits addressing ballistic evidence and eyewitness identifications; (5) affidavits of jurors; and (6) a general cache of additional affidavits.

Based on this evidence, Davis claimed that to apply Georgia's procedures for an extraordinary motion for a new trial in a manner that allows for his execution would be unconstitutional. The state trial court "exhaustively reviewed each submitted affidavit and considered in great detail the relevant trial testimony, if any, corresponding to each."*State v. Davis*, No. CR89-2467-FR, at 3 (Ga.Super.Ct. July 13, 2007). It observed that the majority of the affidavits that Davis submitted had been sworn over five years earlier, and a few had been attested to over ten years earlier. The state trial court concluded that some of the affidavits contained inadmissible hearsay, that the post-trial affidavits by some of the State's witnesses did not constitute cause for a new trial, and that several affidavits were not so material that they would have produced a different result. The state court ultimately denied the motion.

Davis then filed an application for discretionary appeal and a motion for a stay of execution in the Supreme Court of Georgia. While the application was pending, Georgia's State Board of Pardons and Paroles granted a temporary stay of execution and scheduled its own hearing. *See* Ga.Code Ann. §§ 42-9-39(d) (granting Georgia Board of Pardons and Paroles "authority to pardon any person convicted of a crime who is subsequently determined to be innocent of said crime"), 42-9-42(a) (requiring majority vote of the Georgia Board of Pardons and Paroles for a grant of clemency, pardon, parole, or other relief from sentence) (2008). The



Supreme Court of Georgia dismissed Davis's motion for stay of execution as moot and granted his application for discretionary appeal. *Davis v. State*, 282 Ga. 368, 368, 651 S.E.2d 10, 10 (2007).

Thereafter, in a comprehensive opinion, the Supreme Court of Georgia affirmed the trial court's order denying Davis's extraordinary motion for new trial. *Davis v. State*, 283 Ga. 438, 660 S.E.2d 354 (2008). In affirming, the supreme court began by noting the lack of credibility that is generally afforded to recantation testimony, explaining that "[t]rial testimony is closer in time to the crimes, when memories are more trustworthy[, and] ... the trial process itself, including public oaths, cross-examination, and the superintendence of a trial judge, lends special credibility to trial testimony."*Id.* at 441, 660 S.E.2d at 358.The supreme court nonetheless painstakingly detailed each of the seven post-trial affidavits by the State's eyewitnesses, as well as six affidavits from additional witnesses Davis located, and explained how each affidavit failed to support Davis's extraordinary motion for a new trial. *Id.* at 441-47, 660 S.E.2d at 358-63.Among these affidavits were three eyewitnesses who had identified Davis at trial as the officer's shooter, and who Davis claimed had recanted their trial testimony: Antoine Williams, Dorothy Ferrell, and Harriet Murray. After detailing these post-trial affidavits, among others, the supreme court pointed to several defects in them, including the fact that Williams's and Ferrell's affidavits failed to affirmatively claim that Davis was not guilty, and that Murray's unsworn affidavit was yet another inconsistent statement she had made years after the murder. The supreme court determined that none of the affidavits had the materiality required to support an extraordinary motion for a new trial.

The Supreme Court of Georgia concluded this way:

> Particularly in this death penalty case where a man might soon be executed, we have endeavored to look beyond bare legal principles that might otherwise be controlling to the core question of whether a jury presented with Davis's allegedly-new testimony would probably find him not guilty or give him a sentence other than death. In that spirit, we have chosen to focus primarily on one of the required showings for an extraordinary motion for new trial, the requirement that the new evidence be "so material that it would probably produce a different verdict."In weighing this new evidence, we do not ignore the testimony presented at trial, and, in fact, we favor that original testimony over the new. At least one original witness has never recanted his in-court identification of Davis as the shooter, which included a description of his clothing and the location he was in when he struck Larry Young. As we have noted above, most of the witnesses to the crime who have allegedly recanted have merely stated that they now do not feel able to identify the shooter. At trial, the jury had the benefit of hearing from witnesses and investigators close to the time of the murder, including both Davis and Coles claiming the other was guilty. We simply cannot disregard the jury's verdict in this case.

*Id.* at 447, 660 S.E.2d at 362-63 (citations omitted).

Following the Supreme Court of Georgia's opinion, the Georgia Board of Pardons and Paroles rescinded its stay of execution and denied Davis's application.[FN2] In so doing, the



Board took the unusual step of issuing a "Statement," noting that while it "does not generally comment on death cases it has considered for clemency[, because] the Troy Davis case has received such extensive publicity ... the Board has decided to make an exception."[FN3] The Board explained that it had spent a year studying and considering the case; the Board gave Davis's attorneys an opportunity to present every witness they desired to support their allegation that there was doubt as to Davis's guilt, and the Board heard each of these witnesses and questioned them closely; the Board studied the voluminous trial transcript, the police investigation report and the initial statements of all the witnesses; the Board had certain physical evidence retested and Davis interviewed; and "[a]fter an exhaustive review of all available information regarding the Troy Davis case and after considering all possible reasons for granting clemency, the Board ... determined that clemency is not warranted."

Thereafter, Davis petitioned the United States Supreme Court for certiorari review of the Supreme Court of Georgia's decision. The Supreme Court initially granted a stay of execution, *Davis v. Georgia,* --- U.S. ----, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008), but several weeks later, on October 14, 2008, it denied the petition, thereby terminating the stay. *Davis v. Georgia,* --- U.S. ----, 129 S.Ct. 397, 172 L.Ed.2d 323 (2008). Davis then began the process in this Court for permission to file a second or successive federal habeas corpus petition.

## II. DISCUSSION

Under the controlling statute, 28 U.S.C. § 2244(b)(2), a state prisoner may raise a new claim in a second or successive habeas petition in federal district court *only* if a three-judge panel of a United States Court of Appeals first determines that the application makes a prima facie showing that: (A) the petitioner's claim "relies on a new rule of constitutional law,

made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (B) it relies on facts that (i) could not have been discovered previously through the exercise of due diligence, and that (ii), if proven, would "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."28 U.S.C. § 2244(b)(2)(A)-(B) (2006). A "prima facie showing" of these requirements is "simply a sufficient showing of possible merit to warrant a fuller exploration by the district court."*Bennett v. United States,* 119 F.3d 468, 469 (7th Cir.1997) (cited in *In re Holladay,* 331 F.3d 1169, 1173-74 (11th Cir.2003)); *Reyes-Requena v. United States,* 243 F.3d 893, 899 (5th Cir.2001). After painstaking review of this case, we conclude that Davis has completely failed to meet the procedural requirements of § 2244(b)(2), and, therefore, we are constrained to reject Davis's application to file a second or successive habeas petition in the district court.

We begin by observing that it is not clear at all under the case law whether the claim that Davis now raises-a freestanding actual innocence claim-is viable on federal habeas corpus review. In *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 869, 122 L.Ed.2d 203 (1993), the Supreme Court assumed "for the sake of argument in deciding [the] case, that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."[FN4] We likewise have recognized the possibility of freestanding actual innocence claims, *see Felker v. Turpin,* 83 F.3d 1303, 1312 (11th Cir.1996)*("[Herrera] left open the* difficult question of whether federal habeas courts may entertain convincing claims of actual innocence."), but have also recognized that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent



constitutional violation occurring in the underlying state criminal proceeding."*Brownlee v. Haley,* 306 F.3d 1043, 1065 (11th Cir.2002) (quoting *Herrera,* 506 U.S. at 400, 113 S.Ct. at 860). In any event, for purposes of the instant application, we need not address whether a petitioner can bring a freestanding actual innocence claim as described in *Herrera v. Collins* in his first federal habeas petition. That question is not before us because Davis did not bring a *Herrera* claim in his first federal habeas petition. Rather, the only question we face is whether Davis can bring this claim as a second or successive petition. As a result, Davis must satisfy the two procedural requirements embodied in § 2244(b)(2)(B) in order to bring a *Herrera* claim now. He has failed to meet either requirement.

Section 2244(b)(2)(B), as it now stands, was enacted by Congress as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Plainly the statute was designed, among other reasons, to bring some finality and certainty to the seemingly never-ending collateral attack process. According to the legislative history, AEDPA's focus was to eliminate both the delay that habeas filings cause in a case and the filing of frivolous habeas claims. *See, e.g.,* H.R. Conf. Rep. No. 104-518, at 111 (1996), *reprinted in* 1996 U.S.C.C.A.N. 944, 944. Indeed, a common theme found throughout the congressional debates was the desire to prevent habeas petitioners from having successive "bites at the apple." *See* 141 Cong. Rec. S7803, S7877 (1995) (statement of Sen. Dole) ("By imposing filing deadlines on all death row inmates, and by limiting condemned killers convicted in State or Federal court to one Federal habeas petition-one bite of the apple-these landmark reforms will go a long, long way to streamline the lengthy appeals process ...."); 141 Cong. Rec. S16892, S16913 (1995) (statement of Sen. Feinstein) ("[T]his bill provides habeas petitioners with 'one bite at the apple.' It assures that no one convicted of a capital crime will be barred from seeking habeas relief in

Federal court[.]"); 141 Cong. Rec. S7803, S7809 (1995) (statement of Sen. Kennedy) ("The proposal to limit inmates to one bite at the apple is sound in principle."); 141 Cong. Rec. S7803, S7832 (1995) (statement of Sen. Biden) ("The vast majority of us ... want to and have been trying for years to change the old system to limit the time in which a petition can be filed and to limit the number of petitions that can be filed. So essentially you get one bite out of the apple.").

In fact, the codification of § 2244(b)(2)(B) played an important role in achieving this goal by "restrict[ing] the filing of repetitive petitions by requiring that any second petition be approved for filing in the district court by the court of appeals."141 Cong. Rec. S7596, S7597 (1995) (statement by Sen. Hatch). It also did so by "codify[ing] some of the pre-existing [judicial] limits on successive petitions,"*Felker v. Turpin,* 518 U.S. 651, 664, 116 S.Ct. 2333, 2340, 135 L.Ed.2d 827 (1996)-in which successive petitioners had to show either "cause for failing to raise [the claims in the earlier petition] and prejudice therefrom," or "that a fundamental miscarriage of justice would result from a failure to entertain the claim,"*McCleskey v. Zant,* 499 U.S. 467, 494-95, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991). Notably, § 2244(b)(2)(B) tightened these limits by requiring successive petitioners to show *both* "cause"-or diligence-*as well as* "a fundamental miscarriage of justice"-or actual innocence.[FN5]In addition, § 2244(b)(2)(B) also requires successive petitioners to establish actual innocence by "clear and convincing evidence," a far more demanding showing than that found in previous Supreme Court cases, which had required only a "more likely than not" standard. *Schlup,* 513 U.S. at 327, 115 S.Ct. at 867.

Following the enactment of AEDPA, the Supreme Court had occasion to consider the constitutionality of the newly added gatekeeping requirements found in § 2244(b).*Felker,* 518 U.S. 651, 116 S.Ct. 2333, 135 L.Ed.2d 827.In *Felker,* the



Supreme Court recognized that AEDPA prevented the Court from reviewing a Court of Appeals order denying leave to file a second habeas petition. *Felker* held, however, that the Supreme Court was not deprived of appellate jurisdiction because AEDPA did not remove the Court's authority to entertain an *original* petition for habeas corpus. The Supreme Court then held that AEDPA did not violate the Suspension Clause of the Constitution - which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it,"U.S. Const. art. I, § 9, cl. 2- reasoning that:

> The writ of habeas corpus known to the Framers was quite different from that which exists today. As we explained previously, the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority. The class of judicial actions reviewable by the writ was more restricted as well ....
>
> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States."And it was not until well into this century that this Court interpreted that provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas. But we assume, for purposes of decision here, that the Suspension Clause of the Constitution refers to the writ as it exists today, rather than as it existed in 1789.

