**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

|  |  |  |
|---|---|---|
|  | * |  |
| IN RE TROY ANTHONY DAVIS | * | Civil Case No. 4:09-CV-130 (WTM) |
|  | * |  |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

<u>**PETITIONER'S POST-HEARING BRIEF IN SUPPORT
OF HIS PETITION FOR WRIT OF HABEAS CORPUS**</u>

On August 17, 2009, the Supreme Court of the United States transferred Petitioner Troy Anthony Davis's original Petition for Writ of Habeas Corpus to this Court for a "hearing and determination."  Supreme Court Transfer Order, August 17, 2009 (Dkt. #1) ("Transfer Order").  The Transfer Order directed this Court to "receive testimony and make findings of fact" as to whether Mr. Davis's new evidence "clearly establishes [his] innocence."  <u>Id</u>.  A hearing was held on June 23 and 24, during which Mr. Davis presented powerful and credible evidence of his actual innocence.  At the close of the hearing, this Court directed the parties to address five questions.  Order, June 24, 2010 at 1-2 (Dkt. #77).[1]  Mr. Davis answers each question below, in turn.

---

[1] The Court ordered the parties to answer these five questions:

> 1.  Whether, as a matter of constitutional law, the Eighth Amendment to the United States Constitution bars the execution of a petitioner who has had a full and fair trial without constitutional defect, but can later show his innocence;
>
> 2.  What the appropriate burden of proof would be in the case of a petitioner alleging innocence subsequent to a full and fair trial, assuming the Eighth Amendment of the United States Constitution does bar the execution of such an individual upon a sufficient showing of innocence;

Footnote continued on next page

I.    **THE EIGHTH AMENDMENT BARS THE EXECUTION OF A PETITIONER WHO CAN PROVE HIS INNOCENCE**

   A.    **The Supreme Court Would Not Have Ordered Further Proceedings in Mr. Davis's Case if the Constitution Permitted the Execution of an Actually Innocent Person**

A civilized society does not allow the execution of innocent people, even if innocence is not established until after a lawful trial.  This principle was stated repeatedly throughout Herrera v. Collins, 506 U.S. 390 (1993), wherein a majority of the justices acknowledged that the Constitution prohibits the execution of an innocent person.  Justice O'Connor's concurring opinion, joined by Justice Kennedy, said that such an execution would be a "constitutionally intolerable event."  Herrera, 506 U.S. at 419.  Justice Blackmun's dissent, joined by Justices Stevens and Souter, likewise proclaimed that "nothing could be more contrary to contemporary standards of decency, or more shocking to the conscience, than to execute a person who is actually innocent."  Id. at 430 (citations omitted).  As Justice Blackmun bluntly and rightly observed, "[t]he execution of a person who can show that he is innocent comes perilously close to simple murder."  Id. at 446.

---

Footnote continued from previous page

   3.   Whether 28 U.S.C. § 2254(d) bars the Court from granting relief in this case even if it finds that Petitioner can demonstrate his innocence;

   4.   What level of deference, if any, should the Court apply to state court factual determinations when the federal court holds an evidentiary hearing but the state court did not; and

   5.   What level of deference, if any, the Court should apply to the state court's specific findings with respect to any witnesses whose testimony is before both this Court and the state court in affidavit form only?

Order, June 24, 2010 at 1-2 (Dkt.  #77).

Thus, a majority of the Supreme Court justices agreed that the execution of an actually innocent person would be unconstitutional — without regard for the constitutionality of any prior trial proceedings.[2]  Because the Court ultimately did not order further review of Herrera's case, it did not specifically hold that the Eighth Amendment bars the execution of demonstrably innocent people.  Id. at 418-19.   Instead, the opinion of the Court merely assumed that the Eighth Amendment prohibited such a practice.  Id. at 417.  The Herrera Court's prudent approach was framed by the narrow questions presented[3] and Herrera's less than compelling innocence evidence.

In contrast, the Supreme Court here reviewed Mr. Davis's powerful claim of actual innocence and transferred the case to this Court for a hearing and determination.  In practical terms, that course of action answers the legal issue that Herrera did not specifically resolve.  The Supreme Court simply would not have ordered further proceedings for Mr. Davis if the statements of Justices O'Connor, Kennedy, Blackmun, Souter and Stevens, and the assumption of the Court in Herrera, were wrong — i.e., if the

---

[2] At least two additional Justices assumed, without deciding, that a persuasive demonstration of actual innocence would render the execution of a defendant unconstitutional.  See 506 U.S. at 417 ("for the sake of argument . . . a truly persuasive demonstration of 'actual innocence' . . . would render the execution of a defendant unconstitutional.") (Rehnquist, C.J.); id. at 429 (assuming that a persuasive showing of 'actual innocence' . . . would render unconstitutional the execution of Petitioner. . . .") (White, J., concurring).

[3] According to the Court's opinion in Herrera, "the question before us [] is not whether due process prohibits the execution of an innocent person, but whether it entitles petitioner to judicial review of his 'actual innocence' claim." 506 U.S. at 407 n.6; id. at 420 ("the issue before us is not whether a State can execute the innocent.  It is, as the Court notes, whether a fairly convicted man . . . is constitutionally entitled to yet another judicial proceeding in which to adjudicate his guilt anew.") (O'Connor, J., concurring.); id. at 427 ("We granted certiorari on the question of whether it violates due process or constitutes cruel and unusual punishment for a State to execute a person who . . . [is] 'actually innocent.'  I would have preferred to decide that question.") (Scalia, J., concurring).

Constitution somehow *permitted* Mr. Davis to be executed, now that he has demonstrated his innocence.

The correct constitutional rule, implied by the Transfer Order, established by Supreme Court precedent, and mandated by fundamental justice, is that the Eighth Amendment *absolutely* prohibits innocent people from being executed, even after conviction during a constitutionally permissible trial.  See Herrera, 506 U.S. at 417-419, 429, 430, 446; see also Kennedy v. Louisiana, 128 S.Ct. 2641, 2650 (2008) (finding that eligibility for capital punishment relates to culpability); Cabana v. Bullock, 474 U.S. 376, 386 (1986) (Under the Eighth Amendment, "a person who has not in fact killed, attempted to kill, or intended that a killing take place or that lethal force be used may not be sentenced to death.").

Importantly, the factual underpinnings of Herrera's case were not nearly as compelling as the evidence presented by Mr. Davis.  Whereas Herrera pled guilty for his crime, Mr. Davis has steadfastly maintained his innocence for 21 years.  Whereas Herrera argued that his dead brother was actually the perpetrator, Mr. Davis presented persuasive evidence that the actual shooter — Sylvester "Redd" Coles — is alive and can still be held accountable for his actions.  In fact, Mr. Davis presented a compelling eyewitness to the crime (Benjamin Gordon), who unequivocally testified that he saw Redd Coles pull the trigger and murder Officer MacPhail.  Herrera's affidavits were from family members.  In contrast, Mr. Davis's witnesses are unrelated bystanders with almost no ties to Mr. Davis or his family.  Physical evidence strongly tied Herrera to the murder scene: police recovered Herrera's social security card at the scene; there was blood on his

clothing that matched the victim's; and the victim's hair was found in Herrera's car. However, there is no physical evidence linking Mr. Davis to Officer MacPhail's murder; in fact, important conclusions of the state's ballistics expert were later proven to be wrong by the Georgia Bureau of Investigation in 2007.  Similarly, Respondent's purported "blood" evidence is so shallow that Respondent did not even offer a witness (or any supporting testimony) to explain it or defend it at the evidentiary hearing.  After reviewing the reports and accompanying notes, Dr. Charlotte Word, a nationally-recognized expert in forensic DNA and serological testing, found  that "it is not possible to conclude or determine . . . that blood was present on the shorts" or "the biological source (e.g., saliva, tissue/skin/sweat, semen, blood, nasal secretions, vaginal secretions, etc.) of the human DNA detected" or "the individual who deposited the DNA on the tested sample."  Petioner's Exhibit 46 at 7 (emphasis in original).  Indeed, there is no evidence to show that Mr. Davis was wearing the shorts recovered at his mother's house and, even if he was, there is no dispute that Larry Young was "bleeding real heavy" in proximity to Mr. Davis.  See RE 26 p. 803.

