### IN THE UNITED STATES DISTRICT COURT FOR
### THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

IN RE TROY ANTHONY DAVIS )
                             )   CASE NO. CV409-130
                             )

## O R D E R

Before the Court is Petitioner Troy Anthony Davis's Petition for a Writ of Habeas Corpus. (Doc. 2.) This petition was originally filed with the United States Supreme Court and has been transferred to this Court, pursuant to 28 U.S.C. § 2241(b), with instructions to "receive testimony and make findings of fact as to whether evidence that could not have been obtained at the time of the trial clearly establishes petitioner's innocence."[1] In re Davis, 557 U.S. ___, 130 S. Ct.

---

[1] The jurisdictional effects of this transfer, especially with respect to appeal, are unclear. According to the Revision Notes of 28 U.S.C. § 2241:

> Subsection (b) was added to give statutory sanction to orderly and appropriate procedure. A circuit judge who unnecessarily entertains applications which should be addressed to the district court, thereby disqualifies himself to hear such matters on appeal and to that extent limits his usefulness as a judge of the court of appeals. The Supreme Court and Supreme Court Justices should not be burdened with applications for writs cognizable in the district courts.

This text suggests that petitions are transferred to avoid burdening the Supreme Court. Functionally, then, this Court is operating as a magistrate for the Supreme Court, which suggests appeal of this order would be directly to the Supreme Court. However, this Court has been unable to locate any legal precedent or legislative history on point.

1, 1 (2009). This Court has conducted the hearing. (See Docs. 82, 83.) For the reasons that follow, the Court concludes that while executing an innocent person would violate the United States Constitution, Mr. Davis has failed to prove his innocence. Accordingly, the petition is **DENIED**.

## BACKGROUND

This case involves the shooting of Savannah Police Department ("SPD") Officer Mark Allen MacPhail. In the early hours of August 19, 1989, Officer MacPhail was working a part-time security job when he came to the assistance of a homeless man, whom had been assaulted in the parking lot of a Burger King restaurant. As Officer MacPhail neared the commotion, one of the three men responsible for the assault gunned him down.

An earlier shooting at a party in the Cloverdale neighborhood of Savannah also plays a role in this case.[2] Here, an individual shot at a car as it was leaving the party, striking one of its occupants in the face. Because this case centers on eyewitness testimony, the Court presents the facts in

---

[2] By recounting the facts of the Cloverdale shooting, the Court does not mean to suggest that the validity of that conviction is tied to the validity of Mr. Davis's conviction for the murder of Officer MacPhail. See infra Analysis Part III.C.iv. Rather, the Court details those facts because they are necessary to understand the events of August 19, 1989 and the subsequent investigation and trial, during which the State bootstrapped the conviction for the Cloverdale shooting to Mr. Davis's conviction for the MacPhail murder.

the manner in which they were provided by those who witnessed these events.

## I.  THE INVESTIGATIONS

At 11:29 p.m. on August 18, 1989, the SPD received a 911 call from a resident in the Cloverdale neighborhood informing them that several shots had been fired.  (Resp. Ex. 30, Disk 1 at 00:14.)  The police received several more reports of gunfire, and an officer was dispatched to investigate.  At 12:17 a.m. on August 19, 1989, an officer was informed that a local hospital had admitted Mr. Michael Cooper to treat a gunshot wound he received in the Cloverdale neighborhood.  (Id. at 03:37, 09:12.) The police visited Mr. Cooper in the hospital and obtained a description of the shooter: a young, tall, African-American male wearing a white batman shirt, a black hat, and shorts.  (Id. at 11:01.)

At 1:09 a.m. on August 19, 2010, the SPD received a 911 call from an employee at the Thunderbird Inn, located across the street from the Burger King on Oglethorpe Avenue.[3]  (Id. at 22:56.)  The caller informed the police that an individual had been shot in the Burger King parking lot and that she saw two African-American males running from the scene in the direction

---

[3] For reference, a hand drawn diagram of the Burger King parking lot and surrounding area is provided in the appendix to this order.  The diagram is from the police file (Resp. Ex. 30 at 375) and is not to scale.

3

of the Trust Company Bank building. One minute later, the SPD received another 911 call informing the police that the shooting victim was a police officer. (Id. at 24:13.) At 1:16 a.m., the SPD received a second call from the Thunderbird employee, informing them that she saw two men run from the Burger King parking lot towards the Trust Company Bank building, that both were wearing shorts, and that one was wearing a tank top t-shirt. (Id. at 30:38.) The caller did not identify the color of the shorts or the tank top. The limited description was quickly relayed to the responding officers, who immediately began searching for similarly dressed individuals. (Id. at 38:03.) Meanwhile, the officers at the scene secured the area and began interviewing potential witnesses. (Resp. Ex. 30 at 13-14.) The following relevant witness statements were secured during the investigations.

## A. Harriett Murray's First Statement

At 2:27 a.m. on August 19, 1989, Ms. Harriett Murray provided the police with a statement concerning the MacPhail shooting. (Pet. Ex. 32-U at 1.) In the early hours of August 19, 1989, Ms. Murray was sitting in front of the Burger King restaurant with Mr. Larry Young. (Id.) Mr. Young went to the nearby convenience store to purchase cigarettes and beer. (Id.) While Mr. Young was returning from the store to the Burger King parking lot, Ms. Murray noticed that he was arguing with another

4

individual, who was following him. (Id.) Ms. Murray also noticed two other individuals, approaching from the direction of the Trust Company Bank building, who were following Mr. Young. (Id.)

Walking away from the individuals, Mr. Young repeatedly told the group that he was not going to fight them. (Id.) Ms. Murray heard one individual tell Mr. Young not to walk away and threaten to shoot him. (Id.) The individual then started digging down his shirt. (Id.) As the three individuals converged on Mr. Young, one produced a gun. (Id.) Unaware of the weapon, Mr. Young continued to walk away from the trio. (Id.) As Mr. Young approached a van parked at the Burger King drive-through window, the armed individual struck Mr. Young in the head with what Ms. Murray believed was the butt of the weapon. (Id. at 1-2.) Mr. Young then fled toward the drive-through window, and began beating on the van and the window, asking for someone to call the police. (Id. at 1.)

Next, Ms. Murray observed a police officer approaching the three individuals, who were now fleeing, telling them to "hold it." (Id. at 1-2.) As the officer closed to within five feet, the individual with the firearm turned and aimed the weapon at the officer. (Id. at 2.) The weapon did not discharge when the individual first pulled the trigger. (Id.) As the officer reached for his gun, the individual shot him in the face. (Id.)

Wounded, the officer fell to the ground, at which point the gunman fired two or three additional rounds at the officer and then continued running. (Id.) Ms. Murray then found Mr. Young and assisted him in tending to his head wound. (Id.)

Ms. Murray described the gunman as having medium-colored skin with a narrow face, high cheekbones, and a fade-away haircut. (Id.) She estimated him to be between twenty-four to thirty years old, four inches taller than the officer, and approximately one hundred and thirty pounds. (Id.) Ms. Murray recalls the gunman as wearing a white shirt and dark colored pants. (Id.)

B. Larry Young

At 3:10 a.m. on August 19, 1989, the police obtained a statement from Mr. Young concerning the MacPhail shooting. (Pet. Ex. 32-N at 1.) Mr. Young informed the police that, during the early hours of August 19, 1989, he was sitting in the Burger King parking lot drinking beer with his girlfriend, Ms. Murray. (Id. at 2.) When the couple drank their last beer, Mr. Young went to the Time-Saver[4] convenience store to get more beer.[5] (Id.) As Mr. Young was returning, an African-American male wearing a yellow t-shirt began asking him for one of the

[4] Different witnesses refer to this convenience store as either the Time-Saver or Penny-Saver.
[5] The convenience store is located to the west of the Burger King, on the same side of Oglethorpe Avenue as the Burger King. (Pet. Ex. 32-N at 1.)

6

beers that Mr. Young just purchased. (Id. at 2, 5.) When Mr. Young informed the individual that he could not have a beer, the individual began using foul language toward Mr. Young. (Id. at 2.) As Mr. Young continued walking back toward the Burger King, the individual in the yellow t-shirt followed him, continuing the verbal altercation. (Id.) As he approached the Burger King parking lot, Mr. Young noticed a second African-American male slipping through the fence separating the convenience store parking lot from the Trust Company Bank property. (Id.) Soon, Mr. Young realized that he was being followed by a third individual. (Id.)

As Mr. Young entered the Burger King parking lot, he observed Ms. Murray and two gentlemen sitting with her quickly get up and flee the area. (Id.) Mr. Young now realized that he was cornered and resumed arguing with the individual in the yellow t-shirt. (Id.) As Mr. Young was focused on the individual in the yellow t-shirt, he was hit in the head by a second person. (Id. at 2-3.) A stunned and fearful Mr. Young ran toward the Burger King drive-through window, seeking help. (Id. at 3.) When he was at the window, Mr. Young heard one gunshot, which caused him to duck for cover behind a van waiting at the window. (Id. at 8.) Eventually, he ran to the building's front entrance and entered the building. (Id. at 3.)

Mr. Young informed the police that the individual in the yellow t-shirt was around twenty to twenty-one years old, five feet nine inches tall, and one hundred and fifty-eight pounds. (Id. at 5-6.)   The individual had short hair, no facial hair, and lighter brown skin.   (Id. at 6.)   When describing his clothes, Mr. Young stated that the yellow t-shirt was a tank-top and that the individual was wearing "jam" pants.   (Id.)   Mr. Young stated that he definitely recognized the individual in the yellow t-shirt.  (Id. at 5.)

Mr. Young described the individual who assaulted him as about twenty-two to twenty-three years old, five feet eleven inches tall, and one hundred and seventy-two pounds.  (Id. at 7.)   Mr. Young could not remember the individual's facial features or skin color (id.), but believed that he might be able to recognize him if he saw him again (id. at 5).  He did state that the individual was wearing a white hat and a white t-shirt with "some kind of print on it."  (Id. at 7.)  Mr. Young could not remember anything about the third individual because that person was only in the background and was not directly involved in the altercation.  (Id.)