> The Act requires a habeas petitioner to obtain leave from the court of appeals before filing a second habeas petition in the district court. But this requirement simply transfers from the district court to the court of appeals a screening function which would previously have been performed by the district court as required by 28 U.S.C. § 2254 Rule 9(b). The Act also codifies some of the pre-existing limits on successive petitions, and further restricts the availability of relief to habeas petitioners. But we have long recognized that "the power to award the writ by any of the courts of the United States, must be given by written law," and we have likewise recognized that *judgments about the proper scope of the writ are "normally for Congress to make."*

*Id.* at 663-64, 116 S.Ct. at 2339-40 (citations omitted and emphasis added). The Supreme Court concluded that the new restrictions found in § 2244(b) fell well within congressional authority and did not violate the Constitution.

With this in mind, we turn to fulfilling the gatekeeping function Congress has laid out for us in § 2244(b).

A. *28 U.S.C. § 2244(b)(2)(B)(i)*

It is undisputed that Davis's current application does not rely on a new rule of constitutional law, as provided for under § 2244(b)(2)(A). Therefore, we must consider whether Davis has made a prima facie showing establishing the first requirement found in § 2244(b)(2)(B)-that is, whether "the factual predicate for" his *Herrera* claim "could not have been discovered previously through the exercise of due diligence."28 U.S.C. § 2244(b)(2)(B)(i)."What matters under



§ 2244(b)(2)(B)(i) is whether [Davis], with the exercise of due diligence, could have discovered [the facts he now presents to us] at the time he filed his first federal habeas petition."*See Jordan v. Sec'y Dep't of Corr.*, 485 F.3d 1351, 1359 (11th Cir.), *cert. denied,* --- U.S. ----, 128 S.Ct. 450, 169 L.Ed.2d 315 (2007). Because Davis freely admits that virtually every piece of evidence underlying his *Herrera* claim "was discovered before or during Mr. Davis' first federal habeas proceedings and was submitted to the federal habeas court for consideration [of the other claims he brought in that petition]," Davis Br. at 10, he does not argue that this evidence could not have been discovered previously through due diligence. Rather, he attempts to skirt the due diligence requirement in a variety of ways.

First, Davis suggests that he was diligent in gathering the "new" evidence underlying his *Herrera* claim because he brought this very evidence to the first federal habeas court. The problem with this argument, however, is that he did not present evidence of actual innocence to the district court in support of a *Herrera* freestanding actual innocence claim. Rather, he used this evidence only to argue that, under *Schlup,* he could overcome the procedural default of the other constitutional claims he sought to pursue. These defaulted constitutional claims included a *Brady* violation, a *Giglio* violation, and an ineffective-assistance-of-counsel claim, but significantly, did not include a *Herrera* claim. *See Davis,* 465 F.3d at 1251-53.He cannot now argue that by simply presenting the underlying evidence in his first federal habeas petition in support of wholly different constitutional claims-without any accompanying *Herrera* claim-he has satisfied the due diligence prong of the statute.

Plainly, the statute does not support this argument. As the statute reads, a claim brought in a successive petition must be dismissed unless "the factual predicate for the claim could not have been discovered previously through the exercise of due

diligence."28 U.S.C. § 2244(b)(2)(B)(i). Davis concedes that almost all of the factual predicate for his claim *could have been* discovered previously, and in fact, *was* discovered previously. Davis possessed the "factual predicate" for his *Herrera* "claim" during his first federal habeas corpus proceeding, could have presented the claim, but chose not to do so. *See Jordan,* 485 F.3d at 1359 (concluding that petitioner failed to satisfy § 2244(b)(2)(B)(i) because he actually knew of the factual predicate of his claim when he filed his first § 2254 petition); *In re Bryan,* 244 F.3d 803, 805 (11th Cir.2000) (concluding that the petitioner failed to satisfy § 2244(b)(2)(B)(i) because he did not explain why a diligent investigation could not have uncovered the factual predicate of his claim); *In re Magwood,* 113 F.3d 1544, 1548 (11th Cir.1997) (same); *In re Boshears,* 110 F.3d 1538, 1543 (11th Cir.1997) (denying petitioner's application for leave to file a second habeas petition in a non-capital case because the evidence petitioner presented to prove his innocence was readily available to him when he litigated his first habeas petition).

Davis also maintains that even though he had all the necessary evidence, he could not have brought a *Herrera* freestanding actual innocence claim anyway in his first federal habeas petition because he had not first exhausted his state remedies. This argument is foreclosed by Supreme Court precedent, beginning with *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), in which the plurality opinion held that district courts should dismiss "mixed petitions"-those with exhausted and unexhausted claims-and that petitioners with such petitions have two options. *See Burton v. Stewart,* 549 U.S. 147, 154, 127 S.Ct. 793, 797, 166 L.Ed.2d 628 (2007) (citing *Rose,* 455 U.S. at 520-22, 102 S.Ct. at 1204-05). They may: (1) withdraw the mixed petition, exhaust the remaining claims, and return later to district court with a fully exhausted petition; or (2) proceed with only the exhausted claims, although doing so risks subjecting later



petitions that raise new claims to "rigorous procedural obstacles." *Id.* (citing *Rose,* 455 U.S. at 520-21, 102 S.Ct. at 1204-05). Davis obviously chose to proceed with the second option, and cannot now avoid the "rigorous procedural obstacles" found in § 2244(b)(2)(B). Indeed, as the Supreme Court has more recently held, "a petitioner with unexhausted claims who chooses ... to proceed to adjudication of his exhausted claims ... may [not] later assert that a subsequent petition is not 'second or successive' precisely because his new claims were unexhausted at the time he filed his first petition."*Burton,* 549 U.S. at 154, 127 S.Ct. at 797.[FN6]

Moreover, and perhaps even more fundamental, Davis has failed to adequately explain why he had not exhausted his state remedies concerning the *Herrera* claim prior to filing his first federal habeas petition. As he freely admits, he had the "lion's share" of information he needed to perfect a *Herrera* freestanding actual innocence claim at the time he filed his first federal habeas petition. As a result, he could have brought his *Herrera* claim earlier in the state courts, which would have allowed him to exhaust his claim prior to filing his first federal habeas petition. In fact, Georgia law expressly provides that he could have brought an extraordinary motion for a new trial to the Georgia courts at any time. *See* Ga.Code Ann. §§ 5-5-23, 40, 41 (2007); *Timberlake,* 246 Ga. 488, 491, 271 S.E.2d 792, 795-96.

Finally, even if he had not first brought his *Herrera* claim to the state courts, Davis nonetheless could have gone forward with his *Herrera* claim in his first federal habeas petition by attempting to overcome his procedural default with a showing of "cause and prejudice" or an "actual miscarriage of justice."[FN7]*See Freeman v. Att'y Gen.* 536 F.3d 1225, 1231 (11th Cir.2008) ("When a state, prisoner fails to exhaust his federal claims in state court pursuant to independent and adequate state procedural rules before bringing his habeas petition, 'federal habeas review of the claims is barred unless

the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.' "), *cert. denied,* --- U.S. ----, 129 S.Ct. 921, --- L.Ed.2d ---- (2009). Yet, for reasons he does not provide-and which, his counsel has suggested were purely tactical[FN8]-he failed to pursue either option.

Because Davis did not bring his *Herrera* claim during his first federal habeas petition, and cannot excuse his failure to do so on exhaustion grounds, Davis is left with relying on any evidence in support of his *Herrera* claim that "could not have been discovered previously through the exercise of due diligence."28 U.S.C. § 2244(b)(2)(B)(i). Davis concedes that of the 27 exhibits in support of his *Herrera* claim that he submitted along with his application to file a second or successive habeas petition, only one satisfies this procedural requirement: a September 2008 affidavit of trial witness Benjamin Gordon.[FN9]

We agree that the 2008 Gordon affidavit, and only this affidavit, satisfies the requirement of due diligence embodied in § 2244(b)(2)(B)(i). Gordon was a witness at Davis's trial, and his story has changed markedly since that time. In his initial police statement, Gordon discussed a shooting at a party that took place in Cloverdale immediately prior to Officer MacPhail's shooting, and said that the shooter at the Cloverdale party was wearing a white Batman shirt, white Nike shoes, and jeans, and was mad because Gordon and his friends were at the party. The State introduced evidence at trial suggesting that the shooters at both locations were the same person, and called Benjamin Gordon to testify.

At trial, Gordon testified that he did not see the shooter at the Cloverdale party and that he did not remember telling the police any of the details about the shooter. In a 2003 affidavit, Gordon said that Davis had not been among the group of



people at the Cloverdale party, reiterated that he had not seen the shooter, and said that the police had threatened him, so he had signed the police report without reading it. In his 2008 affidavit, Gordon said that he had possessed additional information in 2003, but had not shared it because it involved a family member, Red Coles, and Gordon was worried about getting in trouble with the police. Gordon reaffirmed the contents of his earlier affidavit, but added that Coles had suggested to him, long after the shooting, that he (Coles) was the one who had killed Officer MacPhail.

There is nothing to indicate that Davis could have previously discovered this information with the exercise of due diligence. In fact, because Gordon previously executed an affidavit that was favorable to Davis, there was no reason for Davis to believe that Gordon had omitted any information. As a result, we consider the 2008 Gordon affidavit in determining whether Davis has satisfied § 2244(b)(2)(B)(ii).

B. *28 U.S.C. § 2244(b)(2)(B)(ii)*

We turn then to the second requirement necessary to file a successive petition under AEDPA, embodied in § 2244(b)(2)(B)(ii), and conclude that Davis cannot satisfy § 2244(b)(2)(B)(ii) for two independent reasons.

First, in analyzing this requirement, we consider whether a *Herrera* freestanding actual innocence claim, standing alone, is the kind of claim that can be heard in a *second or successive* habeas petition. We begin, as we must, with the plain language of the statute. As we have often said, "[t]he starting point for all statutory interpretation is the language of the statute itself."*United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir.1999). Indeed, "[t]he first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute. If the statute's meaning is plain and

unambiguous, there is no need for further inquiry."*United States v. Silva,* 443 F.3d 795, 797-98 (11th Cir.2006) (quotation marks omitted) (quoting *United States v. Fisher,* 289 F.3d 1329, 1337-38 (11th Cir.2002)). We "assume that Congress used the words in a statute as they are commonly and ordinarily understood, and we read the statute to give full effect to each of its provisions."*DBB, Inc.,* 180 F.3d at 1281.Put differently, we "must presume that Congress said what it meant and meant what it said."*Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1167 (11th Cir.2003) (quotation marks omitted).

Section 2244(b)(2)(B)(ii) provides that new evidence submitted with an application to file a second or successive petition must "be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."28 U.S.C. § 2244(b)(2)(B)(ii). Under the plain language of the statute, § 2244(b)(2)(B)(ii) requires *both* clear and convincing evidence of actual innocence-"clear and convincing evidence that ... no reasonable factfinder would have found the applicant guilty of the underlying offense"-*as well as* another constitutional violation-"but for constitutional error." It is, in effect, an "actual innocence plus" standard. The statutory language makes perfect sense in the context of a typical constitutional claim, such as one arising under *Brady, Giglio,* or *Strickland,* or where some other constitutional violation being complained of is not based upon the guilt or innocence of the petitioner.

However, the statutory language does not readily accommodate Davis's freestanding *Herrera* claim. In fact, in order to apply the statute to his claim, § 2244(b)(2)(B)(ii) would have to be read to say that the new evidence must "be sufficient to establish by clear and convincing evidence that, but for *the fact that the applicant was actually innocent,* no reasonable factfinder would have found the applicant guilty of



the underlying offense."This reading would render the "but for constitutional error" language entirely superfluous, requiring a petitioner only to show "clear and convincing evidence" of actual innocence in order to satisfy the second prong of the statute. It is, of course, inconceivable that a person would be found not guilty "but for"-or "except for" or "on account of"-his actual innocence; rather, a person is found not guilty precisely because of his actual innocence. We cannot read statutory language in a way that renders it wholly meaningless or nonsensical. While "[this] modification may be an appealing improvement in [Davis's] eyes, ... we are not licensed to practice statutory remodeling."*United States v. Griffith,* 455 F.3d 1339, 1344 (11th Cir.2006)."Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to 'improve' statutes by altering them."*Wright v. Sec'y for the Dep't of Corr.,* 278 F.3d 1245, 1255 (11th Cir.2002). The statute undeniably requires a petitioner seeking leave to file a second or successive petition to establish actual innocence by clear and convincing evidence *and* another constitutional violation. Simply put, Davis has not met the statute's procedural requirements for leave to file a second or successive petition.