Finally, when Herrera was arrested, he was holding a letter in which he confessed to committing the crime.  506 U.S. at 396.  In stark contrast, it is *Redd Coles* that has repeatedly confessed to the murder of Officer MacPhail, as recounted to this Court by Coles' own family members (Benjamin Gordon), his friends (Anthony Hargrove), and a casual acquaintance (Quiana Glover).  Plainly, Mr. Davis has easily surpassed the hurdle that Herrera failed to clear.

**B.    Evolving Standards of Decency Demonstrate that the Constitution Forbids the Execution of the Actually Innocent**

The Transfer Order also reflects our society's contemporary standards of decency, which have greatly evolved in the 16 years since <u>Herrera</u> was decided.  In <u>Herrera</u>, the Court's Eighth Amendment analysis proceeded on the assumption that "constitutional provisions . . . ensur[e] against the risk of convicting an innocent person."  506 U.S. at 398-99.  Justice O'Connor's <u>Herrera</u> concurrence similarly noted that "[o]ur society has a high degree of confidence in its criminal trials, in no small part because the Constitution offers unparalleled protections against convicting the innocent."  <u>Id</u>. at 420.  Yet in recent years that confidence has eroded, in view of the mounting evidence that criminal trials often result in wrongful convictions — and, more chillingly, in wrongful executions.

The Eighth Amendment's Cruel and Unusual Punishment Clause "draws its meaning from the evolving standards of decency that mark the progress of a maturing society."  <u>Trop v. Dulles</u>, 356 U.S. 86, 101 (1958); <u>accord</u> <u>Kennedy</u>, 128 S.Ct. at 2649; <u>Roper v. Simmons</u>, 543 U.S. 551 (2005).  The Supreme Court measures this evolution by "objective evidence of contemporary values before determining whether a particular punishment comports with fundamental human dignity that the [Eighth] Amendment protects."  <u>Coker v. Georgia</u>, 433 U.S. 584 (1977) (plurality).  One source of evidence is legislation.  <u>See</u> <u>Penry v. Lynaugh</u>, 492 U.S. 302 (1989); <u>Kennedy</u>, 128 S.Ct. at 2658 (a consensus of state laws "is entitled to great weight").  Public opinion and jury verdict patterns also reflect contemporary standards.  <u>See</u> <u>Weems v. United States</u>, 217 U.S. 349,

378 (1910) (public opinion); <u>McGautha v. California</u>, 402 U.S. 183, 199 (1971) (jury

verdicts).

### C.   Responding to DNA Exonerations, Many Legislatures Have Enacted Laws Designed to Prevent Wrongful Convictions

Since 1989, at least 255 prisoners have won post-conviction exonerations based on

DNA evidence, with 188 of these occurring in the last decade.[4]  In fact, ten individuals

have been exonerated by DNA evidence since Mr. Davis filed his reply brief in late

November, including one in the state of Georgia.[5]  But when <u>Herrera</u> was decided in

1993, DNA had proven only 15 convictions to be erroneous.[6]  Post-conviction DNA

testing has unequivocally demonstrated the perils of eyewitness misidentification

testimony and its connection with wrongful convictions.  Eyewitness misidentification

testimony was a factor in 75 percent of post-conviction DNA exoneration cases, making

it by far the leading cause of these wrongful convictions.[7]

Justice O'Connor reflects the profound impact of these developments.  In joining

the Court's opinion in <u>Herrera</u> in 1993, Justice O'Connor expressed her "high degree of

confidence" in criminal trials.  Less than a decade later, in 2002, Justice O'Connor

lamented the "fact that in recent years a disturbing number of inmates on death row have

---

[4] <u>See</u> The Innocence Project, "Know the Cases," <u>available at</u> www.innocenceproject.org/know (last accessed July 6, 2010); Gross, Jacoby, Matheson, Montgomery. & Patil, <u>Exonerations in the United States 1989 Through 2003</u>, 95 J. Crim. L. & C. 523, 555 (2006).

[5] <u>See</u> The Innocence Project, "Know the Cases," <u>available at</u> www.innocenceproject.org/know (last accessed July 7, 2010).

[6] <u>Id</u>.

[7] <u>See</u> www.innocenceproject.org/Content/351.php (last accessed July 6, 2010).

been exonerated." <u>Atkins v. Virginia</u>, 536 U.S. 304, 320 n.25 (2002); <u>see also</u> O'Connor

Questions Death Penalty, N.Y. TIMES, July 4, 2001, at A9.  As our understanding of

wrongful convictions continues to evolve and erode our confidence in "fair" trials, the

Eight Amendment, too, evolves to protect those wrongfully convicted.

Beginning in 1994 (one year after <u>Herrera</u> was decided), states responded to the

spike in DNA exonerations by enacting wrongful conviction laws.  Today, at least forty-

seven states, the District of Columbia, and the United States have enacted statutes

mandating DNA testing if the results would have a sufficient exculpatory effect.[8]

In recent years, legislatures likewise have taken steps to prevent eyewitness

misidentifications.  Wisconsin, New Jersey, Maryland, North Carolina, and West

Virginia have each enacted statutes requiring law enforcement agencies to reform the

---

[8] <u>See</u> 18 U.S.C. § 3600; Ala. Code Ann. 15-18-200 (2009); Ariz. Rev. Stat. Ann. § 13-4240 (West 2001); Ark. Code Ann. § 16-112-202 (2006); Cal. Penal Code Ann. § 1405 (West Supp. 2009); Colo. Rev. Stat. Ann. § 18-1-413 (2008); Conn. Gen. Stat. § 52-582 (2009); Del. Code Ann., Tit. 11, § 4504 (2007); D.C. Code §§ 22-4133 to §§ 22-4135 (2008 Supp.); Fla. Stat. § 925.11 (2007); Ga. Code Ann. § 5-5-41 (Supp. 2008); Haw. Rev. Stat. § 844D-123 (2008 Cum. Supp.); Idaho Code § 19-4902 (Lexis 2004); Ill. Comp. Stat., ch., 725, § 5/116-3 (West 2006); Ind. Code Ann. § 35-38-7-5 (West 2004); Iowa Code § 81.10 (2009); Kan. Stat. Ann. § 21-2512 (2007); Ky. Rev. Stat. Ann. § 422.285 (Lexis Supp.2008); La. Code Crim. Proc. Ann., Art. 926.1 (West Supp. 2009); Me. Rev. Stat. Ann., Tit. 15, § 2137 (Supp. 2008); Md. Crim. Proc. Code Ann. § 8-201 (Lexis 2008); Mich. Comp. Laws Ann. § 770.16 (West Supp. 2009); Minn. Stat. § 590.01 (2008); Miss. Code Ann. § 99-39-5 to 99-39-23 (2009); Mo. Rev. Stat. § 547.035 (2008 Cum. Supp.); Mont. Code Ann. § 46-21-110 (2007); Neb. Rev. Stat. § 29-4120 (2008); Nev. Rev. Stat. § 176.0918 (2007); N.H. Rev. Stat. Ann. § 651-D:2 (2007); N.J. Stat. Ann. § 2A:84A-32a (West Supp. 2009); N.M. Stat. Ann. § 31-1a-2 (Supp. 2008); N.Y. Crim. Proc. Law Ann. § 440.30(1-a) (West 2005); N.C. Gen. Stat. Ann. § 15A-269 (Lexis 2007); N.D. Cent. Code Ann. § 29-32.1-15 (Lexis 2006); Ohio Rev. Code Ann. § 2953.72 (Lexis Supp. 2009); Ore. Rev. Stat. § 138.690 (2007); 42 Pa. Cons. Stat. § 9543.1 (2006); R.I. Gen. Laws § 10-9.1-11 (Supp. 2008); S.C. Code Ann. § 17-28-30 (Supp. 2008); S.D. Codified L. § 23-5B-1 to 23-5B-17 (2009); Tenn. Code Ann. § 40-30-304 (2006); Tex. Code Crim. Proc. Ann., Arts. 64.01-64.05 (Vernon 2006 and Supp. 2008); Utah Code Ann. § 78B-9-300 to 78B-9-304 (Lexis 2008 Supp.); Vt. Stat. Ann., Tit. 13, § 5561 (Supp. 2008); Va. Code Ann. § 19.2-327.1 (Lexis 2008); Wash. Rev. Code § 10.73.170 (2008); W. Va. Code Ann. § 15-2B-14 (Lexis Supp. 2008); Wis. Stat. § 974.07 (2005-2006); Wyo. Stat. Ann. § 7-12-303 (2008 Supp.).