C.  Antoine Williams

At 3:22 a.m. on August 19, 1989, the police took a statement from Mr. Antoine Williams concerning the MacPhail shooting.   (Pet. Ex. 32-OO at 1.)   At about 1:00 a.m. that

8

morning, Mr. Williams was pulling into the Burger King parking lot to begin his shift at the restaurant. (Id.) As he was parking, he noticed three men following one individual, who was walking across Fahm Street toward the Burger King parking lot. (Id.) As they drew closer, Mr. Williams could tell that two of the individuals were arguing. (Id.) He overheard the individual being followed say that he did not want to fight anyone and that the three others should go back to where they were. (Id.) As the group came between his car and the drive-through window, one of the individuals ran up and slapped the man being followed in the head with a gun. (Id.)

When Mr. Williams looked the other way, he saw a police officer coming from behind a van waiting at the Burger King drive-through window. (Id.) The officer was running towards the individual with the firearm. (Id.) The two unarmed individuals were already running away, and the individual with the gun was trying to stick it back in his pants. (Id.) According to Mr. Williams, the assailant appeared to panic as the officer was approaching and he was unable to conceal the gun. (Id. at 1-2.) When the officer closed to within approximately fifteen feet, the assailant turned and shot the officer. (Id.) After falling to the ground, it appeared that the officer was trying to regain his footing when the gunman

shot him three more times. (Id. at 2.) After firing the fourth shot, the gunman fled from the scene. (Id.)

Mr. Williams described the gunman as approximately twenty to twenty-three years old, six feet two inches to six feet four inches tall, and one hundred and eighty pounds. (Id.) Mr. Williams believed that the gunman was wearing a blue or white t-shirt, and dark jeans. (Id.) He explained that the dark shade of tint on his car's windows may have affected his ability to distinguish the exact color of the gunman's t-shirt. (Id. at 2-3.) Mr. Williams then described the gun used in the shooting as a rusty, brownish colored revolver. (Id. at 3.) Mr. Williams did state that he believed he could identify the gunman if he saw him again. (Id.) When asked to describe the other three individuals, Mr. Williams could not provide any details because he was focused on the gunman. (Id.)

D.    Dorothy Ferrell's First Statement

At 4:14 a.m. on August 19, 1989, Ms. Dorothy Ferrell provided a statement to the police concerning the MacPhail shooting. (Pet. Ex. 32-Y at 1.) Ms. Ferrell informed the police that, during the early hours of August 19, 1989, she was descending the stairs at the Thunderbird Inn, located directly across Oglethorpe Avenue from the Burger King, when she saw a bloodied individual in the Burger King parking lot. (Id.) Next, Ms. Ferrell observed a police officer walk across the

10

parking lot, yelling at a group of people. (Id.) While two of the individuals fled, one reached into his shorts, produced a firearm, and shot the officer. (Id.) The wounded officer fell to the ground, at which point the gunman fired three additional shots and then fled the scene. (Id.)

Ms. Ferrell also recalls that, at around 6:00 p.m. on August 18, 1989, the same officer directed the gunman to leave the Burger King property. (Id.) The gunman was wearing the same clothes during both incidents—a white t-shirt with writing, dark colored shorts, and a white hat. (Id. at 1-2.) She described the shooter as approximately six feet tall with a slender build and medium-light colored skin. (Id. at 2.) Ms. Ferrell was pretty sure that she could identify the gunman if she saw him again. (Id.)

### E. Anthony Lolas

At 5:20 a.m. on August 19, 1989, the police took a statement concerning the MacPhail shooting from United States Air Force Lieutenant Colonel Anthony Lolas. (Resp. Ex. 30 at 110.) Lt. Col. Lolas informed the police that at approximately 1:01 a.m. he was lying down in the back seat of a van waiting at the Burger King drive-through window when a man started banging on the vehicle, asking for the police. (Id.) As he was rising from the seat, Lt. Col. Lolas heard one gunshot, quickly followed by two additional shots. (Id.) Turning toward the

11

direction of the gunshots, Lt. Col. Lolas saw someone in a striped jumpsuit running toward the front of the Burger King. (Id.) Then, Lt. Col. Lolas focused on an individual in a white t-shirt, whose arm was surrounded by smoke. (Id. at 110-11.) After firing the shots, the gunman fled to the northwest. (Id.) Lt. Col. Lolas stated that he had no doubt that the individual in the white t-shirt was the shooter. (Id. at 111.)

Lt. Col. Lolas never saw the shooter's face, but described him as an African-American male, approximately six feet tall, and around one hundred and seventy pounds. (Id.) The shooter was wearing a white t-shirt with very dark pants. (Id.)

### F. Matthew Hughes

At 5:49 a.m. on August 19, 1989, Mr. Matthew Hughes provided the police with a statement concerning the MacPhail shooting. (Id. at 115.) Mr. Hughes was seated directly behind the driver's seat in a van waiting at the Burger King drive-through when an individual came up to the driver's side window. (Id.) Mr. Hughes could not hear what the man was saying, but noticed a severe cut over his right eye. (Id.) Next, Mr. Hughes heard a pop from the direction of the parking lot. (Id.) He did not think much of it until the other passengers told him there was something going on in the parking lot. (Id.) As Mr. Hughes turned to look, he heard two more popping sounds. (Id.)

Once he was facing the direction of the sounds, he saw an African-American male in a light colored t-shirt standing over the body of a white individual. (Id.) After the shooting, the African-American male ran toward the Trust Company Bank building. (Id. at 116-17.)

Mr. Hughes described the individual in the light colored t-shirt as an African-American male with a slender to medium build, approximately five feet seven inches to five feet nine inches tall. (Id.) The individual wore dark shorts, a light colored baseball cap, and a light colored t-shirt, with either short or no sleeves. (Id.) Mr. Hughes also saw a second individual running toward the Trust Company Bank building, who was much closer to that building than the man in the light colored t-shirt. (Id.) This individual was skinny, dressed in all dark clothes, and appeared to be carrying a gym bag. (Id.)

G. Eric Riggins

At 5:57 a.m. on August 19, 1989, the police obtained a statement from Mr. Eric Riggins concerning the MacPhail shooting. (Id. at 118.) Mr. Riggins was seated in the second row, behind the driver's seat, in a van waiting at the Burger King drive-through window when an individual came to the driver's side window calling for someone to phone the police. (Id.) After a few seconds passed, Mr. Riggins heard a single gunshot. (Id.) Turning toward the direction of the gunshot,

13

Mr. Riggins observed a man falling to the ground. (Id.) An individual, standing five feet from the man on the ground, raised his hand and fired two more shots. (Id.) Mr. Riggins recalls that the gunman never completely stopped running to fire the shots and fled towards the Trust Company Bank building. (Id. at 118-19.)

Mr. Riggins described the shooter as a slim, African-American male, approximately five feet ten inches tall and one hundred and sixty pounds. (Id. at 118.) The gunman was wearing a light colored shirt, dark shorts, and a baseball cap, the color of which Mr. Riggins could not recall. (Id.) Beyond the shooter, Mr. Riggins saw a second, taller male running towards the Trust Company Bank building. (Id.)

H.   Steven Hawkins

At 6:10 a.m. on August 19, 1989, Mr. Steven Hawkins provided the police with a statement concerning the MacPhail shooting. (Id. at 129.) Mr. Hawkins was seated in the middle of the third row of a van waiting at the Burger King drive-through window when an individual came up to the driver's side window asking for someone to call the police. (Id.) Soon thereafter, Mr. Hawkins heard three popping sounds from the parking lot. (Id.) Turning to look in the direction of the noise, Mr. Hawkins saw an African-American teenager, who was skinny, approximately six feet tall, and was wearing a white

14

shirt with black shorts or pants, running across the parking lot. (Id.)

I. Steven Sanders

At 5:15 a.m. on August 19, 1989, the police obtained a statement from Mr. Stephen Sanders concerning the MacPhail shooting. (Id. at 112.) Mr. Sanders was seated in a van waiting at the Burger King drive-through window when he observed one African-American male strike another African-American male in the parking lot. (Id.) The man who had been hit ran to the van, asking for someone to call the police while banging on the hood of the vehicle. (Id.) It was at this time that Mr. Sanders heard a gunshot. (Id.) Turning toward the noise, Mr. Sanders observed an African-American male wearing a white shirt and black shorts standing in front of an individual who was falling forward. (Id.) The male in the white shirt shot at the individual two more times and then start running, with a second individual in a black outfit, toward the Trust Company Bank building. (Id. at 112-13.) Mr. Sanders informed the police that he would not be able to recognize the two fleeing men, except by their clothing. (Id. at 113.)

J. Robert Grizzard

At 6:07 a.m. on August 19, 1989, Mr. Robert Grizzard provided a statement to the police concerning the MacPhail shooting. (Id. at 130.) Mr. Grizzard was seated in a van

waiting at the Burger King drive-through window when he observed
two men running from the parking lot toward the front of the
building. (Id.) Looking in the direction from which the men
fled, Mr. Grizzard saw one man hit another on the side of his
face. (Id.) The assaulted individual then staggered to the van
and asked for someone to call the police. (Id.) Looking back
toward the parking lot, Mr. Grizzard observed a police officer
with a baton moving toward the assailant. (Id.) As the officer
closed in on the assailant, the assailant fired as many as four
shots at the officer. Once the officer fell to the ground, the
shooter fled. (Id.) Mr. Grizzard remembered only that the
shooter was wearing a hat. (Id. at 130-31.) Mr. Grizzard
informed the police that he would not be able to identify the
shooter. (Id. at 131.)

    K.   Mark Wilds

At 6:40 a.m. on August 19, 1989, the police obtained a
statement from Mr. Mark Wilds concerning the Cloverdale
shooting. (Id. at 194.) Mr. Wilds was driving away from the
Cloverdale party with Messrs. Lamar Brown, Benjamin Gordon, and
Joseph Blige when someone fired at their vehicle from the
bushes. (Id.) Mr. Wilds believed that the weapon used was a
thirty-eight caliber. (Id.) Later, at 8:45 p.m. on August 19,
1989, Mr. Wilds amended his statement to include an

identification of Mr. Davis as one who attended the Cloverdale party. (Id. at 195.)