But even if we were to completely read out of the statute the phrase "but for constitutional error" and assume *arguendo* that a *Herrera* claim, without more, is the kind of constitutional error contemplated by § 2244(b)(2)(B)(ii), the Gordon affidavit is plainly insufficient to establish a prima facie showing that, but for this evidence, no reasonable factfinder would have found Davis guilty of the underlying offense. According to Gordon's 2008 affidavit, in 1995 or 1996, Red Coles told Gordon that "he [Coles] shouldn't have done that" when they were talking about the officer shooting. Gordon told Coles to clear it up because they had someone locked up for the murder, and Coles cried. This affidavit is murky; it does not unambiguously establish that Coles

confessed to the murder.

But, more important, the affidavit, standing alone, does not negate the rest of the State's evidence at trial. The prosecutor's case included the presentation of four eyewitnesses to the officer's shooting who unambiguously identified Davis as the shooter. Further, the State's evidence showed that Davis was the one to strike Larry Young, a homeless man who, according to the evidence, was hit in the head by the same person who shot Officer MacPhail. The prosecution also established that Davis confessed to the murder to Jeffrey Sapp and Kevin McQueen. Because this evidence remains in place, Gordon's affidavit does not overwhelmingly bolster the credibility of Davis's witnesses-including Joseph Washington, who said at trial that he saw Coles shoot the officer, and Tanya Johnson, who said at trial that Coles looked nervous after the shooting-to the point where no reasonable factfinder would have credited the State's witnesses.

In short, we are constrained by the statutory requirements found in § 2244(b)(2)(B) to conclude that Davis has not even come close to making a prima facie showing that his *Herrera* claim relies on (i) facts that could not have been discovered previously through the exercise of due diligence, *and* that (ii), if proven, would "establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."28 U.S.C. § 2244(b)(2)(B) (2006). He, therefore, cannot file a successive petition.

C. *Equitable grounds*

Davis suggests, however, that we are not bound by the procedural requirements placed on us by Congress in § 2244(b)(2)(B), and that we may grant him permission to file his *Herrera* claim in a successive petition, on equitable grounds. This argument, it seems, is based on Davis's



assumption that we are his last resort, that no other court or legal body can hear his claim of innocence. We remain unpersuaded.

As an initial matter, Davis has cited no case authority for the notion that we can ignore the gatekeeping requirements found in § 2244(b)(2)(B), and we have been unable to find any. On the contrary, when the Supreme Court reviewed the constitutionality of this precise statutory provision in *Felker*, it observed that "the new restrictions on successive petitions [derive from] ... a complex and evolving body of equitable principles informed and controlled by historical usage, statutory developments, and judicial decisions."518 U.S. at 664, 116 S.Ct. at 2340 (quotation marks omitted). It concluded that "[t]he added restrictions which the Act places on second habeas petitions are well within the compass of [the writ of habeas corpus's] evolutionary process ...."*Id.* In other words, habeas corpus is, at its core, an equitable remedy, and § 2244(b)(2)(B) is Congress's codification of an equitable standard. Neither Congress nor the courts ever have hinted that an *additional* equitable exception to § 2244(b)'s general ban on second or successive federal habeas petitions exists. As a panel of this Court has observed, "[w]e have neither the power nor the inclination to turn back the clock and pretend that the AEDPA was not enacted. It was enacted, and its provisions govern second or successive petitions."*Jordan,* 485 F.3d at 1359 (citation omitted).

But even if we could somehow employ our equitable powers as gatekeeper reviewing a successive petition and ignore the plain requirements found in § 2244(b)(2)(B), Davis has not presented us with a showing of innocence so compelling that we would be obliged to act today. Rather, the record, including all of the post-trial affidavits, is, at best, tortured and difficult. Indeed, the Georgia trial court and Georgia's Supreme Court have twice parsed through all of this evidence and determined that it was insufficient to establish Davis's

innocence. In addition, the Georgia State Board of Pardons and Paroles held a hearing, questioning every witness Davis's attorneys presented to support their allegation that there was doubt as to Davis's guilt; studied the voluminous trial transcript, the police investigation report and the initial statements of all the witnesses; had certain physical evidence retested and Davis interviewed; and ultimately concluded that clemency was not warranted.

Our review of the record is wholly consonant with the repeated conclusions of the state courts and the Board of Pardons and Paroles. For starters, we repeatedly have noted that "recantations are viewed with extreme suspicion by the courts."*United States v. Santiago,* 837 F.2d 1545, 1550 (11th Cir.1988); *United States v. Smith,* 433 F.2d 149, 150-51 (5th Cir.1970) (quoting *Newman v. United States,* 238 F.2d 861, 862 n. 1 (5th Cir.1956)). This makes sense, because as Justice Brennan once explained, recantation testimony "upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction."*Dobbert v. Wainwright,* 468 U.S. 1231, 1233-34, 105 S.Ct. 34, 36, 82 L.Ed.2d 925 (1984) (Brennan, J., dissenting).

We thus approach the recantation affidavits with some skepticism, as we must, and, reviewing the record as a whole, remain unpersuaded. To begin with, four eyewitnesses to Officer MacPhail's murder testified at the trial and identified Davis as the shooter: Steve Sanders, Harriet Murray, Antoine Williams, and Dorothy Ferrell. The first eyewitness, Steve Sanders, an Air Force serviceman, was seated in a van in the parking lot near the site of the shooting. He unambiguously identified Davis as the shooter, and did not back off of his identification when he was pressed on cross-examination, testifying that "you don't forget someone that stands over and



shoots someone."Sanders has submitted *no* post-trial affidavit altering his eyewitness account.

Another eyewitness, Harriet Murray, was sitting in the parking lot, and was a friend of Larry Young, the homeless man who was struck by Officer MacPhail's shooter. At trial, Murray testified that she had identified Davis from the pictures the police had shown her as the man who "hit Larry and shot the police," and that when she saw Davis's picture she was "real shaked up." Notably, she also identified Davis as the shooter in a courtroom identification. But even if we were to consider Murray's 2002 *unsworn* affidavit, in it she does not back off of her courtroom identification of Davis as being the shooter. It simply adds an inconsistency concerning whether the shooter verbally threatened Larry Young before striking him. And, because her post-trial affidavit is unsworn, like the Georgia Supreme Court, we are loath to consider it, and afford it precious little weight, if any. *See Davis,* 283 Ga. at 443, 660 S.E.2d 354.In any event, even considering Murray's unsworn affidavit, both Sanders and Murray unambiguously identified Davis as the shooter of Officer MacPhail, and their identifications still remain intact.

The two other eyewitnesses, Williams and Ferrell, also identified Davis at trial as having shot and killed Officer MacPhail. According to their post-trial affidavits, they have recanted their identifications, but all that they now declare is that they did not see who the shooter was or what he was wearing. The ambiguity of Williams's and Ferrell's post-trial affidavits falls far short of a compelling showing or for that matter, a prima facie showing of Davis's innocence.

Davis also points to several post-trial affidavits averring that Red Coles confessed to Officer MacPhail's murder. Yet, at trial, the jury heard Davis and Coles give conflicting testimony: Coles identified Davis as the one who hit Larry Young in the head, and Davis testified that Coles hit Young in

the head. Neither, however, identified the other as the shooter. The jury chose to believe Coles. But even if we were to wholly discount Coles's testimony, Davis's trial testimony still squarely conflicts with the testimony of various witnesses, including Sanders, Murray, and even Larry Young, who testified that the only man who spoke that night was the one arguing with him, while Davis testified that he twice told Coles to stop bothering the man. In addition, Davis's testimony also squarely conflicts with the testimony of Red Coles's sister, Valerie Coles, who testified that Davis had come to her house to change shirts after the shooting, while Davis testified that he had never been to her house.

All told, the testimony by Murray and Sanders remains; the two other eyewitnesses do not now implicate anyone, much less Coles; Coles continues to implicate Davis; and the testimony of Larry Young and Valerie Coles still collides with Davis's. When we view all of this evidence as a whole, we cannot honestly say that Davis can establish by clear and convincing evidence that a jury would not have found him guilty of Officer MacPhail's murder.

We are also unpersuaded by Davis's suggestion that his claim of innocence has not been and will never be heard. As the record shows, both the state trial court *and* the Supreme Court of Georgia have painstakingly reviewed, and rejected, Davis's claim of innocence. Likewise, the Georgia State Board of Pardons and Paroles thoroughly reviewed, and rejected, his claim, even conducting further research and bringing in witnesses to hear their recantations in person.

Moreover, Davis still may petition the United States Supreme Court to hear his claim under its original jurisdiction. The Supreme Court has made clear that the habeas corpus statute, even after the AEDPA amendments of 1996, continues to allow it to grant a writ of habeas corpus filed pursuant to its original jurisdiction. *See Felker,* 518 U.S. at 660, 116 S.Ct. at



2338;*see also In re Medina,* 109 F.3d 1556, 1564 (11th Cir.1997), *overruled on other grounds by Stewart v. Martinez-Villareal,* 523 U.S. 637, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998); *accord Spivey v. State Bd. of Pardons & Paroles,* 279 F.3d 1301, 1304 n. 4 (11th Cir.2002). The Supreme Court rested this conclusion-that AEDPA "has not repealed our authority to entertain original habeas petitions,"*Felker,* 518 U.S. at 660, 116 S.Ct. at 2338-on the fact that "[n]o provision" even "mentions our authority to entertain original habeas petitions."*Id.*

## III. CONCLUSION

Since Davis has failed to meet either of the statutory requirements found in AEDPA, 28 U.S.C. § 2244(b)(2)(B), we are constrained to deny him leave to file a second or successive petition. But because Davis still may file a habeas corpus petition in the Supreme Court, pursuant to its original jurisdiction, we shall continue the stay of execution for 30 days from the date of the filing of this opinion. At the expiration of the 30 day time period, this stay shall be automatically lifted.

APPLICATION DENIED.

BARKETT, Circuit Judge, dissenting:

This case highlights the difficulties in navigating AEDPA's thicket of procedural brambles. While we must deal with the thorny constitutional and statutory questions before us, we also cannot lose sight of the underlying issue in this case. Simply put, the issue is whether Troy Anthony Davis may be lawfully executed when *no* court has ever conducted a hearing to assess the reliability of the score of affidavits that, if reliable, would satisfy the "threshold showing" for "a truly persuasive demonstration of actual innocence," thus entitling Davis to habeas relief. *Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (quotation omitted).

In the affidavits, seven of nine key trial witnesses recanted their testimony which pointed to Davis as Officer MacPhail's murderer. The two remaining non-recanting witnesses were Sylvester "Red" Coles, who was himself alleged to have been the shooter in affidavits, and Steve Sanders, who identified Davis at trial two years after the incident despite admitting to police immediately following the shooting that he would not be able to recognize the shooter.

The majority of the affidavits support the defense's theory that, after Coles raced to the police station to implicate Davis, the police directed all of their energy towards building a case against Davis, failing to investigate the possibility that Coles himself was the actual murderer. For example, none of the photospreads shown to eyewitnesses even included a picture of Coles. Additionally, three affiants now state that Coles confessed to the killing. To execute Davis, in the face of a significant amount of proffered evidence that may establish his actual innocence, is unconscionable and unconstitutional.

The majority takes the position that we cannot permit Davis to bring his evidence before the district court because our discretion to do so is constrained by AEDPA. But AEDPA cannot possibly be applied when to do so would offend the Constitution and the fundamental concept of justice that an innocent man should not be executed. In this case, the circumstances do not fit neatly into the narrow procedural confines delimited by AEDPA. But it is precisely this type of occasion that warrants judicial intervention. As Justice Fortas noted:

> The scope and flexibility of the writ [of habeas corpus]-its capacity to reach all manner of illegal detention-its ability to cut through barriers of form and procedural mazes-have always been emphasized and jealously guarded by courts and lawmakers. The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected.