administration of eyewitness identifications.[9]  In 2007, Vermont and Georgia created task

forces to review eyewitness identification procedures.[10]  Additionally, Pennsylvania,

North Carolina, Connecticut, California, New York, Illinois, Wisconsin, and Texas have

all created criminal justice reform commissions to address the causes of wrongful

convictions.[11]

      States have also severely limited the use of the death penalty or eliminated it

entirely.  In March 2009, the State of New Mexico banned the death penalty in all cases,

citing concerns over imperfections in the criminal justice system and the potential for

innocent people to be put to death.[12]  On May 7, 2009, the Governor of Maryland signed

into law a capital punishment reform bill that limits the imposition of the death penalty to

first-degree murder cases with biological or DNA evidence, videotaped voluntary

confessions, or video linking defendants to a crime.[13]  Similarly, legislators and

governors in the states of Montana, Kansas, Connecticut, and Colorado have all recently

initiated reviews of their states' death penalty statutes.[14]  Texas received nationwide

---

[9] See www.innocenceproject.org/news/LawView5.php.

[10] Id.

[11] See www.innocenceproject.org/news/LawView6.php.

[12] See 2009 N.M. Laws Ch. 11, §§ 3, 5 (effective July 1, 2009), N.M. Stat. Ann. § 31-20A-2 (2009).

[13] See 2009 Md. Laws 186.  The Maryland Commission on Capital Punishment, established by the legislature to examine the death penalty in Maryland, formally recommended abolition of the punishment in its Final Report to the General Assembly on December 12, 2008.  Among the reasons for the Commission's recommendation was the "real possibility" that Maryland "risk[s] the execution of an innocent person."  Final Report, pp. 18-19.

[14] See, e.g., Death Penalty Information Center, www.deathpenaltyinfo.org; Mike Dennison, "Senate OKs Death Penalty Ban," The Standard State Bureau, Feb. 17, 2009, available at www.mtstandard.com/articles/2009/11/18/special_reports/legislature_2009/hjjajhicieggia.txt.

attention as the Texas Senate Criminal Justice Committee and the Texas Forensic Science Commission investigated the 2004 execution of Cameron Todd Willingham, a man proven innocent by forensic evidence but denied reprieve.[15]

Admittedly, there is no exonerating DNA evidence in Mr. Davis's case.  But as Mr. Davis's counsel explained at the evidentiary hearing, DNA exonerations are simply the canary in the coal mine — indicators of the disturbing extent to which trials with constitutional safeguards can result in wrongful convictions, usually by witness misidentification.  Mr. Davis's case is another troubling example of this trend.  As Detective Ramsey testified, Larry Young openly misidentified Troy Davis based on a photo array.  According to Detective Ramsey, Young was shown a photo array that included Mr. Davis (but not Redd Coles) and was asked to identify the man with whom Young was arguing on the night of the assault.  Young selected Mr. Davis.  By mere coincidence, Ramsey and Young later saw Redd Coles in the waiting area of the police station, whereupon Young immediately told Ramsey that *Redd Coles* (the man in the waiting area) was the man berating him in the parking lot, retracting Young's earlier misidentification of Mr. Davis.

**D.    Public Opinion Reflects Growing Skepticism Towards the Criminal Justice System's Reliability, and Juries Are Increasingly Unwilling to Impose the Death Penalty**

Erroneous convictions have stoked popular doubts about the reliability of criminal convictions.  The Harris polling agency recently reported:

---

[15] Report of the Innocence Project Arson Review Committee, Apr. 2006, available at www.innocenceproject.org/docs/ArsonReviewReport.pdf; David Grann, "Trial by Fire: Did Texas Execute an Innocent Man?" NEW YORKER, Sept. 7, 2009.

> There is one issue almost all Americans agree on — 95 percent of U.S. adults say that sometimes innocent people are convicted of murder while only 5 percent believe that this never occurs. This is a number that has held steady since 1999.   Among those who believe innocent people are sometimes convicted of murder, when asked how many they believe are innocent, the average is 12 out of 100 or 12 percent.[16]

With respect to capital cases, the most recent Gallup Crime Survey, conducted in October 2009, found that 59% of Americans believe that within the past five years, "a person has been executed under the death penalty who was, in fact, innocent of the crime he or she was charged with."[17]  That skepticism is reflected in the practice of criminal juries which are returning dramatically fewer capital sentences with each passing year.  In 1994, the year after <u>Herrera</u>, 328 individuals were sentenced to death.  By 2009, juries returned just 106 capital sentences, representing a 68% decrease.[18]

"It is far worse to convict an innocent man than to let a guilty man go free."  <u>In re Winship</u>, 397 U.S. 358, 372 (1970).  This axiom, along with the requirement that

---

[16] <u>See</u> www.harrisinteractive.com/harris_poll/index.asp?PID=882.  The Harris Poll was conducted by telephone within the United States between February 5 and 11, 2008 among a nationwide cross section of 1,010 adults (aged 18 and over).  Similarly, in a 2000 poll conducted for Newsweek by Princeton Survey Research Associates found that 82% of those polled agreed that "states should make it easier for Death Row inmates to introduce new evidence that might prove their innocence, even if that might result in delays in the death penalty process."  <u>See</u> www.pollingreport.com/crime.htm.

[17] 2009 Gallup Crime Survey, <u>available at</u>  www.gallup.com (last accessed July 6, 2010).

[18] Death Penalty Information Center, "Death Sentences By Year: 1977-2008," <u>available at</u> http://www.deathpenaltyinfo.org/death-sentences-year-1977-2008 (last accessed July 6, 2010); Death Penalty Information Center, "The Death Penalty in 2009: Year End Report" (Dec. 2009). In Georgia, 59 individuals were sentenced to death between 1993 and 1999; in the following seven years, only 15 individuals received a capital sentence.  <u>Id</u>.  These statistics are compiled by the United States Department of Justice, Bureau of Justice Statistics, <u>available at</u> www.ojp.usdoj.gov/bjs/cp.htm.

reasonable doubt represents the boundary between guilt and innocence, reflects the abiding belief that no person should ever be executed for a crime they did not commit. Id. at 365.  Our confidence that the system will not execute an actually innocent man is premised on the assumption that trial procedures will prevent such a deplorable event. But the post-Herrera consensus is that existing constitutional protections frequently are insufficient to ensure that the death penalty is never imposed upon the guiltless.  On the contrary, the growing and contemporary view is that our system sadly often *does* execute innocent people.

It is lastly significant that, as society has grown more wary of wrongful convictions and executions, the post-Herrera Court has taken steps to limit the circumstances under which capital punishment may be imposed.  Recently, the Court has linked the death penalty's availability to the culpability of the offender.  For example, the Court has barred the execution of the mentally retarded, juveniles, and those whose participation in the killing was indirect.  Atkins v. Virginia, 536 U.S. 304 (2002); Roper v. Simmons, 543 U.S. 551 (2005); Enmund v. Florida, 458 U.S. 782 (1986).  If, as Atkins, Roper, and Enmund demonstrate, it is unconstitutional to execute an individual with diminished criminal responsibility, then surely it must also be unconstitutional to execute Mr. Davis now that he has demonstrated his actual innocence.