### L. Joseph Blige

At 7:10 a.m. on August 19, 1989, Mr. Blige provided the police with a statement concerning the Cloverdale shooting. (Id. at 196.) He informed the police that he was leaving the Cloverdale party in Mr. Wilds's vehicle, along with Messrs. Brown, Gordon, and Michael Cooper, when someone started shooting at them from behind some bushes. (Id.) There were between four and five people standing behind the bushes when the shooting began. (Id.) One bullet struck Mr. Cooper, whom Mr. Wilds subsequently drove to the hospital. (Id.)

### M. Benjamin Gordon

At 7:47 a.m. on August 19, 1989, the police obtained a statement from Mr. Benjamin Gordon concerning the Cloverdale shooting. (Id. at 198.) Mr. Gordon informed the police that, as he was leaving the Cloverdale party in Mr. Wilds's vehicle with Messrs. Brown, Cooper, and Blige, someone on the corner fired multiple shots at the vehicle, hitting Mr. Cooper. (Id.) The shooter was wearing a white batman shirt and a dark colored pair of jeans. (Id.) Mr. Gordon remembered seeing the gunman earlier at the party, by the pool. (Id.) Mr. Gordon believed that the individual was angry at Mr. Gordon and his friends because they were from another neighborhood and the girls were

talking mostly to them. (Id. at 198-99.) Later that evening, Mr. Gordon walked to the Burger King because he heard that an officer had been shot. (Id. at 199.)

    N.    Lamar Brown

At 6:00 p.m. on August 19, 1989, Mr. Lamar Brown provided the police with a statement concerning the Cloverdale shooting. (Id. at 207.) According to Mr. Brown, he was leaving the Cloverdale party in Mr. Wilds's vehicle, along with Messrs. Gordon, Blige, and Cooper, when someone started shooting at them from the corner. (Id.) The shooter was dark skinned with short hair, between five feet nine inches and five feet ten inches tall, and around one hundred and fifty-nine pounds. (Id. at 208.) The gunman was wearing a batman shirt, black pants, and a black hat. (Id.) Mr. Brown did not remember seeing this individual at the party. (Id.)

Later that evening, Mr. Brown was passing time with Messrs. Wilds, Gordon, and Blige in the Yamacraw neighborhood when he heard gunshots. (Id. at 209-10.) After the shooting, Mr. Brown observed two individuals running toward the Trust Company Bank building, into the Yamacraw neighborhood. (Id. at 209.) One was running a short distance behind the other. (Id. at 210.) Due to the darkness, Mr. Brown could not see any identifying features on either individual. (Id.)

O.   Sylvester "Red" Coles's First Statement

At 8:52 p.m. on August 19, 1989, Mr. Sylvester "Red" Coles gave a statement to the police concerning the MacPhail shooting. (Id. at 143.)  Mr. Coles was standing outside of Charlie Brown's pool room with Messrs. Troy Davis and Darrell Collins when he started arguing with someone passing through the parking lot. (Id. at 143-44.)   Mr. Coles continued to argue with the individual as he walked toward the Burger King restaurant, followed by Messrs. Davis and Collins.  (Id.)  Mr. Coles stated that, when they were near the restaurant's drive-through window, Mr. Davis hit the individual in the head with a pistol.  (Id.)

As the individual ran off shouting, a police officer came out of the Burger King restaurant and told Messrs. Coles and Davis to "hold it."  (Id.)  Mr. Coles stood in the middle of the parking lot while Mr. Davis ran past him toward the Trust Company Bank building.  (Id.)  After the officer, nightstick in hand, ran past Mr. Coles toward Mr. Davis, Mr. Coles heard a gunshot.  (Id.)  Upon hearing the shot, Mr. Coles began running toward the Trust Company Bank building.  (Id.)  As he was fleeing, Mr. Coles turned around and saw the police officer falling to the ground.  (Id. at 145.)  Mr. Coles ran past the pool room to his sister's house in Yamacraw Village.  (Id. at 143-44.)

Mr. Coles informed the police that he had seen Mr. Davis with a firearm earlier that evening at the pool room. (Id. at 145.) The gun was black, with a short barrel and brown wooden handle. (Id.) Mr. Coles stated that he thought Mr. Davis was wearing a short sleeve t-shirt and orange cut off shorts, but could not really remember. (Id. at 146.)

### P. Darrell Collins's First Statement

At 11:30 p.m. on August 19, 1989, the police obtained a statement from Mr. Darrell Collins. (Id. at 148.) Mr. Collins informed the police that, on the evening of August 18, 1989, he went to a pool party in Cloverdale with Messrs. Eric Ellison and Davis. (Id.) The trio was leaving the party when Messrs. Collins and Ellison stopped to talk to girls, while Mr. Davis continued to walk toward the street corner. (Id.) When Mr. Davis was almost to the corner, the occupants of an approaching car were leaning out of the vehicle's windows, cussing and throwing things. (Id.) Mr. Davis shot at the vehicle as it passed the corner where he was standing using a short barreled, black gun with a brown handle. (Id. at 149.)

After the shooting, Messrs. Collins and Ellison returned to Mr. Ellison's house. (Id. at 148.) After spending some time at Mr. Ellison's home, the pair were on their way to purchase gas for the vehicle when they passed Mr. Davis, who was walking on

the side of the road. (Id.) Mr. Davis joined them and they went to the Time-Saver. (Id.)

Once at the Time-Saver, Messrs. Collins and Ellison stood by the vehicle while Mr. Davis walked over to Charlie Brown's pool room, located adjacent to the Time-Saver, and engaged Mr. Coles in conversation. (Id. at 148-49.) Soon thereafter, an argument between Mr. Coles and a second individual broke out. (Id. at 149.) As the argument moved toward the Burger King parking lot, Mr. Coles was followed by Mr. Davis, who was, in turn, followed by Mr. Collins. (Id.)

As the group entered the Burger King parking lot, Mr. Davis slapped the individual they had been following in the head. (Id.) Mr. Collins then noticed a police officer advancing toward the commotion. (Id.) Upon observing the officer, Mr. Collins turned around and started walking back toward the gas station. (Id.) While he was returning to the station, Mr. Collins heard a single gunshot, which caused him to start running. (Id.) When Mr. Collins arrived at the gas station, he rejoined Mr. Ellison, who drove Mr. Collins home. He informed the police that, on the night of the MacPhail shooting, Mr. Davis was wearing blue or black shorts, and a white t-shirt with writing on the front. (Id.)

Q.  Jeffrey Sams's First Statement

On August 20, 1989, Mr. Jeffrey Sams provided a statement
to the police concerning the Cloverdale shooting.  (Id. at 161.)
Mr. Sams informed the police that, on August 18, 1989, he was at
a party in the Cloverdale neighborhood, where he saw Mr. Davis.
(Id.)  After he heard some guys arguing at the party, he decided
to take his car home and walk back to the party.  (Id.)  As he
was walking back, Mr. Sams was picked up by Mr. Ellison, whose
vehicle was also occupied by Messrs. Davis and Collins.  (Id.)
Mr. Ellison then drove the group to the Time-Saver.  (Id.)
After visiting the store, the group went to Charlie Brown's pool
room.  (Id.)  After shooting a few games of pool, Mr. Sams
returned to the car, where he stayed until Messrs. Ellison and
Collins returned.  (Id.)

R.  Jeffrey Sapp

At 2:30 on August 21, 1989, Mr. Jeffrey Sapp provided a
statement to the police concerning the MacPhail shooting.  (Id.
at 166.)  Between 2:00 and 3:00 p.m. on August 19, 1989, Mr.
Davis was riding a bicycle when he stopped to talk with Mr.
Sapp.  (Id.)  Mr. Davis asked Mr. Sapp if he heard about a
shooting.  (Id.)  After Mr. Sapp told Mr. Davis that he heard an
officer had been shot, Mr. Davis confessed that he was the
shooter.  (Id.)  Mr. Davis then recounted how Mr. Coles got into
a fight with another individual, whom Mr. Davis slapped in the

22

face with a pistol. (Id.) The police officer then appeared from behind a van, told Mr. Davis to stop, and reached for his firearm. (Id.) Mr. Davis told Mr. Sapp that he shot the officer because the officer was reaching for his firearm. (Id.) Mr. Sapp stated that he did not believe Mr. Davis's story. (Id.)

### S. Eric Ellison

On August 21, 1989, the police obtained a statement from Mr. Eric Ellison. (Id. at 156.) Mr. Ellison informed the police that, on the evening of August 18, 1989, he and Mr. Collins were driving to a party in the Cloverdale neighborhood when they passed Mr. Davis, who was walking to the same party. (Id.) They picked up Mr. Davis and continued to Cloverdale. (Id.) Once they arrived, the group parted ways. (Id. at 156-57.) When Mr. Ellison left the pool area at the back of the home, he observed an argument in the front yard between two groups of people, which involved some shouting and cursing. (Id.) A few minutes later, Mr. Ellison saw Mr. Davis leave the party in a truck, only to return within five to ten minutes. (Id. at 157.)

As Messrs. Ellison and Collins were in the front yard speaking with some girls, Mr. Ellison noticed an automobile driving by with an individual leaning out of a passenger's side window, yelling derogatory comments. (Id.) When the car neared

the corner, Mr. Ellison heard between four and five gunshots. (Id.) The gunfire prompted Mr. Ellison to leave the party with Mr. Collins. (Id.) As Mr. Ellison was leaving, he saw Mr. Davis close to the corner where the shots were fired. (Id.) Mr. Davis asked Mr. Ellison to be taken to the Yamacraw neighborhood. (Id.) Having agreed, Mr. Ellison was driving the three toward Yamacraw when he passed Mr. Jeffery Sams, who was walking back to the party. (Id.) Mr. Sams got into the vehicle, and the four drove off toward Yamacraw. (Id.)