*Harris v. Nelson*, 394 U.S. 286, 291, 89 S.Ct. 1082, 22 L.Ed.2d 281 (1969).

## BACKGROUND

The facts of this case center around the night of Friday, August 18 and the early morning of Saturday, August 19, 1989, in Savannah, Georgia. It is undisputed that "Red" Coles was harassing and following a homeless man, Larry Young, between a pool hall and a Burger King parking lot. Davis and Darrell "D.D." Collins also were present during some portion of the harassment. Someone hit Young, nearby police officer Mark MacPhail responded, and someone shot MacPhail three times.

The police had no leads until Coles went to the police station the day after the murder, admitted that he was one of the three individuals involved in the altercation with Larry Young, and implicated Davis in the MacPhail shooting. There is no dispute that the police focused exclusively on Davis as a suspect because of Coles's statement. The witnesses at trial primarily identified the shooter as the person wearing a white shirt. However, the totality of the evidence, including the affidavits, contains conflicting evidence about what color shirts Davis and Coles were wearing, with testimony that each was wearing a white shirt.

The two trial witnesses who claimed that Davis confessed to the shooting have since recanted in sworn affidavits.[FN1] Additionally, three witnesses who did not testify at trial have since submitted sworn affidavits stating that Coles confessed to them that he was the shooter, and one of the State's trial witnesses submitted a sworn affidavit stating

that Coles essentially confessed to him, but that he had not said anything sooner because he and Coles were related. Thus, no one at this time contends that Davis has ever confessed to the shooting; conversely, multiple witnesses maintain that Coles has confessed.

## DISCUSSION

### I. *A Claim of Actual Innocence Is a Cognizable Constitutional Claim.*

In *Herrera,* the Supreme Court assumed, "for the sake of argument ..., that in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim."506 U.S. at 417, 113 S.Ct. 853.Without explicitly announcing a standard by which to judge such a claim, the majority stated that the required threshold showing of innocence "would necessarily be extraordinarily high," in light of the disruptive effect of entertaining such a claim and the enormous burden on a state court of having to retry a case. *Id.* The majority then held that Herrera's showing of innocence fell short of such a standard.*Id.* at 418-19, 113 S.Ct. 853.

In a concurring opinion, Justice O'Connor, joined by Justice Kennedy, stated that, regardless of whether one used the "verbal formula" from the Eighth Amendment or Fourteenth Amendment, "the execution of a legally and factually innocent person would be a constitutionally intolerable event."*Id.* at 419, 113 S.Ct. 853.Nonetheless, because the record "overwhelmingly demonstrate[d]" Herrera's guilt, she concurred in the denial of relief. *Id.* at 421, 113 S.Ct. 853.[FN2]

Justice Blackmun, joined by Justices Stevens and Souter, dissented from the denial of relief and explained that the



majority's discussion of the validity of a freestanding actual innocence claim was dictum because the Supreme Court decided the case based only on the assumption that Herrera's claim was valid.*Id.* at 430, 113 S.Ct. 853.Justice Blackmun declared that "the Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence."*Id.* at 431, 113 S.Ct. 853.He explained that the execution of an actually innocent person violated the Constitution's ban on cruel and unusual punishment and its guarantee of substantive due process. *Id.* at 431-37, 113 S.Ct. 853.

Between Justice O'Connor's concurrence and Justice Blackmun's dissent, five justices agreed that the execution of an actually innocent person would violate the Constitution. Consistent with the opinions of five justices in *Herrera,* I believe that the Eighth and Fourteenth Amendments prohibit the execution of an actually innocent individual.

With respect to the Eighth Amendment, it is absurd to suggest that executing a person for a crime of which he is innocent does not amount to cruel and unusual punishment. Indeed, the Supreme Court has held that execution violates the Eighth Amendment for several offenses comparatively less severe than murder, including rape. *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). The Court has also held that the execution of mentally retarded persons and juvenile offenders violates the Eighth Amendment because such persons are less criminally culpable. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (mentally retarded persons); *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) (juvenile offenders).

Similarly, the execution of one who is actually innocent, but found legally guilty, clearly runs contrary to social consensus. As Justice Blackmun stated in his *Herrera* dissent, it is

"crystal clear that the execution of an innocent person is at odds with contemporary standards of fairness and decency."506 U.S. at 431, 113 S.Ct. 853 (quotation omitted). Obviously, the execution of an actually innocent individual has nothing to do with the goals of criminal punishment. Such an execution would serve no retributive purpose nor have any deterrent value. See *Kennedy v. Louisiana,* 554 U.S. ----, 128 S.Ct. 2641, 2661, 171 L.Ed.2d 525 (2008). On the contrary, the execution of an actually innocent individual undermines the legitimacy of the criminal justice system's power to punish. See *Herrera,* 506 U.S. at 433-34, 113 S.Ct. 853 (Blackmun, J., dissenting) (noting that "the legitimacy of punishment is inextricably intertwined with guilt").

Likewise, the Fourteenth Amendment's Due Process Clause prohibits states from depriving any person of life or liberty without due process of law."[S]ubstantive due process prevents the government from engaging in conduct that shocks the conscience, or interferes with rights implicit in the concept of ordered liberty."*United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987) (quotations and citations omitted)."[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."*Tinker v. Beasley,* 429 F.3d 1324, 1328 (11th Cir.2005) (quoting *County of Sacramento v. Lewis,* 523 U.S. 833, 849, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)).

Certainly, the execution of an actually innocent person would shock the conscience such that it runs afoul of the right to substantive due process. *SeeHerrera,* 506 U.S. at 430, 113 S.Ct. 853 (Blackmun, J., dissenting) ("Nothing could be more contrary to contemporary standards of decency or more shocking to the conscience than to execute a person who is actually innocent.") (internal citations omitted). Justice Blackmun remarked that "[e]xecution of an innocent person is the ultimate arbitrary imposition" because it is one "from



which one never recovers and for which one can never be compensated."*Id.* at 437, 113 S.Ct. 853 (quotation and citation omitted).

I do not believe that any member of a civilized society could disagree that executing an innocent person would be an atrocious violation of our Constitution and the principles upon which it is based.

II. *As the Constitution Prohibits the Execution of an Actually Innocent Individual, Habeas Relief Must Be Available to an Actually Innocent Individual Facing Execution.*

The majority opinion does not consider whether federal habeas relief may ever be available for the actually innocent, but instead concludes that AEDPA prohibits this court from granting permission to file a second or successive habeas petition when the only claim asserted is one of actual innocence. I do not believe that AEDPA's procedural bars should be read to preclude this court from granting permission to file a second or successive habeas petition to individuals who bring a viable freestanding actual innocence claim. As we have recognized, "if a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception."*Mize v. Hall,* 532 F.3d 1184, 1195 n. 9 (11th Cir.2008).

In considering § 2244(b)(2)(B)(ii), the majority opinion concludes that a freestanding actual innocence claim is not the type of claim that may be brought on a second or successive petition. Section 2244(b)(2)(B)(ii) requires "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."The majority opinion decides that this requires that a court of appeals only grant permission to file such a petition when a petitioner can establish *both* actual

innocence *and* a separate constitutional violation other than the actual innocence. In other words, the "constitutional error" in § 2244(b)(2)(B)(ii) cannot be the actual innocence of the applicant.

However, it is incongruous to suggest that an actually innocent individual who can allege a constitutional violation occurred at trial is entitled to permission to file a second or successive petition, while an actually innocent individual who cannot identify any such violation cannot receive permission from this court to file such a petition to prove his claim, even though granting permission may prevent his unconstitutional execution. Indeed, the underlying principle of a *Herrera* actual innocence claim is that actual innocence renders an execution "constitutionally intolerable *even if* [the defendant's] conviction was the product of a fair trial."*Schlup v. Delo,* 513 U.S. 298, 316, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) (quotation omitted). It is the actual innocence of the defendant, not the presence of constitutional errors at trial, that render an execution of an actually innocent individual a violation of the Eighth and Fourteenth Amendments. Accordingly, it should be the actual innocence of the applicant that entitles him to file a second or successive habeas petition.

For the same reason, the failure to satisfy the diligence requirement of 28 U.S.C. § 2244(b)(2)(B)(i) should not be interpreted to bar a viable freestanding actual innocence claim. The concept of punishing an innocent defendant with the penalty of death simply because he did not file his papers as early as he should have is draconian. Moreover, as the majority opinion admits, at least one affidavit, the 2008 Gordon affidavit,[FN3] does satisfy § 2244(b)(2)(B)(i). However, the majority's analysis of Davis's claim under § 2244(b)(2)(B)(ii) with that affidavit serving as the factual predicate for Davis's claim is flawed.



The majority opinion looks at the Gordon affidavit *alone* and compares it with the State's evidence at trial, and finds that the affidavit cannot establish that "no reasonable factfinder would have found [Davis] guilty of the underlying offense," as required by § 2244(b)(2)(B)(ii). However, this analysis confuses the "factual predicate" of § 2244(b)(2)(B)(i) with the "facts underlying the claim" in § 2244(b)(2)(B)(ii) by analyzing only the Gordon affidavit, and not the totality of Davis's evidence. While the "factual predicate" for the claim may be Gordon's 2008 affidavit, there is nothing in AEDPA that suggests that this court consider only the "factual predicate" when determining if § 2244(b)(2)(B)(ii) has been satisfied. Instead, the requirement under § 2244(b)(2)(B)(ii) that this court consider the "facts underlying the claim" suggests that we consider *all* of the relevant facts of Davis's actual innocence claim, which here would include all of the evidence Davis now presents. When considered together, this evidence significantly undermines the evidence presented by the State at trial.

There is no question that, even pre-AEDPA, the procedural obstacles to filing a second or successive habeas petition were considerable. *See generally Schlup,* 513 U.S. at 317-19, 115 S.Ct. 851.Nonetheless, the Supreme Court has "consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice."*Id.* at 321, 115 S.Ct. 851.And, particularly relevant in the present case, the Court has recognized that "[t]he quintessential miscarriage of justice is the execution of a person who is entirely innocent."*Id.* at 324-25, 115 S.Ct. 851.Thus, where a defendant who can make a viable claim of actual innocence is facing execution, the fundamental miscarriage of justice exception should apply and AEDPA's procedural bars should not prohibit the filing of a second or successive habeas petition. I respectfully dissent.

FN1. In *Schlup,* the Supreme Court held that a petitioner who makes the requisite showing of actual

innocence may be able to obtain federal review of any constitutional claim that would otherwise be defaulted because the petitioner failed to raise that claim in state court. 513 U.S. at 314-17, 115 S.Ct. at 861-62.

FN2. Georgia's State Board of Pardons and Paroles, State of Georgia, Denial of Commutation and Stay of Sentence of Death (Sept. 12, 2008).

FN3. Georgia's State Board of Pardons and Paroles, State of Georgia, Statement Regarding Troy Davis Case (Sept. 28, 2008).

FN4.*See also id.* at 419-21, 113 S.Ct. at 870-71 ("[T]he execution of a legally and factually innocent person would be a constitutionally intolerable event," but resolving this issue is "neither necessary nor advisable in this case," where the petitioner is "not innocent.") (O'Connor, J., concurring); *id.* at 428, 113 S.Ct. at 875 ("I nonetheless join the entirety of the Court's opinion, ... because there is no legal error in deciding a case by assuming, *arguendo,* that an asserted constitutional right exists ....") (Scalia, J., concurring); *id.* at 429, 113 S.Ct. at 875 ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render unconstitutional the execution of petitioner in this case.") (White, J., concurring); *id.* at 437, 113 S.Ct. at 879 (Because "[e]xecution of an innocent person is the ultimate 'arbitrary imposition' ... from which one never recovers and for which one can never be compensated [,] ... petitioner may raise a substantive due process challenge to his punishment on the ground that he is actually innocent.") (internal citations and brackets omitted) (Blackmun, J., dissenting in part).