## II.   INNOCENCE ANALYSIS REQUIRES THE COURT TO MAKE A PREDICTIVE JUDGMENT ABOUT HOW RATIONAL JURORS WOULD REACT TO THE EVIDENCE

In order to prevail on a free-standing innocence claim, Mr. Davis must show a clear probability that a reasonable juror would have reasonable doubt about his guilt.

This standard derives from two sources:  first, the Supreme Court's Transfer Order, which directed this Court to make findings as to whether Mr. Davis's new evidence "clearly establishes petitioner's innocence," Transfer Order at 1; and second, the Supreme Court's actual innocence precedents. These cases stand for three propositions.

### A.    This Court Must Determine Whether Reasonable Jurors Would Have Reasonable Doubt

First, the innocence analysis requires the district court to make a "probabilistic determination about what reasonable, properly instructed jurors would do." House v. Bell, 547 U.S. 518, 538 (2007) (quoting Schlup v. Delo, 513 U.S. 298, 328 (1995)). The inquiry does not turn on "the district court's independent judgment" or upon "discrete findings on disputed points of fact." Id. at 540.  Instead, the district court must assess how *reasonable jurors* would vote, in light of all the evidence, both old and new. Id. at 538.  This includes an assessment of "the credibility of the witnesses presented at trial," id., the significance of physical evidence, id. at 547, the lack of motive "when identity is in question", id. at 540, evidence pointing to another suspect, see id., and confessions from the alternative suspect, id. at 549.

In House, the Supreme Court applied this predictive analysis in determining both petitioner's Schlup innocence claim and his free-standing innocence claim.  See id. at 554-55.  Consequently, any assessment of whether Mr. Davis's new evidence "clearly establishes petitioner's innocence" (see Transfer Order at 1) must also be a probabilistic judgment of what rational jurors would do in light of that new evidence.

**B.     The Court's Predictive Judgment Should Be Assessed
According to a Standard Somewhat Greater Than, but
Close to, the "More Likely Than Not" Test Created by
Schulp v. Delo**

Second, the Court's predictive judgment naturally must be made in reference to a
particular quantum of proof.   The Supreme Court has recognized two proof standards for
innocence cases, one applicable to "avoid[] the injustice of executing one who is actually
innocent" (so-called "fundamental miscarriages of justice" claims), and another, more
demanding, standard for a petitioner whose guilt is conceded or plain but who alleges that
his sentence is too harsh (so-called "innocent of the death penalty" claims).   Mr. Davis's
claim should be measured according to a standard which approximates that used in
"fundamental miscarriage of justice" cases.

The outer extreme of the Supreme Court's actual innocence standards was
expressed in <u>Sawyer v. Whitley</u>, 505 U.S. 333 (1992).  In <u>Sawyer</u>, the Court imposed an
exacting standard of proof for petitioners whose guilt was obvious but who attacked their
eligibility for the death penalty.  In such cases, a petitioner must show by clear and
convincing evidence that . . . no reasonable juror would have found [him] eligible for
[execution]." <u>See</u> <u>id</u>. at 336.

In <u>Schulp v. Delo</u>, the Court held that <u>Sawyer's</u> "clear and convincing" standard
was inapplicable when a petitioner alleges that he is actually innocent of the crime rather
than legally ineligible for the death penalty.  The <u>Schulp</u> Court held that the "paramount
importance of avoiding the injustice of executing one who is actually innocent" justifies a
standard less exacting than <u>Sawyer's</u> "clear and convincing" requirement.  <u>See</u> <u>Schulp v.</u>

14

<u>Delo</u>, 513 U.S. 298, 325-26 (1995).  The Court found that an erroneous conviction was a "correspondingly greater injustice" than an erroneous sentence and therefore demanded a less demanding standard of proof.  <u>Id</u>.  Thus, the Court held that a petitioner could prove his actual innocence by showing that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  <u>Id</u>. at 327.  This standard is what the Court termed a "gateway" vehicle for reaching the merits of a constitutional claim that has been procedurally defaulted.  <u>Id</u>. at 315.  Because the Supreme Court denied *certiorari* on Schlup's <u>Herrera</u> claim, its holding did not address the applicable standard for a free-standing innocence claim.  <u>See</u> id. at 315 n.31.

In <u>House</u>, the Court shed some light on the free-standing innocence standard.  The Court said that a free-standing innocence claim "requires more convincing proof of innocence than [] <u>Schlup</u>," but did not say precisely how much more proof would be required.  547 U.S. at 555.  The Court found that "given the closeness of the <u>Schlup</u> question here, [] House's showing falls short of the threshold implied in <u>Herrera</u>."  <u>Id</u>. Importantly, however, the Court did not conduct a different analysis for the free-standing innocence claim than it did for House's <u>Schlup</u> claim.  <u>See id</u>.  Thus, the probability required for a free-standing innocence claim is likely somewhat greater than <u>Schlup</u>'s "more likely than not" standard, but is significantly less than <u>Sawyer</u>'s "clear and convincing" standard.

This balance accords with the principle underlying the standard of proof in a criminal case.  "The function of a standard of proof . . . is to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness

15

of factual conclusions for a particular type of adjudication." Addington v. Texas, 441 U.S. 418, 423 (1979).  Society demands a great deal of assurance in guilt before a defendant, especially an innocent one, can be put to death.  As discussed above, this was the view of five justices in Herrera, who recognized that the execution of an actually innocent man is alternately "shocking to the conscience," "contrary to contemporary standards of decency," "constitutionally intolerable," and "perilously close to simple murder."  See supra.  The Schlup Court echoed these remarks in its discussion of the proof standards for innocence cases:

> Though the Sawyer [clear and convincing] standard was fashioned to reflect the relative importance of an erroneous *sentence*, application of that standard to petitioners such as Schlup would give insufficient weight to the correspondingly greater injustice that is implicated by a claim of actual innocence.

513 U.S. at 325 (emphasis added).  To avoid such injustice, the actual innocence standard cannot be calibrated at the exceedingly demanding level set by Sawyer.  It should instead closely approximate, if only slightly exceed, Schlup's "more likely than not" standard.

### C.   The Court's Predictive Judgment Must Incorporate the Understanding that Reasonable Doubt Marks the Legal Boundary Between Guilt and Innocence

Third, the assessment of what properly instructed jurors would do "must incorporate the understanding that reasonable doubt marks the legal boundary between guilt and innocence" in our legal system.  Schlup, 513 U.S. at 328 (citing In re Winship, 397 U.S. 358 (1970)).  Reasonable doubt is the enduring landmark of our legal system— the standard that measures the "essential meaning of innocence."  Id. at 328.  It is "firmly

established in our legal system" that "the line between innocence and guilt is drawn with reference to a reasonable doubt," regardless of whether the innocence question arises at trial, after trial, or even in assessing eligibility of the death penalty of a defendant who admits his guilt.  Id.

In explaining the importance of the reasonable doubt standard at trial, the Supreme Court declared that "the use of the reasonable doubt standard is indispensible to command the respect and confidence of the community in applications of criminal law." In re Winship, 397 U.S. 358, 365 (1970).  In Winship, the Court recounted the long history of the reasonable doubt standard, noting that it "dates at least from our early years as a Nation," id. at 361, and went on to explain that our nation's adherence to that standard "reflect[s] a profound judgment about the way in which law should be enforced and justice administered."  Id.  The Supreme Court utilizes reasonable doubt in all of its prescribed post-trial innocence analyses.  The Court recognized that "even in Sawyer, with its emphasis on eligibility for the death penalty, the Court did not stray from the understanding that the eligibility determination must be made with reference to reasonable doubt."  Schlup, 513 U.S at 328.