At the direction of Mr. Davis, Mr. Ellison drove to a convenience store. (Id. at 158.) After going into the store, the group went to the adjacent pool room to shoot pool. (Id.) The group separated while playing pool. Finishing his last game, Mr. Ellison was leaving the pool room when he heard three gunshots. (Id.) As he got into his car, where Mr. Sams was already located, Mr. Collins approached and entered the vehicle. (Id. at 159.) Mr. Ellison then drove home, where he remained until he had to report to work at 10:00 a.m. (Id.)

T.   Monty Holmes

At 2:11 p.m. on August 22, 1989, Mr. Monty Holmes provided a statement to the police regarding the MacPhail shooting. (Id. at 169.) Mr. Holmes stated that, on the morning of August 19, 1989, Mr. Davis came to his home and confessed to shooting Officer MacPhail. (Id.) Mr. Davis told Mr. Holmes that he shot

24

the officer because he thought the officer was reaching for his firearm. (Id.) Mr. Holmes thought the confession was a joke. (Id.)

U. Craig Young

At 2:28 p.m. on August 22, 1989, the police obtained a statement from Mr. Craig Young. (Id. at 211.) Mr. Craig Young informed the police that Mr. Davis told him that he had gotten into an argument with Mr. Mike Wilds at the Cloverdale party. (Id.) Mr. Craig Young recalls Mr. Wilds's vehicle being shot at and hearing that Mr. Davis was the shooter. (Id.)

According to Mr. Craig Young, he was walking home with Mr. Sapp on the morning of August 19, 1989, when Mr. Sapp informed him that Mr. Davis claimed to have shot the police officer. (Id. at 212.) As the two separated, Mr. Craig Young observed Mr. Davis slowly riding a bicycle down the street. (Id.)

V. Harriett Murray's Second Statement

At 6:11 p.m. on August 24, 1989, Ms. Murray provided the police with a second statement concerning the MacPhail shooting. (Pet. Ex. 32-V at 1.) In this statement, Ms. Murray identified Mr. Davis as Officer MacPhail's murderer from a photographic lineup. (Id. at 1-2.) She also identified Mr. Coles as the individual in a yellow shirt who grabbed Mr. Young's arm, causing Mr. Young to turn around. (Id.) It was at this time that the individual in the white shirt—Mr. Davis—struck Mr.

25

Young with the gun. (Id. at 1.) Ms. Murray stated that the individual in the yellow shirt was heavier than the individual in the white shirt, whom she estimated was between 135 and 155 pounds. (Id.)

W. Sylvester "Red" Coles's Second Statement

At 7:55 p.m. on August 24, 1989, Mr. Coles provided a second statement to the police concerning the MacPhail shooting. (Resp. Ex. 30 at 147.) In this statement, Mr. Coles admits that he was carrying a gun on the night Officer MacPhail was shot. (Id.) Specifically, Mr. Coles carried a chrome, long barreled, thirty-eight caliber revolver in the waistline of his pants. (Id.) Mr. Coles no longer had the gun on him when he started the argument because he had given it to Mr. Sapp for safekeeping while Mr. Coles was playing pool. (Id.)

X. Darrell Collins's Second Statement

At 9:03 a.m. on August 25, 1989, the police obtained a second statement from Mr. Collins. (Id. at 150.) In this statement, Mr. Collins tells the police that he, Messrs. Ellison, Sams, and Davis were all in the car as they drove to the Time-Saver. (Id.) When Mr. Ellison went inside Charlie Brown's pool room, Mr. Coles took a firearm from his pants and placed it on the front seat of Mr. Ellison's vehicle. (Id.) Not wanting the gun in the car, Mr. Collins took it and hid it in some bushes on the side of the building. (Id.) Mr. Collins

26

described the gun as long barreled and chrome with a brown handle. (Id.) Also, he informed the police that he had seen Mr. Davis with the gun used in the Cloverdale shooting at least twice, once two weeks prior to that shooting and once after that shooting. (Id. at 151.)

### Y.  Jeffrey Sams's Second Statement

At 4:06 p.m. on August 25, 1989, Mr. Sams provided a second statement to the police concerning the MacPhail shooting. (Id. at 164.) Mr. Sams informed the police that, when he was sitting by himself in Mr. Ellison's car, Mr. Coles placed a gun in the front seat of the vehicle. (Id.) According to Mr. Sams, Mr. Collins immediately picked up the gun and removed it from the car. (Id.) Mr. Sams recalled the gun as being shiny, but could not remember if it had a long or short barrel. (Id.)

### Z.  Antoine Williams's Second Statement

At 1:16 p.m. on August 30, 1989, Mr. Williams provided the police with a second statement. (Pet. Ex. 32-PP at 1.) In this statement, he identified Mr. Davis as the individual who shot the officer. (Id.) Mr. Williams was about sixty percent sure in his identification. (Id.) He had not read about the case in the newspaper, or heard about it on the radio or television. However, Mr. Williams did see a picture of Mr. Davis on a wanted poster at work, which he thought looked like the gunman. (Id.

at 1-2.)  He stated that he would not be able to identify any of the other individuals involved in the incident.  (Id. at 2.)

Also, Mr. Williams informed the police that the individual who slapped the man was the same individual who shot the officer.  (Id. at 1.)  And, he stated that the gunman was wearing either a white or blue shirt, but that he had difficulty distinguish between these colors due to the dark tint on his car windows.  (Id. at 2.)  However, Mr. Williams stated that the tint would not have prohibited him from distinguishing yellow from either white or blue.  (Id.)

### AA.  Valerie Gordon

At 10:47 a.m. on September 1, 1989, the police obtained a statement from Ms. Valerie Gordon, Mr. Coles's sister.  (Resp. Ex. 30 at 175.)  Ms. Gordon informed the police that, in the early morning of August 19, 1989, she was sitting on her front porch when she heard gunshots.  (Id.)  A few minutes later, Mr. Coles ran onto the front porch and sat down in a chair.  (Id.)  He then informed his sister that he was not sure what was going on, but that there had been a shooting and he thought someone was trying to kill him.  (Id. at 175-76.)  Mr. Coles changed out of his yellow t-shirt and into a red, white, and blue stripped collared shirt that Ms. Gordon retrieved for him.  (Id. at 176.)  As Ms. Gordon returned to the front door, she observed a shirtless Mr. Davis standing next to the porch, talking to Mr.

28

Coles. (Id.) Mr. Coles gave Mr. Davis the yellow t-shirt he had previously been wearing, which Mr. Davis then put on. (Id. at 177.) Ms. Gordon informed the police that, after Mr. Davis put on the yellow t-shirt, Mr. Coles left the property and she went inside the house. (Id.) A few minutes later, she observed Mr. Davis take off the yellow t-shirt, lay it just inside her front door, and exit the property. (Id. at 177-78.)

BB. Dorothy Ferrell's Second Statement

At 10:25 a.m. on September 5, 1989, Ms. Ferrell provided the police with a second statement concerning the MacPhail shooting. (Pet. Ex. 32-Z at 1.) In this statement, Ms. Ferrell identifies Mr. Davis as the individual who shot the officer. (Id.) She stated that, on the night of the MacPhail shooting, Mr. Davis was wearing a white t-shirt with quarter length sleeves and writing on the front, and dark colored shorts. (Id. at 4.) She admitted that she had seen his picture on television once prior to her identification, but stated that her identification was based only on what she observed on August 19, 1989. (Id. at 1-2.) Ms. Ferrell was between eighty and ninety percent sure that Mr. Davis was the shooter. (Id. at 3.)

Also, Ms. Ferrell stated that, prior to her identification, she had seen a photograph of Mr. Davis on the seat of a police car. (Id. at 2.) Ms. Ferrell was speaking to an officer in her neighborhood about events unrelated to the MacPhail shooting

29

when she noticed the photograph on the seat of the officer's vehicle. (Id.) Ms. Ferrell informed the officer that she had witnessed the shooting and that the individual in the photograph was the gunman. (Id.)

## II. PROBABLE CAUSE HEARING

On September 8, 1989, Mr. Davis had a probable cause hearing in Chatham County Recorder's Court. (Recorder's Court Transcript at 1.) At the hearing, the State was represented by Chatham County District Attorney Spencer Lawton, and Mr. Davis was represented by Mr. Robert Falligant, Jr. (Id.) At the conclusion of the hearing, the court found that the State presented sufficient evidence to charge Mr. Davis and submitted the case to Chatham County Superior Court. (Id. at 185.) The Court now relates the relevant witness testimony.

### A. Larry Young

At the hearing, Mr. Young testified that, in the early hours of August 19, 1989, he was sitting in the Burger King parking lot with Ms. Murray when he walked to the Penny-Saver convenience store to purchase more beer. (Id. at 6-7.) As he was returning to the Burger King, an individual approached him and asked for some beer. (Id. at 8.) When Mr. Young told him no, the individual got upset and started cursing at him. (Id.) Mr. Young continued to walk toward the Burger King and exchange expletives with the individual, who was now following him.

(Id.)  As he was walking, Mr. Young noticed another individual slip through a fence and circle around the back of the adjacent Trust Company Bank building.  (Id. at 9.)  By the time Mr. Young reached the Burger King parking lot, he was aware of a third individual following him.  (Id. at 9-10.)

When Mr. Young reached the parking lot, he heard one of the individuals say something, which caused the two gentlemen sitting with Ms. Murray to start running.  (Id. at 10.) Startled, Mr. Young looked back at his pursuers and noticed that the three had closed in on him, prompting Mr. Young to quicken his pace.  (Id.)  As he neared the Burger King drive-through, Mr. Young stopped and was confronted by the individual he had been arguing with, who was dressed in a yellow t-shirt.  (Id. at 11-12.)  Mr. Young was aware that someone was further behind him on his left side, and that someone was closer behind him on his right side, wearing a white t-shirt and a light colored cap. (Id. at 12.)