FN5. Indeed, "cause" in the pre-AEDPA case law was "based on the principle that petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition."*Id.* at 498, 111 S.Ct. at 1472.Furthermore, a "fundamental miscarriage of justice" was satisfied by a petitioner presenting "new facts [that] raise[ ] sufficient doubt about [petitioner's] guilt to undermine confidence in the result of the trial."*Schlup,* 513 U.S. at 317, 115 S.Ct. at 862;*see also id.* at 327, 115 S.Ct. at 867 ("To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.").

FN6. To the extent Davis suggests the Supreme Court has created an exception to *Rose* in *Panetti v. Quarterman,* 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007), that exception does not apply here. In *Panetti,* the Supreme Court redefined "second or successive" to exclude an application including a mental incompetency claim, but notably *limited* its holding to incompetency claims because all prisoners are at risk of deteriorations in their mental state, and may not become incompetent until well after their petition is filed. *See id.* at 2853 ("Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the *unusual* posture presented here: a § 2254 application raising a[n] ... incompetency claim filed as soon as that claim is ripe.") (emphasis added); *see also id.* at 2866-67 (Thomas, J., dissenting) ("Today's decision thus stands only for the proposition that [mental incompetency] claims somehow deserve a special (and unjustified) exemption from the statute's plain

import."). Davis's actual innocence claim, on the other hand, is not the kind of claim that would not ripen until sometime in the future like an incompetency claim.

FN7. We assume, without deciding, that an unexhausted *Herrera* claim is subject to the procedural default rules, which allow for a federal court to hear an unexhausted claim if the petitioner has shown "cause and prejudice" or an "actual miscarriage of justice." *See Mize v. Hall,* 532 F.3d 1184, 1195 n. 9 (11th Cir.2008) (stating in dicta that "if a petitioner in fact has a freestanding actual innocence claim, he would be entitled to have all his procedural defaults excused as a matter of course under the fundamental miscarriage of justice exception"); *see also Brown v. Hooks,* 176 Fed.Appx. 949, 954-55 (11th Cir.2006) (unpublished) (vacating the district court's decision dismissing a petition with prejudice so that the district court can determine whether either of the two "narrow circumstances" applies to excuse the procedural default of the petitioner's unexhausted actual-innocence claim based on a newly discovered affidavit).

FN8. Davis also has argued that he could not have brought his *Herrera* claim until he sought relief from Georgia's State Board of Pardons and Paroles, relying on language in *Herrera* that a freestanding actual innocence claim may be viable only "if there were no state avenue open to process such a claim."506 U.S. at 417, 113 S.Ct. at 869.However, a person seeking to establish his innocence of a crime under Georgia law may apply for a pardon "any time after conviction," Georgia Pardons and Paroles Rule 475-3-.10(3)(a), signifying that Davis could have exhausted this state avenue before he filed his first federal habeas petition.



FN9. The other affidavits are these: Gary Hargrove-8/17/01; Joseph Washington-12/5/96; Harriet Murray-10/14/02; Anthony Hargrove-8/20/01; Shirley Riley-8/18/01; Darold Taylor-8/20/01; Tonya Johnson-12/6/96; Anita Dunham Saddler-7/10/02; April Hester Hutchinson-7/2/02; Peggie Grant-7/11/02; Daniel Kinsman-10/15/02; Kevin McQueen-12/5/96; Jeffrey Sapp-2/9/03; Monty Holmes-8/17/01; Darrell "D.D." Collins-7/11/02; Larry Young 10/11/02; Dorothy Ferrell-11/29/00; Antoine Williams-10/12/02; April Hester Hutchinson-11/30/95; Abdus-Salam Karim-10/8/02; Robert Grizzard-3/23/03; Benjamin Gordon-2/10/03; Michael Cooper-2/10/03; Joseph "Papa" Blige-12/1/95; Lamar Brown-11/2/95; and Professor Jeffrey S. Neuschatz-7/6/07.

FN1. Moreover, one of the two supposed confessions offered at trial was entirely inconsistent with the events of the night in question as reported by all other relevant witnesses, suggesting that little if any credibility should be afforded to that "confession."

FN2. Unlike the record in *Herrera,* the evidence presented by Davis in support of his actual innocence claim is significant and compelling.

FN3. Benjamin Gordon's 2008 affidavit implicates Coles as the shooter both through incidents Gordon witnessed on the night of the shooting as well as Gordon's relation of an incident in which Coles essentially confessed to Gordon that he was the one who shot the officer.

**APPENDIX B – MAJORITY AND DISSENTING OPINIONS OF THE SUPREME COURT OF GEORGIA Dated March 17, 2008**

**In the Supreme Court of Georgia**

Decided: March 17, 2008

**S07A1758. DAVIS v. THE STATE.**

MELTON, Justice.

Troy Anthony Davis was convicted of murdering Savannah police officer Mark MacPhail[1] and of related crimes. He was sentenced to death for the murder, and this Court affirmed. Davis v. State, 263 Ga. 5 (426 SE2d 844) (1993), cert. denied, 510 U. S. 950 (114 SC 396, 126 LE2d 344) (1993). He filed a petition for writ of habeas corpus in the Superior Court of Butts County, and this Court affirmed the denial of that petition. Davis v. Turpin, 273 Ga. 244 (539 SE2d 129) (2000), cert. denied, 534 U. S. 842 (122 SC 100, 151 LE2d 59) (2001). See also Davis v. Thomas, 266 Ga. 835 (471 SE2d 202) (1996) (reversing the habeas court's denial of a continuance). He filed a federal habeas petition, and his appeals from the denial of that petition failed. Davis v. Terry, 465 F3d 1249 (11th Cir. 2006), cert. denied, ___ U. S. ___ (127 SC 3010, 168 LE2d 728) (2007). After the trial court issued a new order for his execution, Davis filed an extraordinary motion for new trial on July 9, 2007, eight days before the beginning of the week-long period set for his

[1] On direct appeal, this Court adopted the spelling of the victim's name contained in the trial transcripts. We now adopt the spelling that presently appears to be correct.



execution. See OCGA § 5-5-41 (b). The trial court denied the extraordinary motion for new trial without conducting a hearing. Davis then filed an application for discretionary appeal and a motion for a stay of execution in this Court. While the application was pending, the State Board of Pardons and Paroles granted a temporary stay of execution and scheduled a hearing. On August 3, 2007, this Court dismissed Davis's motion for a stay of execution as moot and granted his application for discretionary appeal. Davis v. State, 282 Ga. 368 (651 SE2d 10) (2007). The State Board of Pardons and Paroles then rescinded its stay of execution and suspended its consideration of Davis's petition for clemency while this Court considers the instant appeal. In light of the following discussion, we conclude that the trial court did not abuse its discretion in denying Davis's extraordinary motion for new trial without first conducting a hearing, and, accordingly, we affirm.[2]

1. The evidence at trial authorized the jury to find the following: In the early morning of August 19, 1989, Davis was at a pool hall in Savannah with his friends, Sylvester "Red" Coles and sixteen-year-old Darrell "D.D." Collins. Nearby, a homeless man named Larry Young was exiting a convenience store. Coles asked Young for one of the beers Young had just purchased. When Young refused, Coles followed him up the street, cursing at him. Davis and Collins circled around a bank in an apparent flanking

[2] We must point out that, contrary to the dissent's implication otherwise, this opinion does not hold and nowhere states that recantations and confessions must be categorically excluded and never considered in cases such as this. Nor do we hold that a trial court has no right to hold a hearing to consider the evidence with which it has been presented. We simply hold that, in dealing with the evidence and in its decision not to hold a hearing, the trial court did not abuse the discretion with which it is empowered by law under the facts of this case.

maneuver and joined Coles in surrounding Young. Someone shouted a threat about shooting Young, and Davis came from behind Young and struck him in the head with a pistol, injuring him badly. Collins fled as soon as Young was struck. Davis and Coles fled immediately afterward when it became obvious that the police were being called. Mark MacPhail, a police officer working off-duty at the nearby bus station and Burger King, began pursuing Davis and Coles and shouted for them to stop. Coles stopped, and MacPhail ran past him. Davis kept running and fired a handgun at MacPhail, who was shot and fell. Davis then stood over MacPhail smiling and fired again. Altogether, MacPhail was shot three times, once in the face, once in the right thigh, and once in the chest.

Earlier on the night of the murder, a man named Michael Cooper was shot while leaving a party. A bullet retrieved from Michael Cooper's body during his medical treatment was similar to bullets from the murder scene. Shell casings retrieved from the two scenes were matched with greater certainty. Testimony at trial identified Davis as the person who shot Michael Cooper.

At trial, Davis's defense centered on the theory that Coles was the murderer. Both Davis and Coles testified, each claiming their innocence. The evidence at trial authorized the jury to conclude beyond a reasonable doubt that Davis was the man who struck Larry Young and shot Officer MacPhail..

2. Because the statutes authorizing extraordinary motions for new trials are silent as to procedural details, "the procedural requirements for such motions are the product of case law." Dick v. State, 248 Ga. 898, 899 (2) (287 SE2d 11) (1982). We have held that a new trial may be granted based on newly-discovered evidence only where the defendant shows each of the following:

> (1) that the evidence has come to his



> knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.

Timberlake v. State, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980) (punctuation and citations omitted). "Failure to show one requirement is sufficient to deny a motion for a new trial." Id. (emphasis supplied). Extraordinary motions for new trial are "not favored," and a "a stricter rule is applied to an extraordinary motion for a new trial based on the ground of newly available evidence than to an ordinary motion on that ground. " Crowe v. State, 265 Ga. 582, 590-591 (15) (458 SE2d 799) (1995) (punctuation and citation omitted). A trial court's ruling on such a motion "will not be reversed unless it affirmatively appears that the court abused its discretion. [Cit.]" Young v. State, 269 Ga. 490, 491-492 (2) (500 SE2d 583) (1998) (punctuation and citation omitted). For the reasons set forth below, we conclude that the trial court did not abuse its discretion in denying Davis's extraordinary motion for new trial without first conducting a hearing, particularly in light of the requirement under Timberlake that newly-discovered evidence be so material that it probably would result in a different verdict, Timberlake, 246 Ga. at 491 (1), and in light of the duty of a defendant to present in the affidavits supporting his or her extraordinary motion for new trial "facts sufficient to authorize that the motion be granted," Dick, 248 Ga. at 899 (2) (emphasis in original).

3. Davis's extraordinary motion for new trial relied primarily on affidavit testimony consisting of four

types, recantations by trial witnesses, statements recounting alleged admissions of guilt by Coles, statements that Coles disposed of a handgun following the murder, and an alleged eyewitness account. We discuss each of these affidavits, which are the ones highlighted by Davis in his brief on appeal, by category below.

## A. Recantations by Trial Witnesses

This Court has noted the general lack of credibility that should be assigned to recantation testimony in the context of an extraordinary motion for new trial, stating that such "[d]eclarations made after the trial are entitled to much less regard than sworn testimony delivered at the trial." Norwood v. State, 273 Ga. 352, 353 (2) (541 SE2d 373) (2001) (quoting Johnson v. State, 236 Ga. App. 764, 765 (1) (513 SE2d 291) (1999)). Trial testimony is closer in time to the crimes, when memories are more trustworthy. Furthermore, the trial process itself, including public oaths, cross-examination, and the superintendence of a trial judge, lends special credibility to trial testimony. Accordingly, we have quoted the Court of Appeals as follows:

> "The only exception to the rule against setting aside a verdict[,] without proof of a material witness' conviction for perjury, is where there can be no doubt of any kind that the State's witness' testimony in every material part is purest fabrication." Cit. A recantation impeaches the witness' prior testimony. Cit. However, it is not the kind of evidence that proves the witness' previous testimony was the purest fabrication. See, e.g., Fugitt v. State, [251 Ga. 451 (1) (307 SE2d 471) (1983)] (the evidence offered was extrinsic proof that the witness' testimony was physically impossible; consequently, the trial court was able to determine the truth of the matter without having to take into account the witness' credibility).



Id. See also Drake v. State, 248 Ga. 891, 894 (287 SE2d 180) (1982). The trial court relied on this principle in disregarding the alleged recantations in Davis's case. Davis argues that the sheer number of recantations in his case demands a different analysis. Pretermitting whether such an argument might ever be persuasive, we find it unpersuasive in Davis's case in light of the analysis that follows. Thus, under the right for any reason principle, we conclude that Davis has failed to show that these alleged recantations support his extraordinary motion for new trial.