In view of the foregoing, this Court must make a predictive, probabalistic judgment about how reasonable jurors would react to the full record, as supplemented by the new evidence presented during the hearing and in the affidavits filed by Petitioner. Those reasonable jurors now "know" the following facts:  (1) most of the prosecution's witnesses have recanted their trial testimony; (2) Redd Coles has confessed to this murder on numerous occasions; (3) new ballistics evidence shows that the only physical evidence

in the case was likely deposited by third-parties present at both scenes[19]; and (4) Benjamin Gordon, a relative of Redd Coles, witnessed Officer MacPhail's murder and saw Coles murder MacPhail in cold blood.  In light of these new facts, a reasonable juror would be left with nothing but doubt.  When, as here, reasonable doubt is "clear," this Court must utilize every available avenue to prevent the State of Georgia from executing an innocent man and coming "perilously close to simple murder."  Herrera, 506 U.S. at 446.

## III.   28 U.S.C. § 2254(D) DOES NOT BAR THIS COURT FROM GRANTING RELIEF IN THIS CASE

Section 2254(d) does not bar relief in this case for two reasons.  First, the Supreme Court has said that the 1996 amendments to § 2254 only "inform" its original habeas authority; the Court has never suggested that § 2254(d) circumscribes its power to grant the writ.  Second, § 2254(d)(1) does not apply in this case.  Instead, relief is allowed under § 2254(d)(2) because the Georgia Supreme Court's 2008 decision was based on unreasonable factual determinations made without the benefit of an evidentiary hearing.

---

[19] Testimony at the 2010 evidentiary hearing shows that that the matching shell casings found in Cloverdale and the Trust Company Bank were likely left by Mark Wilds.  At the 2010 hearing, Detective Whitcomb admitted that Lamar Brown had no reason to lie when he confessed that Wilds had multiple guns and was present at both places where the matching shell casings were recovered: 1528 Cloverdale and Fahm Street.  According to Gordon's 2010 testimony and the August 19, 1989 Voluntary Statements of Wilds and Brown, Wilds and Brown shot at the party at 1528 Cloverdale and then returned to Fahm street.  According to Brown's 1989 Voluntary Statement, Wilds took "the guns" from the car and walked down Fahm street toward the Trust Company Bank.  Petitioner's Exhibit 32M.  Matching shell casings were found at 1528 Cloverdale and the Trust Company Bank.  No reasonable juror could deny that the shell casings that the State argued linked the MacPhail and Cooper shootings could have been left by Mark Wilds.

## A.     Section 2254(d) Only "Informs" the Court's Original Habeas Authority

The Supreme Court has not determined the extent to which either § 2254(d)(1) or (d)(2) applies to original[20] habeas cases.  As the Court made clear in Felker v. Turpin, the Supreme Court — not Congress — decides what limitations apply to its original habeas authority.  518 U.S. 651 (1996).  Title I of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") radically changed § 2254(d).  In Felker, the Supreme Court found that although AEDPA "impose[d] new requirements for the granting of relief under [§ 2254]" the new limitations only "inform" its authority to issue such relief in an original habeas petition.  Id. at 663 (emphasis added).  In the same vein, the Court found that AEDPA's "gatekeeping" amendments to 28 U.S.C. § 2244 only "inform our consideration of original habeas petitions." Id.

Limits on the Supreme Court's original habeas authority must be self-imposed.  The Court has zealously guarded its "discretionary" powers to issue the original writ, deciding whether statutory provisions restrict, inform, or have no effect on its original habeas authority.  Indeed, Supreme Court Rule 20.4(a) delineates the standards under which the Court will grant original writs under its "discretionary powers" by requiring a petitioner to satisfy only three provisions:  28 U.S.C. §§ 2241, 2242 and 2254(b).  Section

---

[20] Petitioner uses the word "original" habeas jurisdiction in the sense that Mr. Davis's petition was filed originally with the Supreme Court, recognizing that the Court's original habeas jurisdiction, while likely constitutional in nature under the Suspension Clause and its role as the only constitutionally-mandated federal court, is clearly appellate in nature.  See Felker v. Turpin, 518 U.S. 651, 665 (1996) (Souter, J., concurring opinion) (citing Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 HARV. L.REV. 1362, 1364-1365 n.1-2 (1953) (articulating "essential functions" limitations to Congress' power to limit the Court's jurisdiction under Article III's Exceptions clause)).

2254(b) requires that a habeas petitioner exhaust his state remedies before filing an original petition.  But the Court has determined that this provision limits its power to issue relief in an original habeas action only because 2254(b), adopted in 1948, was "declaratory" of limits that the Supreme Court had previously placed on its own original habeas authority.  See Felker, 518 U.S. at 663 n.4 (citing Ex parte Hawke, 321 U.S. 114, 64 (1944) (original habeas case in which the Court limited its own authority to hear only exhausted claims)).  Unlike the state exhaustion requirement contained in § 2254(b), however, the Court has never held that AEDPA's amendments to § 2254(d) limit its authority to issue relief in an original habeas action.

Further, a construction of § 2254(d) that would preclude the Supreme Court from issuing relief in this case would give rise to "substantial constitutional questions" involving the Suspension Clause.  The Suspension Clause of the Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public safety may require it."  U.S. CONST. art. I, §9 cl. 2.  In INS v. St. Cyr, 533 U.S. 289 (2001), the Court concluded that a construction of AEDPA that eliminated the availability of federal habeas corpus review of immigration orders of deportation "would give rise to substantial constitutional questions" under the Suspension Clause.  533 U.S. at 305.  Likewise, in Felker the Supreme Court held that the Suspension Clause question was avoided only because AEDPA had not foreclosed the petitioner from seeking relief in original writ to Supreme Court.  Felker, 518 U.S. at 660-661, 664-65.

Here, interpreting AEDPA to preclude the Court from issuing relief in this original habeas case would raise substantial constitutional questions.  The Court has twice held that Congressional abrogation of its habeas jurisdiction was constitutional only because the statutes did not repeal the Court's power "to entertain" an original writ.  Felker, 518 U.S. at 660 (AEDPA was not unconstitutional because the Act "has not repealed our authority to entertain original habeas petitions.") (citing Ex parte Yerger, 8 Wall. 85, 19 L.Ed. 332 (1869) (Act of 1867 was not unconstitutional because it did not repeal the Court's original habeas jurisdiction)).  If the Court retains the authority to "entertain" an original habeas writ, then the Court must necessarily also have the power to grant that original writ.  Cf. Marbury v. Madison, 5 U.S. 137 (1803) (it is the duty of the Court "to say what the law is" and with every right, there must be a "remedy"); Boumediene v. Bush, 128 S.Ct. 2229, 2266 (2008) (original habeas action in which the Court held that "[w]e do consider it uncontroversial [] that . . . the habeas court must have the power to order the conditional release of an individual unlawfully detained").

### B. Mr. Davis's Case Satisfies Section 2254(d)(2); Section 2254(d)(1) Does Not Apply

Even if § 2254(d) somehow circumscribed the Supreme Court's original habeas powers, § 2254(d)(2) is satisfied.  Subsections 2254(d)(1) and (2) are disjunctive exceptions to § 2254(d)'s rule that a habeas petition shall not be granted on claims "adjudicated on the merits" in State court.  Despite Respondent's erroneous assertion to the contrary at the June 24, 2010 hearing, the statute's language plainly allows a

petitioner to proceed under <u>either</u> 2254(d)(1) <u>or</u> 2254(d)(2).[21]  Respondent has cited no

authority that holds otherwise.

      Critically, the text of the statute places the word **"or"** between the two exceptions

contained subsections (1) and (2):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; **<u>or</u>**
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (emphasis added).

      Section 2254(d)(2) applies to "decision[s] adjudicated on the merits in a state court

[] based on a factual determination."  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 339 (2003).

As discussed below, Mr. Davis asserts that the Georgia Supreme Court's decision to

refuse to grant him a new trial based on new evidence was based on erroneous factual

determinations.[22]

---

[21] Respondent represented incorrectly at the evidentiary hearing that 2254(d)(1) and (d)(2) were connected by the word "and" rather than "or."  Respondent is plainly mistaken.