As Mr. Young was focused on the individual in the yellow t-shirt, someone else struck him on the right side of his head. (Id. at 13-14.)  Dazed, Mr. Young ran in between a van waiting at the drive-through and the drive-through window and asked for someone to call the police.  (Id. at 14-15.)  When Mr. Young was in between the van and the window, he heard a single gunshot. (Id. at 15.)  Scared, Mr. Young ran to the front of the building

31

and went inside. (Id. at 16-17.) Once inside, he was joined by Ms. Murray, who helped tend to his wound. (Id. at 17.)

On August 19, 1989, the police showed Mr. Young a photo array of individuals and asked him if he recognized anyone who was involved in his assault. (Id. at 18-19.) Mr. Young incorrectly identified the individual he was arguing with, but stated that he was not sure. (Id. at 19.) A few days later, however, Mr. Young realized his error when he saw Mr. Coles in person at the police station. After seeing Mr. Coles, Mr. Young identified him as the man he was arguing with. (Id. at 19-20.)

On cross-examination, Mr. Young testified that the individual he was arguing with was an African-American male with lighter colored skin than Mr. Young and short hair. (Id. at 30.) The man was approximately five foot eleven inches tall and wore a yellow t-shirt and short pants. (Id. at 30-31.) The individual that struck him was wearing a white t-shirt with printing, black pants, and a white baseball cap. (Id. at 40-41, 43.) Mr. Young was unable to identify the individual who struck him from a photo array. (Id. at 48.)

B.   Harriett Murray

At the hearing, Ms. Murray testified that she was drinking beer with Mr. Young in the Burger King parking lot in the early hours of August 19, 1989. (Id. at 53.) Eventually, Mr. Young went to the convenience store to purchase more beer. (Id. at

32

54.) As Mr. Young was returning, he was being followed by an individual who was arguing with him as he continued toward the Burger King parking lot. (Id.) Ms. Murray also noticed two additional individuals approaching from the adjacent Trust Company Bank building, one farther back than the other. (Id. at 55.)

As Mr. Young neared the Burger King parking lot, the three individuals were converging on him, and one told Mr. Young that he would shoot him and began digging in his pants. (Id.) Upon hearing the threat, the two men sitting with Ms. Murray fled. (Id.) When Mr. Young neared the drive-through lane, he was cornered: the individual in the yellow shirt was on his left and the individual in the white shirt was on his right. (Id. at 56-57.) The third individual was standing five or six feet behind Mr. Young. (Id. at 57.) The individual in the yellow shirt grabbed Mr. Young's arm, causing Mr. Young to look to his left, directly at the individual in the yellow shirt. (Id. at 56.) When Mr. Young turned his head, the individual on Mr. Young's right hit him in the head with the handle of a gun. (Id. at 56, 58.) Ms. Murray described the gun as having a black barrel and brown handle. (Id. at 58.)

After being hit, Mr. Young ran between a van waiting at the drive-through and the drive-through window, crying for someone to call the police. (Id. at 59.) Shortly thereafter, a police

officer came running from behind the building. (Id.) Upon
seeing the police, the individuals in the yellow shirt and the
white shirt began to flee. (Id. at 60.) At this point, Ms.
Murray was not sure where the third individual was located.
(Id.) The officer took out his nightstick and told the two
remaining individuals to "hold it." (Id.) Both individuals
initially slowed down, but when the officer ran past the
individual in the yellow shirt and continued toward the
individual in the white shirt, the individual in the yellow
shirt resumed running toward the Trust Company Bank building.
(Id. at 60-61.) As the officer approached, the individual in
the white shirt stopped, waited for the officer to get within
five feet, turned, aimed the gun at the officer, and pulled the
trigger. (Id. at 61.) The gun did not fire the first time.
(Id. at 61-62.) As the officer reached for his own firearm, the
individual in the white shirt fired again, this time striking
the officer in the face and causing him to fall to the ground.
(Id.) The gunman then took two steps forward, fired two or
three additional bullets at the fallen officer and fled. (Id.
at 62.)

Ms. Murray was shown a photo array the night of the
shooting, but could not identify the gunman. (Id. at 64.)
Several days later, the police showed her a second photo array,

from which she identified Mr. Davis as the man who hit Mr. Young and shot the officer. (Id. at 64-65.)

On cross-examination, Ms. Murray testified that the individual who threatened to shoot Mr. Young and started digging in his pants for a gun was the individual in the white shirt. (Id. at 70-71.) She also stated that the individual in the yellow shirt was a little taller and heavier than Mr. Young, while the individual in the white shirt was taller and thinner than Mr. Young. (Id. at 73.) Also, Ms. Murray recalled that the individual in the white shirt had darker skin than both Mr. Young and the individual in the yellow shirt. (Id. at 72-73.)

### C. Sylvester "Red" Coles

At the hearing, Mr. Coles testified that he was playing pool at Charlie Brown's pool room in the early hours of August 19, 1989, when he began arguing with a man coming out of the Time-Saver. (Id. at 96.) The argument started because the man would not give Mr. Coles one of the beers he had just purchased. (Id.) As the argument continued, Mr. Coles pursued the man as he walked toward the Burger King parking lot. (Id. at 96-97.) Messrs. Davis and Collins followed the pair by cutting through the Trust Company Bank property. (Id. at 97.)

As Mr. Coles and the man he was arguing with neared the Burger King drive-through, the man stopped and the two began trading insults face-to-face. (Id. at 98.) While they were

arguing, Mr. Coles observed Mr. Davis take up a position just behind the man and to the man's right, with Mr. Collins remaining somewhere behind Mr. Davis. (Id. at 98-99.) As the man was looking at Mr. Coles, Mr. Davis hit the man in the head with a small, snub-nose thirty-eight with a black or brown handle. (Id. at 99-100.) Mr. Coles saw the handle of the gun sticking out of Mr. Davis's pants while the two were in the pool room earlier that night. (Id. at 100.)

After being struck by Mr. Davis, the individual ran to the drive-through window, pleading for someone to call the police. (Id. at 100.) Both Messrs. Coles and Davis had turned to start running—Mr. Coles toward the Trust Company Bank building and Mr. Davis closer to Oglethorpe Avenue. (Id.) Soon after they had started running, a police officer came around the Burger King and told them to "hold it." (Id. at 101.) Upon hearing the officer, Mr. Coles turned and stopped. (Id.) The officer ran past Mr. Coles's right side, continuing toward Mr. Davis. (Id.) After the officer had passed him, Mr. Coles heard a single gunshot, which caused him to turn and resume running toward the Trust Company Bank building. (Id. at 101-02.) As he was running, Mr. Coles heard two more gunshots. (Id. at 102.) Mr. Coles stated that he was wearing a yellow t-shirt and blue shorts the night of the shooting, but could not remember what Mr. Davis was wearing. (Id. at 103.)

On cross-examination, Mr. Coles testified that he was five feet eleven inches tall, and weighed between one hundred forty and one hundred forty-five pounds. (Id. at 104-05.) He also admitted to carrying a firearm in the waistline of his shorts earlier that evening, but claimed that he no longer possessed it at the time of the argument. (Id. at 115.) Specifically, he gave the weapon to Mr. Sams because Mr. Coles did not want to carry it into the pool room. (Id. at 116-17.) The weapon, a long-barreled, chrome-plated thirty-eight, was never returned to Mr. Coles. (Id. at 116.)

Also on cross-examination, Mr. Coles stated that he continued running to the Yamacraw neighborhood until he reached the home of his sister, Ms. Valerie Gordon. (Id. at 123.) Mr. Coles had been sitting on his sister's porch for twenty to thirty minutes when a shirtless Mr. Davis approached and asked Mr. Coles for a shirt. (Id. at 127-28.) Mr. Coles gave Mr. Davis the yellow t-shirt that he had been wearing earlier that night—the only spare shirt Mr. Coles had on hand. (Id. at 128-29.)

D.  Dorothy Ferrell

At the hearing, Ms. Ferrell testified that, in the early hours of August 19, 1989, she was descending the stairwell of the Thunderbird Motel when she observed some commotion in the Burger King parking lot, which was across Oglethorpe Avenue.

(Id. at 131.)   Ms. Ferrell saw a police officer tell three African-American males, who were running from the parking lot, to stop.  (Id.)  One of the men continued to run.  (Id.)  The second turned and stopped.  (Id.)  The third man was walking backwards, away from the officer, when he fired a gun at the officer.  (Id. at 131, 133.)  When the shot was fired, the second man resumed his flight.  (Id. at 136.)  It took a moment for the officer to fall to the ground.  Then, the shooter fired three or four additional bullets at the officer.  (Id. at 137-38.)

Ms. Ferrell testified that the gunman was wearing a white t-shirt with some letters or a design on it.  (Id. at 138.)  She was unable to recall what the other two men were wearing.  (Id. at 136-37.)  Also, Ms. Ferrell testified that she identified the shooter from a photo array.  (Id. at 139-40.)

On cross-examination, Ms. Ferrell testified that she had a good look at the face of the man in the white t-shirt.  (Id. at 147.)  Ms. Ferrell described the shooter as having a medium build, with lighter colored skin than herself.  (Id. at 153-54.)  She recalled him having a slim, narrow face with what looked like a slight moustache.  (Id. at 148.)  However, Ms. Ferrell admitted that she never saw the gunman's face straight on, only from each side.  (Id. at 151.)   Ms. Ferrell was unable to

provide a description of the gun used in the shooting. (Id. at 150.)

Ms. Ferrell also testified that she first saw a picture of the shooter on the front seat of a police cruiser a few days after the shooting, while she was talking to an officer about an unrelated matter. (Id. at 154-55.) She told the officer that she recognized the man in the picture as the individual who shot the officer in the Burger King parking lot. (Id. at 155-56.) Approximately a week after she saw the picture in the police cruiser, Ms. Ferrell indentified the same individual from an array of five photographs. (Id. at 156-57.) She was positive that the man she identified was the shooter, despite the fact that the photograph showed Mr. Davis straight on and she saw only the gunman's profiles on the night of the shooting. (Id. at 157-58.)