At trial, Jeffrey Sapp testified that he was an acquaintance of Davis and knew him by the nickname, "Rough as Hell." Sapp further testified at trial that Davis admitted that he struck Larry Young, shot Mark MacPhail, and then "finished the job." In an affidavit dated 1996, Sapp stated that he had lied to officers about Davis's admission because he wanted the officers to stop "harassing" him and that he later felt pressured by authorities to maintain his story at trial. Kevin McQueen also testified at trial that Davis confessed his guilt to him. McQueen testified that Davis, while in jail, admitted to shooting MacPhail and then shooting him again to ensure his death because MacPhail had seen his face. McQueen stated in an affidavit dated 1996 that he lied at trial because he was angry at Davis. We note that, even if the recantations by Sapp and McQueen were credited as true, they would show merely that Davis did not admit his guilt to these witnesses, not that Davis was not guilty. Furthermore, the witnesses' original testimony against Davis would remain admissible against him in any retrial. These affidavits lack the type of materiality required to support an extraordinary motion for new trial, as they do not show the witnesses' trial testimony to have been the "purest fabrication." Norwood, 273 Ga. at 353 (2) (punctuation and citation omitted). See Timberlake, 246 Ga. at 491 (1). Furthermore, we note that

these affidavits were both obtained in 1996, long before Davis initiated his federal habeas corpus proceedings. Thus, it appears that Davis has not been diligent in presenting these affidavits to the trial court, which is another of the requirements in an extraordinary motion for new trial. Id. See Llewellyn v. State, 252 Ga. 426, 428-429 (2) (314 SE2d 227) (1984) (holding that a post-trial delay in obtaining and presenting allegedly-exculpatory evidence shows a lack of required diligence).

Larry Young gave testimony at trial that tended to identify Davis as the one who struck him. His testimony addressed, in part, the clothing persons involved were wearing and the location they were standing during the argument and when Young was struck. In an affidavit dated 2002, Young stated that he was, in fact, unable to "remember what anyone looked like or what different people were wearing" and that he "just couldn't tell who did what." This new expression of uncertainty fails to show that Davis was not in fact the perpetrator and fails to show that the witness's testimony was the "purest fabrication"; therefore it lacks the materiality necessary to support an extraordinary motion for new trial. Norwood, 273 Ga. at 353 (2) (citation and punctuation omitted). See Timberlake, 246 Ga. at 491 (1).

Darrell Collins, the sixteen-year-old boy who followed Davis as he approached Larry Young, testified at trial that he witnessed Davis striking Young. This testimony was important because other witnesses testified that the person who struck Young also shot MacPhail. Collins stated in an affidavit dated 2002 that he did not witness Young's being struck. Collins also stated that he felt pressured to testify as he did. This testimony does not in any way show that Davis was not guilty of striking Young and shooting MacPhail, and Collins's original trial testimony would still be admissible against Davis in any retrial. Collins's affidavit lacks the type of materiality required to support an extraordinary motion for new trial, as it does not show



Collins's trial testimony to have been the "purest fabrication." Norwood, 273 Ga. at 353 (2) (citation and punctuation omitted). See Timberlake, 246 Ga. at 491 (1).

Antoine Williams testified at trial that he was "sixty percent" certain that Davis was the shooter. His testimony also included a description of the location of the person who struck Larry Young that was consistent with Davis's location. In an affidavit dated 2002, he stated that he could not identify the shooter. Because there is nothing in this affidavit testimony that indicates affirmatively that Davis was not guilty, and because Williams's original testimony would be admissible against Davis at any retrial, the affidavit testimony lacks the type of materiality required to support an extraordinary motion for new trial, as it does not show Williams's trial testimony to have been the "purest fabrication." Id..

Dorothy Ferrell identified Davis at trial as the shooter. In an affidavit dated 2000, she states that she felt pressured to make the identification and that she did not actually see who shot MacPhail. Again, however, her new version of events lacks the required materiality, because her original trial testimony would be admissible against Davis at any retrial and because her new affidavit testimony does not show her trial testimony to have been the "purest fabrication." Id.

Harriet Murray identified Davis at trial as the shooter, describing in detail his physical features on the night of the murder and his gun. She was cross-examined about inconsistencies between her trial testimony and statements she made to investigators and in Davis's preliminary hearing; however, she never backed down from her identification of Davis. Davis submitted an un-notarized statement from Murray dated 2002 in support of his extraordinary motion for new trial in which she seems to identify Coles as the shooter. Davis also submitted an affidavit dated 2002 from an attorney stating that, when she signed her statement, Murray refused to wait for a notary to arrive or to allow a notary to come to her

house later. As we noted above, an extraordinary motion for new trial must include the "affidavit of the witness himself" or an adequate explanation for its absence. Timberlake, 246 Ga. at 491 (1). We find that the five-year-old affidavit presented by Davis as an explanation for the absence of Murray's sworn testimony is inadequate, and, accordingly, we disregard her unsworn statement. Furthermore, even if we were to consider this unsworn statement, we find that yet another inconsistent statement from Murray, made years after the murder, would lack the materiality required to support Davis's extraordinary motion for new trial because it does not show her trial testimony to have been the "purest fabrication." Norwood, 273 Ga. at 353 (2) (citation and punctuation omitted). See Timberlake, 246 Ga. at 491 (1).

### B. Statements Recounting Alleged Admissions of Guilt by Coles

We have held as follows:

> It is the long-standing rule in this state that declarations to third persons against the declarant's penal interest, to the effect that the declarant, and not the accused, was the actual perpetrator of the offense, are not admissible in favor of the accused at his trial . . . or to procure a new trial on the basis of newly discovered evidence.

Timberlake, 246 Ga. at 492 (1). This rule rests at least in part on the concept that a trial court should consider only evidence that would be admissible if a new trial were ordered. See Herrin v. State, 230 Ga. 476, 478-479 (2) (197 SE2d 734) (1973). See also OCGA § 5-5-23 (mandating that newly-discovered evidence presented in a motion for new trial must not be merely impeaching). However, we have held that testimony recounting admissions of guilt by a declarant to a third party are admissible at trial when "the declarant is



present, testifies, and is subject to cross-examination." Guess v. State, 262 Ga. 487, 488-489 (2) (422 SE2d 178) (1992). As we have noted already, Coles testified at Davis's trial, so any alleged admission of guilt by him to a third party would have been admissible at Davis's original trial. Such testimony at trial would be substantive evidence and not merely impeaching of the declarant. Gibbons v. State, 248 Ga. 858, 862 (286 SE2d 717) (1982). But our rule against allowing testimony about such alleged admissions to third persons also rests on the separate rationale that "a person could subvert the ends of justice by [falsely] admitting the crime to others and then absenting himself." Timberlake, 246 Ga. at 492 (1). This concern would exist in the context of an extraordinary motion for new trial even where the declarant has previously testified at trial. We need not decide here, however, whether the rule against such testimony in support of an extraordinary motion for new trial should apply even where the declarant has testified at trial, because the affidavits in question are not sufficiently material to support an extraordinary motion for new trial. Id. at 491 (1).

Davis's extraordinary motion for new trial included an affidavit from Anthony Hargrove dated 2001. Anthony Hargrove stated that he is the brother of Gary Hargrove, whose affidavit is discussed below. Anthony Hargrove further stated that he and Sylvester Coles were smoking marijuana at a party about a year after Officer MacPhail's murder and that Coles stated that "he killed a policeman and a guy named Troy took the fall for it." Davis also presented an affidavit from Shirley Riley dated 2001 in which she stated that, while she and Coles were drinking beside a pool one day, she asked Coles what happened to the officer and he stated that he shot the officer but that it was an accident. Tellingly, however, she added the following: "Maybe Sylvester was just trying to impress me. I don't know for sure who actually shot the officer." Finally, Davis presented an affidavit from Darold Taylor dated 2001. Taylor stated that Coles frequently threatened people and boasted about his

violent nature. He also stated that, one day when he and Coles were drinking beers together, he asked Coles about rumors that Coles was the shooter. Taylor stated that, after first telling him to "stay out of his business," Coles indicated that he was the one who shot the officer. These three affidavits must be considered, if at all, in light of the evidence presented at trial, including Coles's own testimony. Even the statements about the alleged admissions themselves contain evidence that they are not trustworthy, as the statements show that Coles was someone who wanted to be feared and that at least one of the persons to whom he made his admissions doubted his account. Although the jury clearly would not have deemed these statements utterly irrelevant, the affidavits, if considered at trial, would have merely forced the jury to weigh Davis's guilt or innocence in ways that were independent of the trustworthiness of Davis and Coles, who both actually testified at trial and proclaimed their innocence. Thus, pretermitting the categorical analysis applied by the trial court and applying the right for any reason principle, we conclude that these affidavits are not sufficiently material to support Davis's extraordinary motion for new trial. Id.

### C. Statements that Coles Disposed of a Handgun Following the Murder

Davis presented affidavits from Tonya Johnson and Anita Saddler stating that they observed Coles in possession of a handgun shortly after the murder. The trial court did not abuse its discretion in finding that these affidavits did not support Davis's extraordinary motion for new trial. Young, 269 Ga. at 491-492 (2). First, as the trial court found, Davis has failed to show that he exercised due diligence in obtaining and presenting this testimony earlier. Timberlake, 246 Ga. at 491 (1). Tonya Johnson was a witness at trial, so she was clearly available to Davis. Anita Saddler's affidavit testimony reveals that she could have been identified through Tonya Johnson, showing that she also was available to Davis at trial. Furthermore, as with other affidavits discussed



above, Tonya Johnson's affidavit was obtained in 1996, and Davis has failed to show any reason for his failure to exercise due diligence in coming forward with this new evidence in the trial court sooner, at least before his federal habeas proceedings began. See Llewellyn, 252 Ga. at 428-429 (2). Finally, the affidavits are not so material that they can support Davis's extraordinary motion for new trial. Timberlake, 246 Ga. at 491 (1). Although Coles testified that he disposed of his handgun before the murders, his and other testimony made clear that he had possessed a handgun earlier on the night of the murders. Davis's new testimony, even if not disregarded for other reasons, is not so material to that core question that it can support his extraordinary motion for new trial. Id.

### D. Alleged Eyewitness Accounts

Daniel Kinsman was one of a number of members of the military waiting at the Burger King drive-through in a van during the murder. In an un-notarized statement dated 2002, Kinsman stated that he was "confident that [he] would not have been able to make any identification of the shooter due to poor lighting and the chaotic nature of the scene" and that the incident was "over as soon as it began." Nevertheless, Kinsman stated that he had no doubt that the shooter used his left hand and that, "while [he] could not make out the color of the gun, it had a shiny finish which was reflected from the muzzle flash." Kinsman's unsworn statement is followed by an affidavit from an attorney, also dated 2002, explaining that the attorney was "unsuccessful" in his repeated attempts to obtain a notary for Kinsman's statement. As with the unsworn statement of Harriet Murray, this five-year-old explanation for the absence of sworn testimony is inadequate. See Timberlake, 246 Ga. at 491 (1) (requiring the "affidavit of the witness himself" or an adequate explanation for its absence). Furthermore, as the trial court noted, Davis has failed to show that he exercised due diligence in obtaining this new testimony, which was obtained from a witness who was readily identifiable even pre-trial. Id. Finally, Davis's

argument about the contents of this unsworn statement is questionable. Several witnesses testified at trial that the murder weapon was dark in color, not chrome like Coles's handgun. While Kinsman stated in his affidavit that the finish of the handgun was "shiny," as many surfaces of various colors are, in the same affidavit he affirmatively disclaimed his ability to state what color the finish was. Thus, Kinsman's affidavit sheds little light on whether Coles's or Davis's handgun was the murder weapon. Furthermore, even if we were to accept that the shooter fired with his left hand, Davis has not attempted to show which is his dominant hand or which is Coles's dominant hand. Such details might seem trivial, but one who seeks to overturn his conviction for murder many years later bears a heavy burden to bring forward convincing and detailed proof of his innocence. Thus, the trial court understandably found that this testimony was not sufficiently material. Id. For all of the foregoing reasons, we conclude that the trial court did not abuse its discretion by concluding that Kinsman's affidavit did not support Davis's extraordinary motion for new trial. Young, 269 Ga. at 491-492 (2).