[22] To the extent Justice Scalia's dissenting opinion to the Transfer Order assumes that 2254(d)(1) must apply to this case, he cites only cases in which no state court factual determinations were at issue.  <u>See</u> Transfer Order at 3 (Scalia, Thomas, J.J., dissenting) (citing <u>Knowles v. Mirzayance</u>, 556 U. S. __, 129 S.Ct. 1411 (2009) (state court made no factual findings, question was whether state court's legal determination of <u>Strickland</u> ineffective assistance of counsel standard was

Footnote continued on next page

## IV.   THIS COURT SHOULD EXTEND NO DEFERENCE TO FACTUAL DETERMINATIONS BY THE GEORGIA SUPREME COURT

The case law of the Supreme Court and this circuit shows that § 2254(d) poses no bar to relief when, pursuant to 28 U.S.C. § 2254(d)(2), the habeas court determines that state court determinations of fact which "were relevant" to its decision were unreasonable.  In Wiggins v. Smith, the Supreme Court found that § 2254(d) "pose[d] no bar to granting habeas relief" because the state court's determination of petitioner's Sixth Amendment claim was based "in part" on a factual error.  539 U.S. 510, 528 (2003).

In Jones v. Walker, the Eleventh Circuit Court of Appeals, sitting *en banc*, held that § 2254(d)(2) allowed the court to review petitioner's Sixth Amendment claim *de novo* because the "Georgia Supreme Court unreasonably determined the facts relevant to [petitioner's] Sixth Amendment claim."  540 F.3d 1277, 1288 n.5 (11th Cir. 2008).  The court held that pursuant to § 2254(d)(2), "this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them."  Id.  In Jones, the Georgia Supreme Court found that the petitioner's trial counsel had testified that she warned petitioner about the gravity of the charges he was facing and the dangers of self-representation.  The record showed that she had testified about the former but not the latter.  Id.[23]  Since this unreasonable determination of facts was "relevant" to petitioner's

---

Footnote continued from previous page

unreasonable under 2254(d)(1)); Wright v. Van Patten, 552 U. S. 120 (2008) (no factual dispute; question was whether the state court's reading of the Supreme Court case U.S. v. Chronic was "objectively reasonable" under 2254(d)(1)); Carey v. Musladin, 549 U.S. 70 (2006) (no factual dispute; question was whether courtroom spectator conduct was covered by Supreme Court "clearly established law" pursuant to 2254(d)(1)).

[23] See also Jones v. Walker, 496 F.3d 1216, 1228 (11th Cir. 2007) (discussion of attorney's testimony).

Sixth Amendment claim, the Eleventh Circuit invoked § 2254(d)(2) and applied "the pre-AEDPA *de novo* standard of review to Jones' habeas claims." Id.

### A.   The State Court's Failure to Hold an Evidentiary Hearing Precludes Deference to Its Factual Determinations

The Georgia Supreme Court's failure to hold an evidentiary hearing by definition results in an unreasonable determination of the facts and should thus receive no deference by this Court.  If a state court "makes evidentiary findings without holding an evidentiary hearing and giving the petitioner an opportunity to present evidence, such findings are clearly the result of an 'unreasonable determination' of the facts." Taylor v. Maddox, 366 F.3d 992, 1001 (9th Cir. 2004); see also Bryan v. Mullin, 335 F.3d 1207, 1215-16 (10th Cir. 2003) (en banc).

In Bryan v. Mullin, the Tenth Circuit, sitting *en banc*, afforded no deference to the state court factual findings, reasoning that "because the state court did not hold an evidentiary hearing, we are in the same position to evaluate the factual record as it was." 350 F.3d at 1216.  Other courts have found that the lack of an evidentiary hearing in state court should limit deference under § 2254(d)(2) and (e)(1).  See Teti v. Bender, 507 F.3d 50, 59 (1st Cir. 2007) ("While it might seem questionable to presume the correctness of material facts not derived from a full and fair hearing in state court, the veracity of those facts can be tested through an evidentiary hearing before the district court where appropriate."); Rolan v. Vaughn, 445 F.3d 671, 679-80 (3d Cir. 2006) ("[A]fter AEDPA, state fact-finding procedures may be relevant when deciding whether the determination was 'reasonable' or whether a petitioner has adequately rebutted a fact, the procedures

are not relevant in assessing whether deference applies to those facts."); <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1055 (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section 2254(d)(2) because "'state court ... refused Nunes an evidentiary hearing" and findings consequently "'were made without ... a hearing"). The Supreme Court has similarly found that the "necessary scope of habeas review in part depends upon the rigor of any earlier proceedings. . . .." <u>Boumediene v. Bush</u>, 128 S.Ct. 2229, 2268 (2008) (citing <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976)).

**B.      The State Court Made Unreasonable Factual Determinations**

The Georgia Supreme Court's factual findings without the benefit of a hearing led it to misread the evidence and make unreasonable factual determinations.  Here, a sharply-divided Georgia Supreme Court erroneously concluded that Mr. Davis's affidavits "merely stated that they now do not feel able to identify the shooter." <u>Davis v. Georgia</u>, 283 Ga. 438, 447 (2008).  As Mr. Davis demonstrates in his Petition and demonstrated at the evidentiary hearing before this Court, the state court's factual determination is rebutted by the plain words of each affidavit and the testimony of the witnesses.  The hearing testimony and the submitted affidavits show that each recanting eyewitness was unable to identify the shooter at trial and on the night of the crime.  For example, Darrell Collins testified on June 23, 2010 that he saw neither the shooting nor the assault on Larry Young.  Similarly, Antoine Williams testified at the hearing that he was unable to identify the shooter at the time of the crime.  Larry Young's affidavit shows that he "never" ─ at trial or the night of the shooting ─ was able to identify the

shooter or what he was wearing.  Petitioner's Exhibit 17.  Dorothy Ferrell's affidavit

clearly states that she was not able to identify the shooter at trial or on the night of the

crime.  See Petitioner's Exhibit 2.

The errors of the Georgia Supreme Court, however, do not end there.  The Georgia

Supreme Court made the erroneous factual conclusion that "Testimony at trial identified

Davis as the person who shot Michael Cooper."  Davis v. Georgia, 283 Ga. 438, 440

(2008).  The state court's conclusion is factual error and shows the total lack of depth of

its analysis.  The only State witnesses near the scene when Michael Cooper was shot

were Michael Cooper, Benjamin Gordon, Darrell Collins and Eric Ellison.  Nowhere in

the record do any of these witnesses — or any other witness — identify Mr. Davis as the

shooter.  See (RE 27, p. 1187) (Michael Cooper testifying that he did not see who shot

him); (RE 27, pp. 1199-1203) (Benjamin Gordon testifying that he did not see who had

shot Cooper and did not know what the shooter was wearing, but only heard about the

shooter from others in the car); (RE 27, pp. 1120, 1127; June 23, 2010 hearing) (Darrell

Collins testifying that he did not see who shot Michael Cooper); (RE 27, pp. 1221-22)

(Eric Ellison testifying that he did not see who shot Michael Cooper).  Indeed, the

testimony at the June 23, 2010 hearing showed that Benjamin Gordon did not see the

Cloverdale shooter, but clearly saw Redd Coles shoot Officer MacPhail.  Mr. Gordon was

unequivocal on these critical fact — facts that he had heretofore concealed out of fear for

his and his family's safety.

The state court also erroneously held that "[a] bullet retrieved from Michael

Cooper's body during his medical treatment was similar to bullets from the murder

scene." <u>Davis</u>, 283 Ga. at 439.  The record shows that the state ballistics expert testified

to the unremarkable conclusion that the bullet found in Michael Cooper's body (RE 30,

State's Exhibit #39; RE 27, p. 1279) was probably fired from the same gun as the bullet

found at the scene where Michael Cooper was shot (RE 30, State's Exhibit #41; RE 27, p.

1272) — not the "murder scene" where MacPhail was shot.  (RE 27, p. 1293).  Instead,

the 2007 Georgia Bureau of Investigation Ballistics Report concluded that the bullet

retrieved from Michael Cooper's body and the bullet retrieved from Officer MacPhail's

autopsy "fail[] to reveal sufficient characteristics to determine that the bullets … were

fired from the same firearm."  <u>See</u> Petitioner's Exhibit 31.[24]

The Georgia Supreme Court repeatedly missed, ignored or misunderstood key

facts.  <u>Compare</u>, <u>e.g.</u>, <u>Davis</u>, 283 Ga. at  439 ("Someone shouted a threat about shooting

Young") <u>with</u> Respondent's Answer-Reply at 23 ("Mr. Coles, who was facing Mr.