### E.   Jeffery Sapp

At the hearing, Mr. Sapp testified that, at approximately 2:00 or 3:00 p.m. on August 19, 1989, he stopped to talk with Mr. Davis, who was riding a bicycle through the neighborhood. (Id. at 160.)   Mr. Davis asked Mr. Sapp if he heard about a shooting. (Id. at 161.)   Mr. Sapp acknowledged that he knew about the officer being shot in the Burger King parking lot. (Id.)   In response, Mr. Davis stated that he had shot the officer and explained what happened. (Id.)

Mr. Davis explained that Mr. Coles was arguing with an individual, who said something to Mr. Davis. (Id. at 161.) In response, Mr. Davis hit the individual in the face with a pistol, causing him to run to the drive-through window and call for the police. (Id.) Mr. Davis ran at first, but stopped when the officer told him to freeze. (Id.) Mr. Davis then shot the officer when the officer reached for his firearm. (Id.) Thinking that the officer got a good look at his face, Mr. Davis "finished the job." (Id.) Mr. Davis also said that he shot the officer in self-defense. (Id. at 161-62.)

On cross-examination, Mr. Sapp testified that he stopped Mr. Davis to ask him about the shooting at the Cloverdale party. (Id. at 164.) Mr. Davis stated that he did not know who fired the shots at the party, then inquired if Mr. Sapp heard about another shooting. (Id. at 165-66.) Mr. Sapp opined that Mr. Davis confessed to him because they were close friends. (Id. at 167.) Mr. Sapp admitted that he did not believe the confession. (Id. at 169.)

F.    Monty Holmes

At the hearing, Mr. Holmes testified that, on August 19, 1989, Mr. Davis visited Mr. Holmes, who had just returned to Savannah, at his home. (Id. at 171-72.) While they were catching up, Mr. Davis mentioned the shooting in the Burger King parking lot. (Id. at 173-74.) Mr. Davis explained that he had

40

been in a quarrel when the police officer appeared. (<u>Id.</u> at 174.) When the officer reached for his gun, Mr. Davis shot him in self-defense. (<u>Id.</u> at 174-75.) Mr. Davis said that, after he shot the officer the first time, he had to "finish the job." (<u>Id.</u> at 175.) Mr. Holmes thought Mr. Davis was joking. (<u>Id.</u>)

On cross-examination, Mr. Holmes estimated that the conversation took place at approximately noon and that Mr. Davis rode a bicycle to Mr. Holmes's residence. (<u>Id.</u> at 177.) Mr. Holmes reiterated that he thought Mr. Davis's confession was a joke. (<u>Id.</u> at 178.)

III. <u>THE TRIAL</u>

Mr. Davis was charged with the murder of Officer MacPhail, aggravated assault on Mr. Cooper, obstruction of a law officer, and possession of a gun in commission of a felony. (Trial Transcript at 8.) Mr. Davis pled not guilty and proceeded to trial. The trial occurred in Chatham County Superior Court and lasted from August 19 to 28, 1991. The state presented thirty-four[6] witnesses in its case-in-chief. (<u>Id.</u> at 2-5.) Mr. Davis called five witnesses and testified on his own behalf. (<u>Id.</u> at 5.) After deliberating for approximately two hours, the jury found Mr. Davis guilty on all counts. (<u>Id.</u> at 1608-10.) The Court now relates the relevant witness testimony.

---

[6] The Court does not detail every witnesses' testimony, restricting its account to those witnesses whose testimony is cogent to determining this petition.

A.   Larry Young

At trial, Mr. Young testified that he was sharing a beer with Ms. Murray in the Burger King parking lot in the early hours of August 19, 1989.  (Id. at 797-98.)  When the couple finished, Mr. Young walked to the nearby Time-Saver to purchase more beer.  (Id. at 798.)  As he was returning, a man asked him for one of the newly purchased beers.  (Id. at 799.)  When Mr. Young refused, the man began cursing at Mr. Young, following him as he walked back toward the Burger King.  (Id.)  Mr. Young was continuing toward the Burger King parking lot when he noticed a second man following him, this one approaching from the Trust Company Bank property.  (Id.)  As Mr. Young was entering the Burger King parking lot, the man he was arguing with said something that caused the two gentlemen sitting next to Ms. Murray to flee.  (Id.)  Mr. Young, however, thought little of it and continued to walk toward the Burger King parking lot.  (Id.) As Mr. Young entered the parking lot, he realized that he was now surrounded by three individuals.  (Id. at 799-800.)  The man he was arguing with was in front of him, and the other two individuals were behind him, one on his right and one on his left.  (Id. at 800.)

Of the three men, Mr. Young focused his attention mostly on the man he had been arguing with, who now stood directly in front of him.  (Id.)  The man in front of him was wearing a

42

yellow shirt and was somewhat slender, tall, and had light brown-skin. (Id. at 800-01.) He could not describe the other two men, but remembered that the individual on his right wore a white t-shirt. (Id. at 801-02.)

Mr. Young did try to keep an eye on all three men. However, soon the man in the yellow shirt made a move toward him, causing Mr. Young to shift his attention solely to this individual. (Id. at 802.) As Mr. Young looked forward, he received a hard blow to his head. (Id.) Dazed, he stumbled toward the drive-through window, where a van was waiting, and asked for help. (Id. at 803-04.) When Mr. Young was at the drive-through window, he heard a single gunshot, causing him to hide behind the van. (Id. at 804.) He then ran to the building's front door. (Id.) Once inside, Mr. Young was rejoined by Ms. Murray, who helped tend to Mr. Young's wound. (Id. at 804-05.)

Mr. Young testified that the person who struck him was definitely not the man in the yellow shirt that he had been arguing with. (Id. at 811.) A few days after the assault, Mr. Young picked an individual out of a photo array that he believed was the man he was arguing with. (Id. at 805.) However, he later saw the man he was arguing with while at the police station. (Id. at 805-06.) Realizing his mistake, Mr. Young informed the police that his earlier identification was

incorrect and that the man at the station was the man in the yellow shirt. (Id. at 806.) At trial, Mr. Young testified that he did not recognize Mr. Davis as the man he had been arguing with. (Id. at 813-14.)

On cross-examination, Mr. Young testified that the man he was arguing with might have threatened to shoot him, which caused the gentlemen with Ms. Murray to flee. (Id. at 825.) Mr. Young could not recall the man in the white t-shirt saying anything that night. (Id. at 824-25.) Also, Mr. Young described the man in the white t-shirt as slim, and wearing dark colored shorts and a baseball cap. (Id. at 828.)

Regarding Mr. Young's initial misidentification in the photo array, Mr. Young testified that the photo he first picked out as the man he was arguing with depicted Mr. Davis. (Id. at 831-32.) However, Mr. Young reiterated that his original identification was incorrect and he had not been arguing with Mr. Davis. (Id. at 832-33.) While Mr. Young was not sure who exactly hit him, he was sure that it was the individual behind him on his right, and not the man he had been arguing with. (Id.)

B.  Harriet Murray

Ms. Murray testified at the trial that she was drinking beer with Mr. Young in the Burger King parking lot in the early hours of August 19, 1989. (Id. at 840-41.) After the two

44

finished their last beer, Mr. Young walked to the nearby convenience store to purchase more. (Id. at 842.) When Mr. Young left, Ms. Murray was joined by two gentlemen who had just disembarked from a bus. (Id. at 842-43.) As Mr. Young returned, Ms. Murray noticed an individual following and harassing Mr. Young. (Id. at 843.) As the pair drew nearer, Ms. Murray noticed two additional individuals following Mr. Young, approaching from the Trust Company Bank property. (Id. at 843-44.) The three men steadily closed in on Mr. Young as he neared the parking lot. (Id. at 844.)

As the group neared the parking lot, an individual in a yellow shirt threatened to shoot Mr. Young. (Id. at 845.) Ms. Murray then saw one of the individuals following Mr. Young start digging in the front of his pants. (Id.) These events caused the two gentlemen with Ms. Murray to flee. (Id.) Worried, she went to the Burger King entrance, which was locked, to ask if someone could call the police. (Id. at 845-46.)

Unable to find help, Ms. Murray turned her attention back to Mr. Young, who was now being confronted by the individual in the yellow shirt. (Id. at 846.) As Mr. Young turned to face the individual in the yellow shirt, an individual in a white shirt, located on Mr. Young's right side, hit Mr. Young on the right side of his face with a brown-handled gun with a black barrel. (Id. at 846-47.) After he received the blow, Mr. Young

45

ran in between a van waiting at the drive-through and the drive-through window, pleading for someone to call the police. (Id. at 848.)

While Mr. Young was at the drive-through window, a police officer entered the parking lot from behind the Burger King restaurant. (Id. at 848.) As the officer was approaching, the individuals in the yellow and white shirts started running. (Id. at 848-49.) The third individual had started running as soon as Mr. Young was hit. (Id.) After the police officer told the two to "hold it," the individual in the yellow shirt slowed. (Id. at 849.) The officer ran past the individual in the yellow shirt and continued toward the individual in the white shirt. (Id.) After the officer ran past him, the individual in the yellow shirt resumed running toward the back of the Trust Company Bank property. (Id.) As the officer chased the individual in the white shirt, nightstick in hand, the individual stopped and looked over his shoulder. (Id. at 850.) When the officer came within five or six feet, the individual in the white shirt turned around, gun in hand, and pulled the trigger. (Id.) The gun did not discharge, but only clicked, causing the officer to reach for his own firearm. (Id.) As the officer was reaching, the individual in the white shirt shot him. (Id.) Reeling from the shot, the officer fell to the ground, at which point the individual in the white shirt took a

few steps forward and shot him again. (Id.) After firing his last shot, the individual in the white shirt fled toward the Trust Company Bank building. (Id. at 851.) Ms. Murray then found Mr. Young and helped tend to his wound. (Id.)