Gary Hargrove, apparently the brother of affiant Anthony Hargrove, stated in an affidavit dated 2001 that he was an eyewitness to the murder but that he never came forward, because he was on parole and was out past his curfew. However, upon our careful review of this affidavit, we find no abuse of discretion in the trial court's finding that this affidavit lacks sufficient materiality to support Davis's extraordinary motion for new trial. Id.; Timberlake, 246 Ga. at 491 (1). In fact, the affidavit might actually be read so as to confirm trial testimony that Davis was the shooter. Witnesses at trial indicated that one man struck Larry Young, continued to run when ordered to stop by Officer MacPhail, and then shot MacPhail. In his affidavit, Gary Hargrove indicated that Coles was the one who stood still during the murder and that Davis was the one who kept running. The true import of the witness's testimony appears to be that



Davis was the one who ran from the officer. Furthermore, Davis bears a heavy burden to come forward with clear evidence of his innocence, not a craftily-worded and vague account that can be represented as stating one thing when it might very well state the opposite. Thus, we find no abuse of discretion in the trial court's finding that the affidavit "falls short of the . . . assertion that Mr. Hargrove observed Mr. Coles murder Officer MacPhail" and the trial court's finding that the affidavit lacks sufficient materiality. Id.

4. Particularly in this death penalty case where a man might soon be executed, we have endeavored to look beyond bare legal principles that might otherwise be controlling to the core question of whether a jury presented with Davis's allegedly-new testimony would probably find him not guilty or give him a sentence other than death. In that spirit, we have chosen to focus primarily on one of the required showings for an extraordinary motion for new trial, the requirement that the new evidence be "so material that it would probably produce a different verdict." Timberlake, 246 Ga. at 491 (1). In weighing this new evidence, we do not ignore the testimony presented at trial, and, in fact, we favor that original testimony over the new. At least one original witness has never recanted his in-court identification of Davis as the shooter, which included a description of his clothing and the location he was in when he struck Larry Young. As we have noted above, most of the witnesses to the crime who have allegedly recanted have merely stated that they now do not feel able to identify the shooter. At trial, the jury had the benefit of hearing from witnesses and investigators close to the time of the murder, including both Davis and Coles claiming the other was guilty. We simply cannot disregard the jury's verdict in this case. For that reason, along with the other reasons set forth above, we conclude that the trial court did not abuse its discretion in denying Davis's extraordinary motion for new trial. Young, 269 Ga. at 491-492 (2).

5. Davis argues that the trial court should not have denied his extraordinary motion for new trial without first holding a hearing. We have held as follows:

> if the pleadings in an extraordinary motion for new trial in a criminal case do not contain a statement of facts sufficient to authorize that the motion be granted if the facts developed at the hearing warrant such relief, it is not error for the trial court to refuse to conduct a hearing on the extraordinary motion.

Dick, 248 Ga. at 899 (2) (emphasis in original). This requirement mandates that a defendant provide sworn affidavit testimony, or an explanation for the absence of such affidavit testimony, showing with clarity and specificity the facts he or she intends to prove in a hearing and how those proffered facts support his or her claim that a new trial is warranted. Upon our careful review of Davis's extraordinary motion for new trial and the trial record, we find that Davis failed to present such facts in his motion and, therefore, that the trial court did not abuse its discretion in denying that motion without a hearing.

6. Davis argued in the trial court that to apply Georgia's procedures for extraordinary motions for new trial in a manner that allows for his execution would be unconstitutional. See Herrera v. Collins, 506 U. S. 390 (113 SC 853, 122 LE2d 203) (1993). We hold that Georgia law, as described and applied above, is not unconstitutional.

Judgment affirmed. All the Justices concur, except Sears, C.J., Hunstein, P.J., and Benham, J., who dissent.

S07A1758. DAVIS v. THE STATE.



SEARS, Chief Justice, dissenting.

As the majority notes, Georgia law is largely silent regarding the standards that should govern extraordinary motions for new trial. Thus, by necessity, "the procedural requirements for such motions are the product of case law."[1] This Court has attempted to set standards that promote respect for the judicial process and confidence in the outcomes of that process. Thus, we have required that defendants exercise diligence in discovering and bringing their claims, and we have set the threshold very high for showing that new evidence should take precedence over the evidence presented at trial.[2] However, I believe that this case illustrates that this Court's approach in extraordinary motions for new trials based on new evidence is overly rigid and fails to allow an adequate inquiry into the fundamental question, which is whether or not an innocent person might have been convicted or even, as in this case, might be put to death.

We have noted that recantations by trial witnesses are inherently suspect, because there is almost always more reason to credit trial testimony over later recantations. However, it is unwise and unnecessary to make a categorical rule that recantations may never be considered in support of an extraordinary motion for new trial. The majority cites case law stating that recantations may be considered only if the recanting witness's trial testimony is shown to be the "purest fabrication."[3] To the extent that this phrase cautions that trial testimony should not be lightly disregarded, it has obvious merit. However, it should not be corrupted into a categorical

---

[1] Dick v. State, 248 Ga. 898, 899 (2) (287 SE2d 11) (1982).

[2] Timberlake v. State, 246 Ga. 488, 491 (1) (271 SE2d 792) (1980).

[3] Norwood v. State, 273 Ga. 352, 353 (2) (541 SE2d 373) (2001) (quoting Johnson v. State, 236 Ga. App. 764, 765 (1) (513 SE2d 291) (1999))

rule that new evidence in the form of recanted testimony can never be considered, no matter how trustworthy it might appear. If recantation testimony, either alone or supported by other evidence, shows convincingly that prior trial testimony was false, it simply defies all logic and morality to hold that it must be disregarded categorically.

The majority opinion also notes concerns about confessions by persons other than the defendant. In particular, the majority states that a witness might falsely confess and then flee prosecution. However, this concern could be addressed by requiring the witness to appear in the trial court before his or her alleged confession may be considered. Thus, the trial court would have benefit of the same testimony and cross-examination that a jury would have if a new trial were ordered.

The majority opinion wisely states the following:

> [W]e have endeavored to look beyond bare legal principles that might otherwise be controlling to the core question of whether a jury presented with Davis's allegedly-new testimony would probably find him not guilty or give him a sentence other than death.

Maj. Op., p. 19. I would go further. Because this Court is entrusted with establishing the procedures and standards governing extraordinary motions for new trial, I would hold that recantations and confessions to third parties are not categorically excluded.[4] Instead, they should be assessed by

[4] The effect of the majority's ruling that the witnesses' recantations "lack the type of materiality required to support an extraordinary motion for new trial, as they do not show the witnesses' trial testimony to have been the 'purest fabrication,'" Maj. Op., p. 8-9, is to categorically exclude recantations except in those exceedingly-rare instances when the fabrication is proven by extrinsic evidence, see Fugitt v. State, 251 (Continued...)



the trial court within its sound discretion.[5] This Court was right to hold that such testimony is inherently suspect, and the Court was right to hold that a trial court should consider only such evidence as would be admissible if a new trial were ordered. However, this Court is free to adopt rules and standards that best promote the ends of justice, and this case illustrates with alarming clarity why this Court's rules should allow trial courts to consider all forms of evidence that would be admissible if a new trial were ordered and to exercise sound discretion in weighing that evidence.

While the majority wisely decides to look beyond bare legal principles and seeks to consider the strength of Davis's new evidence, I believe that it has weighed that evidence too lightly. In this case, nearly every witness who identified Davis as the shooter at trial has now disclaimed his or her ability to do so reliably. Three persons have stated that Sylvester Coles confessed to being the shooter. Two witnesses have stated that Sylvester Coles, contrary to his trial testimony, possessed a handgun immediately after the murder. Another witness has provided a description of the crimes that might indicate that Sylvester Coles was the shooter. Perhaps these witnesses' testimony would prove incredible if a hearing were held. Perhaps the majority is correct that the alleged eyewitness's testimony will actually show Davis's guilt rather than his innocence. But the collective effect of all of Davis's new testimony, if it were to be found credible by the trial court in a hearing,[6] would show

Ga. 451 (1) (307 SE2d 471) (1983). Also, the majority merely pretermits the question of whether confessions by another to third parties should be admissible, rather than explicitly holding that they are admissible.

[5] Young v. State, 269 Ga. 490, 491-492 (2) (500 SE2d 583) (1998).

[6] The issues raised by the majority regarding Davis's diligence in bringing his new evidence before the trial court and regarding the fact that several (Continued...)

the probability that a new jury would find reasonable doubt of Davis's guilt or at least sufficient residual doubt to decline to impose the death penalty. Accordingly, I would order the trial court to conduct a hearing, to weigh the credibility of Davis's new evidence, and to exercise its discretion in determining if the new evidence would create the probability of a different outcome if a new trial were held. I am authorized to state that Presiding Justice Hunstein and Justice Benham join in this dissent

of the affidavits are not notarized also seem well suited to being addressed by the trial court in a hearing under the facts of this case. Furthermore, even if the affidavits affected by these issues were discounted, I still believe a hearing on the remaining new evidence would be warranted.



## APPENDIX C -- ORDER DENYING EXTRAORDINARY MOTION FOR NEW TRIAL AND MOTION FOR STAY OF EXECUTION BY THE SUPERIOR COURT OF CHATHAM COUNTY DATED JULY 13, 2007

**IN THE SUPERIOR COURT OF CHATHAM COUNTY**

**STATE OF GEORGIA**

FILED IN OFFICE
2007 JUL 13 PM 7:06
CLERK SUP CT
CHATHAM COUNTY, G.

STATE OF GEORGIA,

vs. Criminal No. CR89-2467-FR

TROY ANTHONY DAVIS,

Defendant.

**ORDER ON DEFENDANT'S EXTRAORDINARY MOTION FOR NEW TRIAL and MOTION FOR STAY OF EXECUTION**

Before the Court are Defendant's Extraordinary Motion for New Trial Pursuant to O.C.G.A. § 5-5-41(c)[1] ("Extraordinary Motion for New Trial") and Motion for Stay

[1] The Court notes that while Defendant cites O.C.G.A. § 5-5-41(c) as authority for this Extraordinary Motion for New Trial, it appears to the Court that Defendant actually brings such motion pursuant to O.C.G.A. § 5-5-41(b) as Defendant fails to argue such statutory authority in his Brief and, further, fails to comply with the requirements of O.C.G.A. § 5-5-41(c) et sq. to bring such Motion.

of Execution. The Court, recognizing the attendant gravity of these motions, and having thoroughly and carefully read and considered these two Motions and further related pleadings, the State's responses thereto, the entire record and the applicable law, hereby finds as follows:

Extraordinary Motion for New Trial

Defendant moves this Court to convene a hearing on Defendant's Extraordinary Motion for New Trial. In his brief, Defendant argues that "newly discovered evidence" requires that a new trial be granted. Although O.C.G.A. § 5-5-41(b) authorizes Defendant to make such a Motion, the Court recognizes that in general, the Georgia Courts do not favor extraordinary motions for new trial. Dick v. State, 248 Ga. 898, 899 (1982) ("Extraordinary motions for a new trial are not favored, and a stricter rule is applied to an extraordinary motion based on the ground of newly available evidence than to an ordinary motion on that ground.") (cit. omitted). Defendant bears a heavy burden in bringing such a motion. Specifically:

> It is incumbent on a party who asks for a new trial on the ground of newly discovered evidence to satisfy the court: (1) that the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that he did not acquire it sooner; (3) that it is so material that it would probably produce a different verdict; (4) that it is not cumulative only; (5) that the affidavit of the witness himself should be procured or its absence accounted for; and (6) that a new trial will not be granted if the only effect of the evidence will be to impeach the credit of a witness.