Young, told him not to walk away 'cause you don't know me, I'll shoot you.' and began

digging in his pants.").  The state court's use of the word "someone" should not be

allowed to obscure the undisputed fact that Redd Coles made that threat to shoot Young

and that Young's attacker was undisputedly the murderer.

The state court also credited Steve Sanders' identification of Mr. Davis based on

trial testimony that is contradicted by the record.  State witness Steve Sanders told the

---

[24] Detective Praylo testified at the June 24, 2010 hearing that item 4D of the 2007 GBI Ballistics
Report (see Item 3 of Petitioner's Exhibit 32J)  and  item 4A of the 2007 GBI Ballistics Report
(see item 3 of Petitioner's Exhibit 32K)  were the bullets he recovered, respectively, from the
MacPhail autopsy and from the hospital where Michael Cooper was treated.  The 2007 GBI
Ballistics Report (Petitioner's Exhibit 31) shows that "Microscopic examination and comparison
fails to reveal sufficient characteristics to determine that the bullets, Items 4A ... and the bullet
4D, were fired from the same gun."

police on the night of the shooting that he "wouldn't recognize" the shooter again if he

saw him.  Petitioner's Exhibit 32EE at 2.  Two years later, Sanders incredibly identified

Mr. Davis <u>for the first time</u> at trial, only after seeing his picture in the paper the day

before.[25]  The Georgia Supreme Court credited Sanders' testimony, in part, because

Sanders' put Mr. Davis in "the location [the assailant] was in when he struck Larry

Young."  <u>Davis</u>, 283 Ga. at 363.  This is wrong.  In fact, Mr. Sanders' testimony of where

Young's assailant was standing belies his in-court identification of Mr. Davis and

implicates Redd Coles.

Sanders testified that the shooter was standing directly in front of Larry Young

when Young was pistol-whipped.[26]  The Georgia Supreme Court, however, failed to

understand that the record clearly shows that Redd Coles — not Mr. Davis — was

standing in front of Larry Young when Young was pistol-whipped.  <u>See</u> RE 25, p. 800

(Young was "face to face" with Coles when he was hit); <u>see also</u> (Dkt #21 at 23) ("Mr.

Coles, who was facing Mr. Young").  Indeed, even Redd Coles admitted that he was in

the position where Sanders placed Young's assailant (who also was the shooter).  <u>See</u>

(RE 8, pp. 98-99) (testimony of Redd Coles) (Q: " … who or what was [Young] looking

at when he got hit?  A: Me and [Young] was facing each other").  At the June 23, 2010

---

[25] As Assistant District Attorney Locke testified during the evidentiary hearing, Mr. Davis was also the only African-American man sitting at either the prosecution or defense table.  Sanders was never asked to identify Redd Coles.

[26] Mr. Davis's trial counsel, Mr. Barker, had Sanders demonstrate Larry Young's assault.  The record shows that Barker played the victim Young while Sanders played the attacker.  <u>See</u> (RE 26, p. 986).  After the demonstration, Mr. Barker asked Sanders: "Q: [] you were standing <u>in front of me</u>, and you made this motion? A: Yes, sir."  (RE 26, p. 986) (emphasis added).

hearing Detective Whitcomb also confirmed that Antoine Williams told the police only hours after the shooting that Young was attacked from the front.

The state court's erroneous determinations go to the heart of Mr. Davis's innocence claim as they include a misreading of his recantation evidence, a lack of understanding of the Michael Cooper shooting which produced the only physical evidence in the case, and a mistake in reading testimony of Steve Sanders who was the only state eyewitness other than Coles who has not recanted.  Plainly, these erroneous factual determinations were "relevant" to the state court's decision.  Thus, § 2254(d) does not bar relief in this case.

### C.    No Statute or Common Law Rule Bars Relief in This Case

Neither § 2254 nor the "anti-retroactivity" doctrine for new constitutional rules announced in <u>Teague v. Lane</u> bar relief in this case.  Respondent has previously argued that Mr. Davis is precluded relief by § 2254(d)(1) and the <u>Teague</u> "anti-retroactivity" doctrine because he seeks to announce a "new constitutional rule."  Respondent's Answer-Reply at 36-37.  Respondent misconceives the law.

First, Section 2254(d)(1) limits federal review of state decisions to Supreme Court holdings that were "clearly established  . . . by the Supreme Court" when the state decision was rendered.  Respondent has offered no authority or textual support for any argument that subsection (d)(1)'s "clearly established law" requirement applies to subsection (d)(2).  Section 2254(d)(2) — the exception Mr. Davis relies on for relief — has no textual or interpretive requirement that a claim be based on "clearly established law" at the time of the state court decision.  <u>See</u> 28 U.S.C. § 2254(d)(2).  Indeed, the

29

Court of Appeals for the Eleventh Circuit, sitting *en banc*, found that the 2254(d)(2) exception applied even though the petitioner sought relief under a claim that was not "clearly established law."  Jones, 540 F.3d at1288 n. 5 (petitioner "cannot meet the requirement of § 2254(d)(1) because the Supreme Court has never confronted [petitioner's] Sixth Amendment challenge . . . [nevertheless] the petitioner has met the requirement of § 2254(d)(2)" so she was entitled to relief if she could have established her novel claim).

Second, Mr. Davis's actual innocence claim clearly falls within a firmly established exception to the so-called "Teague doctrine."  The "anti-retroactivity rule" barring enforcement of new constitutional rules in habeas proceedings was announced in Teague v. Lane, 489 U.S. 288 (1989) (plurality), and confirmed in Penry v. Lynaugh, 492 U.S. 302, 330-333 (1989).  The Teague doctrine can be summed up as follows: a habeas petitioner may not seek to announce or enforce a "new rule" of constitutional law in federal habeas corpus proceedings unless the rule is "substantive."  See Whorton v. Bockting, 549 U.S. 406, 416 (2007); Penry, 492 U.S. at 313.  A new constitutional rule is "substantive" and therefore enforceable in a habeas proceeding if it places "a certain class of individuals . . . beyond the State's power to punish by death" (Penry, 492 U.S. at 330-333), "circumscribe[s] the class of persons eligible for the death penalty," (Zant v. Stephens, 462 U.S. 862, 878 (1983)), or recognizes that the petitioner will "face a punishment that the law cannot impose upon him," (Schriro v. Summerlin, 542 U.S. 348, 351 (2004) (citations omitted)).

There is no doubt that Mr. Davis's proposed "new rule" (a constitutional rule that would forbid the execution of the innocent) is "substantive" and enforceable under Teague. Mr. Davis's proposed "new rule," by definition, "circumscribes the class of persons eligible for the death penalty," and provides that he would "face a punishment that the law cannot impose on him" as it would undoubtedly be "beyond the State's power to punish [him] by death." In Penry, the Court restated the substantive exception to the Teague doctrine by explaining "if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded person . . . [then] such a rule would fall under the [substantive Teague] exception." 492 U.S. at 330-333. Indeed, the Court handed down precisely such a ruling in Atkins v. Virginia, 536 U.S. 304 (2002), and the lower courts have consistently held that the Court's statement in Penry makes clear that mentally retarded petitioners can enforce the new rule regardless of whether it was a "new rule."[27]

## V.   THIS COURT SHOULD EXTEND NO DEFERENCE TO THE GEORGIA SUPREME COURT'S TREATMENT OF THE AFFIDAVITS OF LARRY YOUNG, DOROTHY FERRELL AND HARRIET MURRAY

The Georgia Supreme Court's review of the affidavits of Dorothy Ferrell, Harriet Murray and Larry Young deserves no deference. First, the state court's analysis of Mr. Davis's affidavits under Georgia law contained no specific "determination of the facts" related to Young, Ferrell and Murray that requires deference by under § 2254(d). See, e.g., Taylor v. Maddox, 366 F.3d at 999 , 1001 (a determination is "unreasonable" under

---

[27] See, e.g., In re Holliday, 331 F.3d 1169, 1173 (11th Cir. 2003) ("At this point, there is no question that the new constitutional rule . . . formally articulated in Adkins is retroactively applicable to cases on collateral review.").

section 2254(d)(2) if factual determination was made).  Second, the Georgia Supreme

Court's  sweeping factual conclusion that all the eyewitnesses "<u>now</u> do not feel able to

identify the shooter" is  unreasonable and rebutted by the plain language of the affidavits.