Ms. Murray described the individual in the yellow shirt, who had been arguing with Mr. Young, as stocky and slightly taller than Mr. Young with light colored skin. (Id. at 846.) The first time Ms. Murray was shown a photo spread, she did not recognize any of the individuals pictured. (Id. at 861-62.) Later, Ms. Murray was shown a second photo spread, from which she identified Mr. Davis as the man who both hit Mr. Young and shot the officer. (Id. at 862-65.) Ms. Murray testified that she recognized Mr. Davis's photograph because of his narrow face. (Id. at 865.)

On cross-examination, Ms. Murray admitted that she was a little near-sighted and had trouble seeing long distances without her glasses, which she was not sure if she was wearing that night. (Id. at 870.) Also, Ms. Murray was questioned regarding discrepancies between her trial testimony, police statement, and Recorder's Court testimony regarding which individual threatened to shoot Mr. Young and was digging in his shorts. (Id. at 871-79.) Further, Ms. Murray described the man in the yellow shirt as having a chubby face, and taller, stockier, and lighter in skin color than Mr. Young. (Id. at

883.)  She recalled that the man in the white shirt was tall and slender with dark colored skin, a narrow face, and a fade-away hair cut.  (Id. at 883-84.)  Comparing the individuals in the yellow and white shirts, Ms. Murray testified that the individual in the yellow shirt was shorter, heavier, and lighter in skin color than the individual in the white shirt.  (Id. at 885.)  Also, Ms. Murray admitted that when she first picked out Mr. Davis's picture from the photo spread, she told the police only that he was one of the three men at the shooting, not that he was the gunman.  (Id. at 888-89.)

C.   Sylvester "Red" Coles

Mr. Coles testified at the trial that, in the early hours of August 19, 1989, he was outside of Charlie Brown's pool room when he asked a man passing by for a beer.  (Id. at 900.)  Mr. Coles began arguing with the individual when he was refused, following him along Oglethorpe Avenue toward the Burger King parking lot.  (Id. at 902-04.)  Messrs. Davis and Collins were trailing the two, coming around the back of the Trust Company Bank building.  (Id.)  The three young men converged on the individual with the beer in the Burger King parking lot, Mr. Coles in front of him, Mr. Davis behind the individual to his right, and Mr. Collins in the background.  (Id. at 908-09.)  As the individual was looking at Mr. Coles, Mr. Davis hit the man on the right side of the head with a black, short-barreled,

48

thirty-eight with a brown handle. (Id. at 908, 912-13.) He recalled seeing Mr. Davis with a gun in the waistline of his pants earlier when they were at the pool room. (Id. at 913.)

After the assault the group scattered: the man who was struck ran to the drive-through window, Mr. Coles ran toward the back of the Trust Company Bank building, and Mr. Davis ran along Oglethorpe Avenue toward the front of the Trust Company Bank property. (Id. at 909.) As they started to run, a police officer appeared from behind the Burger King and ordered everyone to "hold it." (Id. at 910.) Mr. Coles stopped and turned, and the officer ran past him toward Oglethorpe Avenue. (Id. at 910.) As the officer past him, Mr. Coles heard a single gunshot. (Id. at 910-11.) After hearing the first gunshot, he turned and resumed running, at which point he heard two more gunshots. (Id. at 911.) Mr. Coles continued running until he reached his sister's house in the Yamacraw neighborhood. (Id. at 912.)

When Mr. Coles arrived at his sister's house, he changed out of his yellow t-shirt. (Id. at 914.) Approximately twenty to thirty minutes after Mr. Coles arrived, Mr. Davis appeared at the house. Mr. Davis was not wearing a shirt when he arrived and asked for one to wear. (Id.) Mr. Coles gave Mr. Davis the only other shirt he had at the house—the yellow t-shirt he had

been wearing earlier. (Id.) As Mr. Coles was leaving, Mr. Davis put on the yellow t-shirt. (Id. at 915.)

On cross-examination, Mr. Coles admitted that he was carrying a long barreled, thirty-eight caliber revolver on the night of the shooting. (Id. at 927.) During his re-direct examination, Mr. Coles described the firearm as chrome plated, making it silver in color. (Id. at 952.) During cross-examination, Mr. Coles also testified that he had been carrying the revolver in the waist of his pants, but would often leave it in some bushes on the side of the building when he went inside the pool room. (Id. at 927-28.) On the night of the shooting, Mr. Coles gave the gun to Mr. Sams for safekeeping, approximately thirty minutes after Mr. Sams arrived at the pool room. (Id. at 930-31.) Mr. Coles never recovered the weapon. (Id. at 931.)

Also on cross-examination, Mr. Coles testified that he arrived at the pool room at approximately 8:00 p.m. and was not in Cloverdale the evening of the shooting. (Id. at 922-24, 926.) He further testified that he neither threatened to shoot anyone nor heard Mr. Davis speak to the man with the beer. (Id. at 936-37.) Mr. Coles admitted that he did not see Mr. Davis shoot the officer and did not remember what Mr. Davis was wearing on the night of the shooting. (Id. at 930, 942.) Mr. Coles stated that he was five feet eleven inches tall and

weighed between one hundred forty-five and one hundred fifty pounds. (Id. at 920.) He explained that he often kept clothes at his sister's house because he liked to change after playing basketball in that neighborhood. (Id. at 924-25.) Mr. Coles admitted that, after leaving his sister's house, he walked back by the Burger King parking lot, then returned to her house. (Id. at 947-48.)

The afternoon after the shooting, Mr. Coles's brother and uncle took him to an attorney, for whom Mr. Coles had occasionally worked. (Id. at 948-49.) After listening to Mr. Coles, the attorney promptly took Mr. Coles to the police station to provide a voluntary statement. (Id. at 949.)

D.   Antoine Williams

Mr. Williams testified at the trial that, in the early hours of August 19, 1989, he was arriving for his 1:00 a.m. shift at the Burger King. (Id. at 955-56.) As Mr. Williams was pulling into the parking lot, he noticed three men following one individual, who was telling them he did not want to fight. (Id. at 957-58.) Mr. Williams parked his car facing the drive-through window, where a van was waiting for its order. (Id. at 961.) While the group was between Mr. Williams and the drive-through window, one of the three men ran in front of the lone individual and struck him with a gun. (Id. at 960-61.)

Immediately after the assault, a police officer came from behind the Burger King building, running toward the men and telling them to stop. (Id. at 961-62.) The two men not responsible for the assault took off running, but the third was trying to hide the weapon in his waistline. (Id. at 962.) As the officer came closer and the individual could not hide the gun, the individual shot the officer. (Id.) According to Mr. Williams, the shooting occurred a couple of feet behind him. (Id.) After the shooting, Mr. Williams went inside the Burger King and told his manager to call the police. (Id. at 962-63.)

On August 29, 1989, Mr. Williams was shown a photo spread and asked if he could recognize Officer MacPhail's murderer. (Id. at 963.) Mr. Williams identified Mr. Davis as the man who both hit the individual with the gun and shot the officer. (Id. at 963-64.) Mr. Williams also testified that Mr. Davis was wearing either a white or yellow shirt, contrary to an earlier statement given to the police. (Id. at 958.) Mr. Williams explained that he could not distinguish these colors due to the dark tint on his car's windows. (Id. at 959-60.) However, when Mr. Williams was shown his prior statement, in which he stated that the gunman was wearing either a white or blue shirt, he reaffirmed his prior statement, explaining that he could remember those details better immediately following the shooting. (Id.)

On cross-examination, Mr. Williams stated that the individual who was assaulted was struck on the left side of his head and that Officer MacPhail's murderer was not wearing a hat. (Id. at 967-68.) With respect to the photo spread, Mr. Williams admitted to seeing a wanted poster of Mr. Davis at work prior to being shown the photos and that he was only sixty percent sure that his identification was accurate. (Id. at 970-71.)

E.    Steven Sanders

Mr. Sanders testified at the trial that, in the early hours of August 19, 1989, he was a passenger in a van at the Burger King drive-through window. (Id. at 976-77.) While the occupants of the van were placing their orders, Mr. Sanders observed two African-American men walking toward the Burger King building, trailed by two other African-American men. (Id. at 977-78.) As they walked in front of the van, one of the trailing men caught up, pushed one of the leading individuals, and then struck him on the right side of his head with an object. (Id. at 978, 981.) After he was hit, the victim started banging on the hood of the van, asking for help and for someone to call the police. (Id.)

Turning his attention to the assailant, Mr. Sanders observed him start to run through the Burger King parking lot. (Id. at 979.) He then witnessed the attacker shoot a police officer, which was the first time Mr. Sanders noticed the

officer. (Id.) To Mr. Sanders, it appeared that the police officer was already standing in the parking lot, the gunman shooting him as the gunman ran past the officer. (Id. at 979-80.) The officer fell to the ground, at which point the gunman fired several more bullets. (Id.) When he was finished, the shooter fled toward the back of the Trust Company Bank building. (Id. at 980.) Mr. Sanders testified that the gunman was wearing a white t-shirt, dark shorts, and a white hat, and identified Mr. Davis as the individual responsible for both the assault and the murder. (Id. at 983.)

On cross-examination, Mr. Sanders admitted that he initially told the police he would not be able to identify the gunman, except by what he was wearing. (Id. at 984.) He further conceded that he saw a picture of Mr. Davis in the paper the day before he testified. (Id. at 983-84.) Mr. Sanders could identify neither the individual that was struck in the head nor the object used to strike him. (Id. at 986.) Also, Mr. Sanders testified that, after the shooting, he observed a second man, dressed in a black shirt and black pants, run in the same direction as the shooter. (Id. at 988.) This second individual appeared to be trailing the shooter, but not running with him. (Id.)

F.    Robert Grizzard

Mr. Grizzard, a staff sergeant in the United States Air Force, testified at the trial that he was at the Burger King drive-through window in the early hours of August 19, 1989 in a van, which he was driving. (Id. at 996-97.) While there, Mr. Grizzard noticed one individual chasing a second across the parking lot toward the Burger King. (Id. at 998.) When the man in front tripped and fell, the pursuer veered off and headed away from the building. (Id. at 998.)