Drake v. State, 248 Ga. 891, 894 (1982)(cit. omitted). To meet his burden, Defendant's pleadings and accompanying affidavits must set forth "facts satisfying these requirements; conclusions of counsel will not suffice." Dick, 248 Ga. At 900. "Failure to show one requirement is sufficient to deny a motion for new trial." Timberlake v. State, 246 Ga. 488, 491 (1980)(cit. omitted). Moreover, an extraordinary motion for new trial that fails to show "any merit" may be denied a requested hearing. Dick, 248 Ga. At 899.

Defendant argues in his brief that newly discovered evidence warrants a new trial.[2] Specifically, Defendant submits to the Court affidavits that fall generally into the following categories: (1) evidence characterized by the Defendant as recantations of trial testimony[3]; (2) evidence averring post-trial confessions by Mr. Sylvester Coles[4]; (3) affidavits of persons who have not previously testified who

---

2 This Court notes that while Defendant's Extraordinary Motion for New Trial does not exceed statutory authority for timely filing, the majority of affidavits submitted by Defendant were sworn over five years ago and a few affidavits were sworn over ten years ago. The Georgia Supreme Court has looked askance at evidence that was obtained four years post-trial and then was not submitted to the Court for two additional years, at which point it formed the basis of an extraordinary motion for new trial. "The statutes which control extraordinary motions for new trial based on newly discovered evidence require a defendant to act without delay in bringing such motion. The obvious reason for this requirement is that litigation must come to an end." Llewellyn v. State, 252 Ga. 426, 428 (1984).

3 In his brief Defendant argues that the following individuals have now recanted or materially recharacterized their previous testimony: Larry Young; Harriet Murray; Dorothy Ferrell; Antoine Williams; Darrel "D.D." Collins; Kevin McQueen; and Jeffrey Sapp.

4 Defendant submits affidavits from Anthony Hargrove, Shirley Riley and Darold Taylor wherein each affiant states that Mr. Coles has implicated himself in the murder of Officer MacPhail.

were either present at the scene of the murder of Officer MacPhail or in the general area in the moments following the crime; (4) expert affidavits; (5) affidavits of jurors; and (6) a general cache of affidavits that do not fall into the above-enumerated categories. The court has exhaustively reviewed each submitted affidavit and considered in great detail the relevant trial testimony, if any, corresponding to each.

The Court finds that the first category of evidence submitted by Defendant fails to meet the newly discovered evidence standard under well-settled Georgia law. "A post-trial declaration by a State witness that his former testimony was false is not cause for a new trial." Pryor v. State, 179 Ga. App. 293, 294 (1986)(cit. omitted); Brown v. State, 209 Ga. App. 314, 316 (1993); Drake v. State, 248 Ga. 891, 894 (1982).

The second category of evidence submitted by Defendant contains affidavits wherein the affiants allege that Mr. Coles confessed the murder to them. Accordingly, these three affidavits contain inadmissible hearsay. "It is the long-standing rule in this state that declarations to third persons against the declarant's penal interest, to the effect that the declarant, and not the accused, was the actual perpetrator of the offense, are not admissible in favor of the accused at his trial." Timberlake, 246 Ga. at 492. Accordingly, these three affidavits fail to meet the threshold or "overriding" requirement of the six-part standard that the newly discovered evidence be admissible. Dick, 248 Ga. at 900.

The third category of evidence submitted by Defendant contains affidavits by persons who have not previously given testimony in this case, wherein the affiants were either present at the scene of the crime or in the general vicinity thereof. Each of these affidavits fails to meet the six-part standard.



The first such affidavit, of Gary Hargrove, dated August 17, 2001, states that he observed whom he believed to be Mr. Davis running from the scene of the crime. The affidavit further states that a person Mr. Hargrove establishes as Mr. Sylvester Coles was facing the body of Officer MacPhail. The Court first notes that this affidavit falls short of the brief's plain assertion that Mr. Hargrove observed Mr. Coles murder Officer MacPhail, and such assertion is clearly discouraged. Dick, 248 Ga. at 899 (holding that Defendant must meet his burden through pleadings and affidavits that set forth "facts satisfying these requirements; *conclusions of counsel will not suffice*")(emphasis added). Moreover, the Court finds such evidence to be cumulative to that heard at trial. Defendant concedes as much in his brief.[5] Accordingly, the Court finds that Defendant does not establish to this Court that the affidavit of Mr. Gary Hargrove meets elements two, three and four of the six-part standard, described, supra.

The Court likewise finds that Defendant fails to meet his burden regarding the affidavits of Anita Saddler and Daniel Kinsman and therefore such affidavits do not qualify as newly discovered evidence. The affidavit of Ms. Sadler, July 10, 2002, states that she observed Mr. Coles with a gun in his possession minutes after the murder occurred and also that he acted nervously. This affidavit provides cumulative evidence and serves to impeach Mr. Coles, who testified at trial that he was in possession of a gun the evening of the murder but that he had discarded said weapon prior to the occurrence of the crime. As such, Ms. Sadler's affidavit fails to meet elements two, three, four and six of the six-part standard.

---

[5] "[H]argrove's affidavit corroborates trial witness Joseph Washington's affidavit and trial testimony that identified Red Coles as the assailant who shot and killed Officer MacPhail." Defendant's Brief at 11.

Defendant next presents the unsworn affidavit of Daniel Kinsman, allegedly signed in October 2002, who states that the perpetrator shot with his left hand and that the murder weapon had a shiny finish. The Court finds, however, that Defendant fails to meet his burden to establish elements to and three, and therefore Kinsman's affidavit similarly fails to meet the requisite six-part standard.

The fourth category of evidence submitted by Defendant consists of two affidavits purporting to present expert testimony. One such affidavit, from Jeffrey Neuschatz, dated July 6, 2007, argues generally that practice standards on witness identification have changed since the 1991 trial. The second affidavit, from Kelly Fite, dated April 18, 2003, discusses ballistics evidence and is apparently submitted to impeach the expert testimony elicited by the State at trial. The Court finds that both affidavits fail to meet elements two, four and six of the six-part standard.

The fifth category of evidence submitted by Defendant includes affidavits from jurors who, after reviewing selected affidavits, now express concerns about the case. The Court finds that the jurors' affidavits do not form a legal basis of support for Defendant's Extraordinary Motion for New Trial. "The Georgia Code reflects the venerable common law rule prohibiting jurors from impeaching their verdict." Gaines v. State, 274 Ga. App. 575, 576 (noting that O.C.G.A. § 17-9-41 provides that "[t]he affidavits of jurors may be taken to sustain but not to impeach their verdict").

The sixth category of evidence submitted by Defendant contains all remaining affidavits. The Court finds that Defendant fails to meet his burden for all such affidavits wherein he fails to satisfy this Court that each such affidavit meets the six-part standard.

Wherefore, in light of the foregoing, and the Court having found that Defendant has failed to carry his burden on



each and every submitted affidavit, the Court hereby **DENIES** Defendant's request for a hearing and **DENIES** Defendant's Extraordinary Motion for New Trial.

Motion for Stay of Execution

Defendant moves this Court to stay his execution pending this Courts' determination of Defendant's Extraordinary Motion for New Trial. The Court, having denied Defendant's Extraordinary Motion for New Trial, accordingly **DENIES** Defendant's Motion for Stay of Execution.

**SO ORDERED THIS 13TH DAY OF JULY, 2007.**

S/PENNY HAAS FREESEMANN, JUDGE

SUPERIOR COURT, E.J.C.

STATE OF GEORGIA

cc: Thomas Dunn, Esq.
Spencer Lawton, DA
David Lock, ADA

## APPENDIX D - 28 U.S.C. § 2241

§ 2241. Power to grant writ

(a) Writs of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions. The order of a circuit judge shall be entered in the records of the district court of the district wherein the restraint complained of is had.

(b) The Supreme Court, any justice thereof, and any circuit judge may decline to entertain an application for a writ of habeas corpus and may transfer the application for hearing and determination to the district court having jurisdiction to entertain it.

(c) The writ of habeas corpus shall not extend to a prisoner unless--
(1) He is in custody under or by color of the authority of the United States or is committed for trial before some court thereof; or

(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or

(3) He is in custody in violation of the Constitution or laws or treaties of the United States; or

(4) He, being a citizen of a foreign state and domiciled therein is in custody for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof, the validity and effect of which depend upon the law of nations; or



(5) It is necessary to bring him into court to testify or for trial.

(d) Where an application for a writ of habeas corpus is made by a person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district wherein such person is in custody or in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application. The district court for the district wherein such an application is filed in the exercise of its discretion and in furtherance of justice may transfer the application to the other district court for hearing and determination.
(e)(1) No court, justice, or judge shall have jurisdiction to hear or consider an application for a writ of habeas corpus filed by or on behalf of an alien detained by the United States who has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

(2) Except as provided in paragraphs (2) and (3) of section 1005(e) of the Detainee Treatment Act of 2005 (10 U.S.C. 801 note), no court, justice, or judge shall have jurisdiction to hear or consider any other action against the United States or its agents relating to any aspect of the detention, transfer, treatment, trial, or conditions of confinement of an alien who is or was detained by the United States and has been determined by the United States to have been properly detained as an enemy combatant or is awaiting such determination.

**APPENDIX E - 28 U.S.C. § 2244**

**§ 2244. Finality of determination**

(a) No circuit or district judge shall be required to entertain an application for a writ of habeas corpus to inquire into the detention of a person pursuant to a judgment of a court of the United States if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus, except as provided in section 2255.

(b)(1) A claim presented in a second or successive habeas corpus application under section 2254 that was presented in a prior application shall be dismissed.

(2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--

(A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(3)(A) Before a second or successive application permitted by this section is filed in the district court, the applicant shall



move in the appropriate court of appeals for an order authorizing the district court to consider the application.

(B) A motion in the court of appeals for an order authorizing the district court to consider a second or successive application shall be determined by a three-judge panel of the court of appeals.

(C) The court of appeals may authorize the filing of a second or successive application only if it determines that the application makes a prima facie showing that the application satisfies the requirements of this subsection.

(D) The court of appeals shall grant or deny the authorization to file a second or successive application not later than 30 days after the filing of the motion.

(E) The grant or denial of an authorization by a court of appeals to file a second or successive application shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari.

(4) A district court shall dismiss any claim presented in a second or successive application that the court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section.

(c) In a habeas corpus proceeding brought in behalf of a person in custody pursuant to the judgment of a State court, a prior judgment of the Supreme Court of the United States on an appeal or review by a writ of certiorari at the instance of the prisoner of the decision of such State court, shall be conclusive as to all issues of fact or law with respect to an asserted denial of a Federal right which constitutes ground for discharge in a habeas corpus proceeding, actually adjudicated by the Supreme Court therein, unless the applicant for the writ of habeas corpus shall plead and the court shall find the

existence of a material and controlling fact which did not appear in the record of the proceeding in the Supreme Court and the court shall further find that the applicant for the writ of habeas corpus could not have caused such fact to appear in such record by the exercise of reasonable diligence.
(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of--

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.



**APPENDIX F - 28 U.S.C. § 2254**

**§ 2254. State custody; remedies in Federal courts**

(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.
(b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that--

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--

(A) the claim relies on--

(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and

(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for



constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

(f) If the applicant challenges the sufficiency of the evidence adduced in such State court proceeding to support the State court's determination of a factual issue made therein, the applicant, if able, shall produce that part of the record pertinent to a determination of the sufficiency of the evidence to support such determination. If the applicant, because of indigency or other reason is unable to produce such part of the record, then the State shall produce such part of the record and the Federal court shall direct the State to do so by order directed to an appropriate State official. If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.

(g) A copy of the official records of the State court, duly certified by the clerk of such court to be a true and correct copy of a finding, judicial opinion, or other reliable written indicia showing such a factual determination by the State court shall be admissible in the Federal court proceeding.

(h) Except as provided in section 408 of the Controlled Substances Act, in all proceedings brought under this section, and any subsequent proceedings on review, the court may appoint counsel for an applicant who is or becomes financially unable to afford counsel, except as provided by a rule promulgated by the Supreme Court pursuant to statutory authority. Appointment of counsel under this section shall be governed by section 3006A of title 18.

(i) The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall

not be a ground for relief in a proceeding arising under section 2254.