> **A.    The Georgia Supreme Court Made No Specific Factual**
> **Findings Related to the Young, Ferrell or Murray**
> **Affidavits**

In 2008, a sharply-divided Georgia Supreme Court rejected the affidavits Mr.

Davis submitted in the context of an Extraordinary Motion for New Trial.  The state court

held that recantations were immaterial under Georgia law regardless of credibility or

substance because recantation affidavits "were not the kind of evidence that proves the

witness' previous testimony was the purest fabrication" by "extrinsic proof that the

witness'[s] prior testimony was physically impossible."  <u>See</u> <u>Davis</u>, 283 Ga. at 441 (citing

<u>Fugitt v. State</u>, 251 Ga. 451 (1983)(requiring extrinsic proof that testimony was

"physically impossible").  Since recantation affidavits "were not the type of evidence"

the court could consider, the state court made no specific factual findings related to

Young, Ferrell or Murray that would require deference under § 2254(d)(2).  <u>See</u> <u>id</u>. at

441, 442 (Young) and 443 (Ferrell and Murray) .

> **B.    The Affidavits Clearly Show That Young and Ferrell**
> **Were Unable to Identify the Shooter at Trial and on the**
> **Night of the Crime**

The Georgia Supreme Court attempted to show some semblance of substantive

review by making the sweeping generalization that most of Mr. Davis's affidavits

recanting the identification of Mr. Davis were merely statements that the eyewitnesses

"now do not feel able to identify the shooter." <u>Id</u>. at 447.  The affidavits, however,

clearly show that Young and Ferrell were unable to identify the shooter at trial and on the night of the crime.

Dorothy Ferrell's affidavit clearly states that she was not able to identify the shooter at trial or on the night of the crime:

> I didn't see who was doing the shooting, I just heard the gunshots.
> … I don't know which of the guys did the shooting because I didn't see that part. … I didn't want to get up there and [testify] that I saw who did the shooting because I didn't see that part. But I felt like I had to say that."

Petitioner's Exhibit 2.

Ferrell's recantation of her dubious identification of Mr. Davis at 1:00 am across four lanes of traffic, a tree-lined boulevard and a dimly-lit parking lot is supported by evidence in the record the Georgia Supreme Court never considered and the jury never heard.  In her affidavit, Ferrell recounts that she told a friend that she had testified falsely and the friend called Mr. Davis's trial counsel to report her perjury. Petitioner's Exhibit 2.  Indeed, the trial record shows that soon after Ms. Ferrell testified, the wife of Mr. Davis's trial counsel received a call stating Ms. Ferrell lied at trial because the district attorney had promised to help her while she was in jail.  RE 27 p. 1476.  Soon after, the district attorney disclosed a letter  he received from Ms. Ferrell before trial.  The letter from Ferrell asks for the district attorney's help getting out of jail.  No one else knew about the request made in the letter but Ferrell, the district attorney and the caller.  Thus, there is credible evidence in the record that Ferrell recanted to a friend immediately after she testified.

Larry Young's affidavit shows that he "never" ─ at trial or the night of the shooting ─ was able to identify the shooter or what he was wearing:

> [The Police] kept asking me what had happened at the bus station and I kept telling them that I didn't know. Everything happened so fast down there. I couldn't honestly remember what anyone looked like or what different people were wearing. Plus, I had been drinking that night so I just couldn't tell who did what. … I was never able to make sense of what happened that night. It's as much of a blur now as it was then.

Petitioner's Exhibit 17.

Young's recantation that he did not know "who did what" on the night of the shooting is supported by evidence in the record and testimony at the June 23, 2010 hearing.  Detective Whitcomb testified at the hearing that only hours after the shooting, Antoine Williams described Young's attacker as coming from in front of him, not behind as Young testified.  Likewise, Steve Sanders demonstrated at trial that Young was attacked from the front, not behind.  See supra at n. 26.  As Young described in his affidavit and at trial, he had consumed a large amount of alcohol and - as Detective Ramsey testified at the hearing - misidentified Redd Coles and Mr. Davis and was not taken to the hospital to treat his brain injury until after he gave a statement.

Lastly, the Georgia Supreme Court ignored Harriet Murray's affidavit without regard to its substance or consistency with her earlier statements because the affidavit was unsworn.  Davis, 283 Ga. at 443.  Because of this technicality, the court failed to consider that Ms. Murray's affidavit clearly describes Redd Coles, not Troy Davis, as the shooter through Coles' self-confessed, belligerent actions toward Larry Young. See Petitioner's Exhibit 14 ("While I was crouching on the steps, I saw the man who was

arguing with Larry, chasing him from the Time Saver, and who slapped Larry shoot the police officer."). Murray's affidavit is convincing in that it is consistent her police statement (taken 2 hours after the shooting) and preliminary hearing testimony (given less than 3 weeks after the shooting), in which she identified the shooter  as the man who followed, argued and threatened Young. Compare Petitioner's Exhibit 32U (August 19, 1989 Voluntary Statement of Harriet Murray) with RE 7 pp. 70-71 (Preliminary hearing testimony of Murray describing the shooter as the man who was harassing and following Young; see also RE 7 pp. 8-9, 31-32, 33-34; RE 25 p. 799, RE 26 pp. 823, 902, 904, 906, RE 27 p. 1422 (Coles description of his actions toward Young). Moreover, Murray identified Mr. Davis by process of elimination when she was shown a Coles-free photo array immediately after Detective Ramsey had Murray, Coles, Collins and Young reenact the shooting with Coles playing the innocent bystander.  RE 27 pp. 1324-25.  According to Ms. Murray's August 24, 1989 Voluntary Statement, she picked Mr. Davis's picture after the reenactment because Mr. Davis was "the only one left."  Petitioner's Exhibit 32V.

The slim majority of the Georgia Supreme Court's unreasonable and unspecific factual determination deserves no deference under § 2254(d) in light of the clear language of the affidavits.

* * *

In sum, the Eighth Amendment to the United States Constitution bars the execution of Mr. Davis because he has shown a clear probability that reasonable jurors would have reasonable doubt in light of "all the evidence," new and old.  AEDPA's

amendments to § 2254(d) should not be read to apply to original habeas actions due to the substantial constitutional issues that would arise.  Even if § 2254(d) did apply, Mr. Davis relies on the exception to § 2254(d) contained in subsection (2), not subsection (1), which allows this Court to grant Mr. Davis relief without consideration of the Georgia Supreme Court's unreasonable determinations of facts made without the benefit of a hearing. Finally, the Georgia Supreme Court made no specific findings of fact related to the affidavits of Larry Young, Dorothy Ferrell or Harriet Murray which would be entitled to deference under AEDPA.

_/s/_ Jason Ewart_____
JASON EWART
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Counsel for Petitioner

## **CERTIFICATE OF SERVICE**

I do hereby certify that I have this day electronically filed this *Petitioner's Post-Hearing Brief In Support Of His Petition For Writ Of Habeas Corpus* with the Clerk of the Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

Mary Beth Westmoreland
Susan V. Boleyn
Beth Attaway Burton
Department of Law
GA Attorney General's Office
40 Capitol Square, SW
Atlanta, GA 30334-1300
(404) 656-3349

This the 7th Day of July, 2010.

_/s/_  Jason Ewart_____
JASON EWART
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
(202) 942-5000

Counsel for Petitioner