While he was still at the window, Mr. Grizzard again saw the man who had been chasing the individual. (Id.) This time, Mr. Grizzard saw him strike another man in the head. (Id.) The individual who had been struck staggered toward the van's driver's side window, asking for someone to call the police. (Id.) Next, Mr. Grizzard observed a police officer running toward the assailant. (Id.) As the officer approached, the individual aimed a weapon at the officer and fired one shot. Struck by the bullet, the officer fell to the ground, at which point the gunman fired at least one more shot at the officer. (Id.) When he finished shooting, the gunman fled. (Id. at 998-99.) Mr. Grizzard described the weapon as dark in color with a short barrel. (Id. at 1009.)

Mr. Grizzard testified that the gunman was wearing a dark baseball hat and a light colored shirt, the exact color of which

he could not recall. (Id. at 999.) However, Mr. Grizzard was sure that the same individual who struck the man on the head shot the officer. (Id.) Mr. Grizzard was unable to identify Mr. Davis as the shooter. (Id. at 1002.)

On cross-examination, Mr. Grizzard reiterated that he did not see what the assailant used to strike the individual. (Id. at 1007-08.) Also, Mr. Grizzard again stated that he would not be able to identify the gunman. (Id.)

G.  Dorothy Ferrell

Ms. Ferrell testified at the trial that, on the night of August 18, 1989, she was a guest at the Thunderbird Motel, located across Oglethorpe Avenue from the Burger King . (Id. at 1011-12.) Around 1:00 a.m. on August 19, 1989, she was descending a stairwell at the motel when she heard screaming from the Burger King parking lot. (Id. at 1012-13.) She ran to the sidewalk to get a better view. (Id. at 1013.)

From the sidewalk, she saw three men in the Burger King parking lot. (Id.) As one of the men started running toward the Trust Company Bank property, a police officer entered the parking lot and told the men to stop. (Id. at 1013-14.) As the officer approached, one of the men, who was wearing a light yellow t-shirt, started moving backwards. (Id. at 1014-15.) Then the third man, who was wearing a white t-shirt and dark shorts, shot the officer. (Id. at 1015.) After the officer

56

fell to the ground, the gunman stepped forward, stood over the officer, and fired more bullets at him. (Id. at 1016.) Finished, the gunman ran toward the Trust Company Bank. (Id. at 1016.) At trial, Ms. Ferrell identified Mr. Davis as the individual who shot the officer. (Id. at 1021.)

Ms. Ferrell also testified that, two days after the shooting, she recognized a photograph of Mr. Davis and identified him as the gunman. (Id. at 1021-23.) According to Ms. Ferrell, she was speaking with a police officer about matters unrelated to the MacPhail shooting when she noticed a photograph of Mr. Davis on the front passenger seat of the officer's cruiser. (Id. at 1022.) She informed the officer that she recognized the man in the photograph as Officer MacPhail's murderer. (Id. at 1023.) Ms. Ferrell had not seen any pictures of Mr. Davis prior to that identification. (Id.) A few days later, Ms. Ferrell was shown a photo spread and asked if she recognized the gunman. (Id. at 1024.) Ms. Ferrell again identified Mr. Davis. (Id. at 1024-25.) Ms. Ferrell testified that she was pretty confident in the accuracy of her identification. (Id. at 1027.)

On cross-examination, Ms. Ferrell testified that the individual in the yellow t-shirt was looking straight at the gunman when he fired the first shot. (Id. at 1041.) Ms. Ferrell stated that the gunman passed in front of the Trust

Company Bank building while fleeing. (Id. at 1041-42.) She was then impeached with her police statement, in which she claimed that the gunman ran behind the Trust Company Bank building. (Id. at 1045-46.) Ms. Ferrell was also questioned on variations between her police statement and trial testimony regarding when the individuals in the yellow and white t-shirts started running. (Id. at 1044-46.) Finally, Ms. Ferrell admitted that the portion of her police statement recounting how Officer MacPhail had run the shooter off the Burger King property earlier in the day was incorrect. (Id. at 1046-48.) She explained that she had not seen Officer MacPhail run the shooter off the property, only some individuals dressed like the shooter. (Id. at 1048.) Ms. Ferrell opined that the inconsistency was due to a misunderstanding by the officer taking her statement. (Id. at 1048-50.)

Also on cross-examination, Ms. Ferrell was challenged regarding her prior descriptions of the shooter. (Id. at 1050-52.) In her police statement, Ms. Ferrell recalled that the shooter was six feet tall with a narrow face and slender build, while she described the shooter as slightly taller than her height—five feet—and with a medium build when she testified in Recorder's Court. (Id. at 1050-51.) In Recorder's Court, Ms. Ferrell testified that the shooter had lighter colored skin than her. (Id.) However, Ms. Ferrell admitted that she and Mr.

Davis had about the same skin color, while Mr. Coles's skin color was much lighter that hers. (Id.) Ms. Ferrell did state that she would not describe Mr. Coles's skin color as light, but rather as "red." (Id.) Also, Ms. Ferrell admitted that, despite testifying in Recorder's Court that the shooter had a narrow face, she never saw the shooter face-on, seeing only his left and right profiles. (Id. at 1052-53.) Finally, Ms. Ferrell testified that she saw Mr. Davis on television prior to her identification of his photograph.[7] (Id. at 1053-54.)

On redirect-examination, Ms. Ferrell explained a few of the inconsistencies between her various statements. Ms. Ferrell clarified that, in Recorder's Court, she stated the shooter was a little taller than Mr. Davis's attorney, not a little taller than herself. (Id. at 1064-65.) Also, Ms. Ferrell explained that she did not see only left and right profiles of the gunman's face. While she never observed his face straight on, Ms. Ferrell saw enough of the shooter's face at various angles to recognize that he had a narrow face. (Id. at 1066-67.)

## H.   Darrell Collins

Mr. Collins testified at the trial that he attended a party in the Cloverdale neighborhood with Messrs. Davis and Ellison on the night of August 18, 1989. (Id. at 1115.) When the three

---

[7] Ms. Ferrell also admitted during cross-examination that she had a number of prior criminal convictions for shoplifting and trespass. (Id. at 1060-61.)

arrived at the party, they went to the backyard, where Mr. Collins swam in the pool while Messrs. Ellison and Davis talked with some of the guests. (Id. at 1116-17.) They stayed for approximately an hour and a half. (Id. at 1118.) As the group was walking through the front yard to Mr. Ellison's car, with Mr. Davis in front, a car drove by the house with individuals hanging out of the windows, cursing and throwing items. (Id. at 1118-19.) As the car rounded the corner at the end of the block, Mr. Collins heard gunshots. (Id. at 1120.)

Contrary to his earlier statements, Mr. Collins testified at trial that he did not see who shot at the car. (Id.) The State challenged Mr. Collins with the contents of his August 19, 1989 police statement, which both placed Mr. Davis at the end of the block where the car turned and identified him as the shooter. (Id. at 1120-21.) At trial, Mr. Collins alleged that the police pressured him into identifying Mr. Davis as the Cloverdale shooter by threatening to charge him as an accessory to murder and give him a ten to twelve year prison sentence. (Id. at 1120-21, 1135-37.) Explaining his photo identification of Mr. Davis as the Cloverdale shooter, Mr. Collins testified that he identified Mr. Davis because the police asked if Mr. Collins knew any of the individuals in the photographs. (Id. at 1130.)

After the Cloverdale shooting, Mr. Ellison drove Mr. Collins to Mr. Ellison's home. (Id. at 1121.) Later, Mr. Ellison, accompanied by Messrs. Collins and Sams, were driving to purchase gasoline when they came upon Mr. Davis, who asked for a ride. (Id. at 1122.) Now accompanied by Mr. Davis, Mr. Ellison drove to the gas station, which was adjacent to Charlie Brown's pool room. (Id.) After Mr. Ellison purchased gasoline, he and Mr. Collins went inside the pool room. (Id. at 1123.) Mr. Collins could not recall if Mr. Davis went inside the pool room. (Id.)

Later, Mr. Collins observed Mr. Coles get into an argument with a gentleman in front of the pool room. (Id.) The two continued to argue as they walked in front of the Trust Company Bank building, toward the Burger King parking lot. (Id. at 1224, 1131.) Messrs. Collins and Davis followed the pair, also walking in front of the Trust Company Bank building. (Id. at 1131.) By the time they reached the parking lot, Mr. Collins was behind the three other individuals. (Id. at 1132.) As they approached the Burger King restaurant, Mr. Davis slapped the individual that Mr. Coles was arguing with on the right side of the face. (Id. at 1124-25.) Mr. Collins did not see anything in Mr. Davis's hand when he dealt the blow. (Id.)

After Mr. Davis slapped the individual, Mr. Collins noticed a police officer standing behind the Burger King building. (Id.

61

at 1125.)  As Mr. Collins was turning to exit the parking lot, he saw the officer making motions toward where Mr. Davis assaulted the individual.  (Id.)  Mr. Collins heard some gunshots as he was walking away, which caused him to start running.  (Id. at 1125-26.)  He ran back to the pool room, got in Mr. Ellison's car with Messrs. Ellison and Sams, and left the area.  (Id. at 1126.)  Mr. Collins stated that, on the night of the shootings, Mr. Davis was wearing blue or black shorts and a white t-shirt with writing on it.  (Id. at 1128.)

Mr. Collins testified that he did not see Mr. Davis with a firearm on the night of the shooting.  (Id. at 1126-27.)  Again, the State challenged Mr. Collins with his initial police statement where he described the gun Mr. Davis used at the Cloverdale shooting as short-barreled and black with a brown handle.  (Id. at 1127.)  Mr. Collins was also challenged with his August 25, 1989 police statement, in which he informed the police that he saw Mr. Davis with the weapon Mr. Davis used in Cloverdale both prior to and after that shooting.  (Id. at 1134-35.)  Yet, Mr. Collins contended that the police told him what to put in his statement and that his present testimony reflected the truth.  (Id.)  However, Mr. Collins did testify that, prior to the Cloverdale shooting, he saw Mr. Davis with a gun fitting the description that Mr. Collins provided in his police statement.  (Id. at 1128.)